UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA,     :     17 Cr. 722 (VSB)

          -v-                 :

SAYFULLO HABIBULLAEVIC SAIPOV,   :

           Defendant.   :

----------------------------------------------------------X


DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8750

Jennifer L. Brown, Esq.
   Attorney-in-Charge


TO:   Geoffrey S. Berman
       United States Attorney
       Southern District of New York
       One St. Andrew's Plaza
       New York, New York 10007

Attn:  Andrew Beaty/ Amanda Houle Matthew Laroche
       Assistant United States Attorney
       Southern District of New York

# TABLE OF CONTENTS

STATEMENT OF THE CASE......................................................................................................1

I.   Thirty Years of Experience With a Federal Death Penalty Has Demonstrated That It Operates in an Arbitrary, Capricious, Irrational and Discriminatory Manner.  This Court Should Declare the Penalty Unconstitutional and Strike the Notice of Intent to Seek the Death Penalty. ..........................2

   A.   The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty. ........................................................................................4

   B.   The federal death penalty as actually sought and imposed and what the figures mean...............9

   C.   The absence of any discernible principled basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional. ................................................................................................................11

   D.   The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect...................................................................................................19

   E.   Conclusion: the federal death penalty experiment has failed.......................................................35

II.  The Evolving Standards of Decency that Mark the Progress of  Maturing Society Have Rendered the Federal Death Penalty Invalid as Both Cruel and Unusual in Violation of the United States Constitution. ........................................................................................................................................38

III. The Supreme Court's *Ring* Decision Has Rendered the Federal Death Penalty Unconstitutional and the FDPA May Not Be Saved By A Judicial "Construction" That Creates a New Criminal Offense Whose Elements and Intertwined Procedures Have Neither Been Considered, Nor Enacted Into Law, By Congress. ................................................................................................................................45

   A.   Introduction and summary of the argument. ...................................................................................45

   B.   Aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt. ..............48

   C.   The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests exclusive authority to identify aggravating factors exclusively with the prosecutor....................................................................51

   D.   The Separation of Powers Doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA. ............53

   E.   Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA. .....................................................................................................61

IV.  Even If the FDPA Can Be Rendered Constitutional By a Finding by the Grand Jury of Gateway and Statutory Aggravating Factors, the "Special Findings" in the Indictment Should Be Stricken and the Death Notice Should Be Dismissed Because the Government Has Not Obtained an Indictment Consistent With the Requirements of the Fifth Amendment...................................................................67

   A.   Introduction ....................................................................................................................................67

   B.   The grand jury was not given the choice of holding Mr. Saipov to answer for a capital crime

because it was (presumably) unaware of the consequences of its "Special Findings." ....................67

C.   The Government did not obtain an indictment alleging all elements of a capital crime...........71

V.   The FPDA Fails to Provide a Structure Which Permits Jurors to Make a Reached Choice Between a Sentence of Life in Prison Without the Possibility of Release and Execution. .....................................72

CONCLUSION ...................................................................................................................................78

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,               :        17 Cr. 722 (VSB)

                        -v-                     :

SAYFULLO HABIBULLAEVIC SAIPOV,          :

                        Defendant.       :

-----------------------------------------------------------X


**MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY
BECAUSE THE DEATH PENALTY AND THE FEDERAL DEATH PENALTY ACT ARE
UNCONSTITUTIONAL**

**STATEMENT OF THE CASE**

Thirty years of experience with a federal death penalty has demonstrated that it operates in an arbitrary, capricious, irrational and discriminatory manner such that its application is never constitutional. This memorandum of law explains why.

Sayfullo Saipov is charged in a 28-count superseding indictment (ECF No. 59-1) alleging, among other charges, nine capital offenses. Counts One through Eight allege that he committed murder in aid of racketeering (*see* 18 U.S.C. § 1959(a)(1)), and Count Twenty-Eight alleges Mr. Saipov intentionally damaged a truck with reckless disregard for human life and caused the deaths of eight individuals. ECF No. 59-1 at 7-8, 13. The "aggravating circumstances" of these alleged capital crimes form the basis for the government's Notice of Intent to Seek the Death Penalty ("Death Notice") (ECF No. 80).

The indictment contains multiple "Special Findings as to Sayfullo Habibullaevic Saipov," representing an effort by the Government to comply with the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). As discussed *infra, Ring* held that aggravating factors in a capital case function as the equivalent of elements of the greater offense of capital murder. It is argued at Point

Five of this memorandum that the Government's unilateral "Ring fix" is not a fix at all and that, without congressional action, the FPDA is not constitutional. In addition to alleging "gateway" *mens rea* elements, the notice alleges numerous statutory and non-statutory aggravating factors. (*See* Death Notice, ECF No. 80).

Counsel note that many of the arguments which follow were resolved adversely to Mr. Saipov by the United States Court of Appeals for the First Circuit in *United States v. Sampson,* 486 F.3d 13 (1st Cir. 2007). These issues remain, however, matters of first impression in the Supreme Court because that Court has only reviewed a federal death sentence on its merits once. Additionally, *Sampson* was decided more than a decade ago, based on information then current. The motions here presented are based on updated information, most of it current as of the end of September 2018. Additionally, the First Circuit now has pending before it on direct appeal two cases where federal juries returned sentences of death: (1) the retrial of Mr. Sampson's case, where he was again sentenced to death, *United States v. Sampson*, No. 17-6001, and (2) the direct appeal of the sentence of death returned in the Boston Marathon Bombing Case, *United States v. Tsarnaev*, No. 16-6001. Many of the issues decided in *Sampson* will be subject to re-argument in those two cases.

## ARGUMENT

**I.  Thirty Years of Experience With a Federal Death Penalty Has Demonstrated That It Operates in an Arbitrary, Capricious, Irrational and Discriminatory Manner. This Court Should Declare the Penalty Unconstitutional and Strike the Notice of Intent to Seek the Death Penalty.**

A "modern" federal death penalty has been in effect for almost exactly 30 years. On November 18, 1988, Congress enacted a federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking. 21 U.S.C. § 848(e). The reach of the federal death penalty was later expanded when, on September 13, 1994, President Clinton signed into law the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 *et seq.* In March 2006, the procedural provisions of the ADAA, 21 U.S.C.

§§ 848(g), were repealed.  This prosecution is brought pursuant to the FDPA.

There are presently 62 men and one woman under an active federal sentence of death.[1]  Some have been there for more than 25 years.  Over the past quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself as arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, incapable of answering in a rational and predictable way the profound question of who should live and who should die.  This Court should strike it down.

If the government disputes the accuracy of any of the data underlying this argument, a hearing is requested at which counsel will establish the truth of all factual assertions made in this memorandum.

To summarize what is to follow:

- Only a tiny handful of those federal defendants who could face the federal death penalty ever do.

- The theoretically national federal death penalty is, in practice, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the FDP has consistently and disproportionately targeted members of minority groups.

- Of the few defendants actually targeted for death, nearly half (234/498) have been simply permitted to enter plea agreements that take death off the table.

- Of the cases that proceed to trial, two-thirds of defendants are spared the death penalty by juries or judges.

- There has been a sharp drop in the number of cases authorized by the Department of Justice for capital prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of federal death verdicts returned by juries.

- Approximately one-third of federal death sentences have been set aside on direct appeal or in proceedings brought pursuant to 28 U.S.C. § 2255.

---

[1] See Death Penalty Information Center, List of Federal Death-Row Prisoners, available at: https://deathpenaltyinfo.org/federal-death-penalty#PrisonerList

- Despite the fact that federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for more than 25 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.[2]

**A. The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: revisiting the constitutional premise of _Furman v. Georgia_ in the context of the federal death penalty.**

In 1972, the United States Supreme Court, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death-penalty schemes (including the then-existing federal penalty) as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. _Furman v. Georgia_, 408 U.S. 238 (1972).[3] The random and capricious imposition of the death penalty is perhaps best captured by the comparison drawn in _Furman_ by Justice Stewart between receiving a sentence of death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, … many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race … I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of

---

[2] _See_ Exhibit A at 1-13.

[3] Four years after _Furman_, the issue of capital punishment returned to the Court, this time in the cases of five men who had been prosecuted and sentenced to death—all in the South—under newly-enacted post-_Furman_ statutes.  On July 2, 1976, the Court issued opinions in those five cases. In three of the cases, the Court concluded that the states had successfully met the constitutional concerns raised in the _Furman_ opinion.  _Gregg v. Georgia_, 428 U.S. 153 (1976); _Jurek v. Texas_, 428 U.S. 262 (1976); _Proffitt v. Florida_, 428 U.S. 242 (1976).  The other two state schemes were struck down because they required automatic imposition of a sentence of death for certain murders without allowing for the "particularized consideration of all relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death."  _Woodson v. North Carolina_, 428 U.S. 280, 303 (1976) (Opinion of Justices Stewart, Powell and Stevens); _Roberts v. Louisiana_, 428 U.S. 325 (1976).

> death under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).  In

*Zant v. Stephens*, 462 U.S. 862 (1983), the Court summarized its holding in *Furman* as follows:

> A fair statement of the consensus expressed by the Court in
> *Furman* is that "where discretion is afforded a sentencing body on a
> matter so grave as the determination of whether a human life should be
> taken or spared, that discretion must be suitably directed and limited so
> as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court had also found that the death penalty was fraught with invidious

and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking

political clout, or if he is a member of a suspect or unpopular minority…."  *Furman*, 408 U.S. at 255

(Douglas, J., concurring).  Justice White, who concurred in the result, highlighted the infrequent

utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted
> with great infrequency even for the most atrocious crimes and that there
> is no meaningful basis for distinguishing the few cases in which it is
> imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring).  In fact, the infrequency with which defendants were targeted

for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See*

*Furman*, 408 U.S. at 248 n.11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at

309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 and 362-63

(Marshall, J., concurring).

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions

per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the

inference is strong that the punishment is not being regularly and fairly applied," 408 U.S. at 294, and,

"When the punishment of death is inflicted in a trivial number of the cases in which it is legally

available, the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of

little more than a lottery system." *Id.*  The United States is now a nation of 328 million people.  This does not include the 3.3 million people on Puerto Rico.  The last time this country carried out 50 or more executions was 2009.  Exhibit A at 74.  As noted earlier, in the 30 years since 1988, in thousands of cases where the penalty was theoretically available, the United States has carried out the federal death penalty three times. To reiterate Justice Brennan's observation, "the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system."

In the 30 years since the return of the federal death penalty, from a universe of thousands of potential federal capital cases, there have been 520 defendants authorized for capital prosecution. Exhibit A at 4.  Of this number, juries have returned 85 death verdicts involving 81 defendants, some of whom were sentenced to death twice after a first death verdict was set aside. *Id.* Three federal prisoners have been executed.[4]  There has not been a federal execution in 15 years.

It is estimated that the Attorney General authorizes just 14% of the cases potentially eligible for a capital prosecution.  Exhibit A at 4.  Thus, only a handful of the many federal defendants who are potentially eligible for capital punishment are ever targeted.  And those who are targeted are rarely sentenced to death and even more rarely are they executed.

Recently the Connecticut Supreme Court, employing state and federal constitutional analysis, declared Connecticut's capital punishment scheme unconstitutional in general and specifically as it applied to those who were serving a sentence of death when the Connecticut legislature repealed capital punishment.  *State v. Santiago*, 122 A.3d 1 (Conn. 2015).  That opinion also relied in part on the rarity with which sentences of death were pursued and imposed.  *Id.* at 38-39.

Also of recent significance is the dissenting opinion filed in 2015 by Justices Breyer and Ginsburg in *Glossip v. Gross*, 135 S. Ct. 2726, 2755-2780 (2015) (Breyer & Ginsburg, JJ., dissenting)

---

[1] Two federal executions took place in 2001 (Timothy McVeigh and Raul Garza) and one in 2003 (Louis Jones).  The McVeigh and Jones executions were carried out pursuant to the 1994 federal death penalty; Mr. Garza was executed pursuant to the 1988 enactment.  Exhibit A at 4.

("*Glossip* dissent").[5]  That dissent called into question the continued constitutionality of capital

punishment, citing, among other reasons, the increasing rarity of the punishment, its disproportionate

racial impact, its regional application, and the arbitrary manner in which it is sought.

 This argument—that the federal death penalty should be struck down because it is so

infrequently sought or imposed—should not be misunderstood as a call for more frequent use of the

federal death penalty.  As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of
> arbitrariness, but of informed selectivity.  Informed selectivity, of
> course, is a value not to be denigrated.  Yet, presumably the States
> could make precisely the same claim if there were 10 executions per
> year, or five, or even if there were but one.  That there may be as many
> as 50 per year does not strengthen the claim.  When the rate of
> infliction is at that low level, it is highly implausible that only the worst
> criminals who commit the worst crimes are selected for this
> punishment.  No one has yet suggested a rational basis that could
> differentiate in these terms the few who die from the many who go to
> prison.  Crimes and criminals simply do not admit of a distinction that
> can be drawn so finely as to explain, on that ground, the execution of
> such a tiny sample of those eligible.  Certainly the laws that provide for
> this punishment do not attempt to draw that distinction; all cases to
> which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

 At the time *Furman* was decided, as the opinion itself reflects, 15-20% of convicted murderers

and rapists were sentenced to death in those jurisdictions where the death penalty was available for

such offenses.  *Furman*, 408 U.S. at 386 n.11 (Burger, C.J., dissented, citing four sources to support the

statistic).  Justice Powell, also dissenting, cited similar statistics.  *Id.* at 435 n.19.  For his part, Justice

Stewart utilized Chief Justice Burger's statistical analysis to lend further support to his conclusion that

the death penalty was, indeed, in an Eighth Amendment sense, "unusual."  As stated by Circuit Judge

Gregory of the Fourth Circuit, dissenting in a case where the federal death penalty was imposed:

---

[4] Although there was a second dissent in *Glossip* on the merits of the issue presented—the constitutionality of the drugs utilized in lethal injections—this brief will utilize the shorthand "*Glossip* dissent" to refer to the opinion of Justices Breyer and Ginsburg.

> When the government selects a few offenders from such a large
> pool for execution, it cannot further its legitimate penological interests;
> instead it merely inflicts gratuitous pain and suffering.

*United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, Cir. J., dissenting).

In *Furman*, arbitrariness and caprice were determined to be inevitable side-effects of a rarely-imposed punishment of death. This view is in harmony with Justice White's observations, premised on his experience reviewing hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is
> exacted with great infrequency even for the most atrocious crimes and
> that there is no meaningful basis for distinguishing the few cases
> in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring); *see also*, Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed."  In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion).  This understanding was repeated in *Woodson v. North Carolina*, 428 U.S. 280, 295 n.31 (1976).

After 30 years of experience with a post-*Gregg* federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases examined in *Furman*. Being sentenced to death in the federal system is truly akin to being struck by lightning.  Indeed, as argued *infra*, no meaningful basis may be discerned for distinguishing the cases of those sentenced to death from those spared the sentence, even among the most extreme.  In 2011, the Death Penalty Information Center published a report on this issue, entitled, "Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976" (Death Penalty

8

Information Center Washington, DC 2011).[6]  The report catalogues the arguments and collects the

data for declaring the scheme of capital punishment that is practiced in our courts unconstitutional.

*See also*, G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L.

Rev. 425, 431 (2010) ("The infrequency of the federal death penalty—with 67 federal death sentences

in the face of over 150,000 murders—makes death by lightning-strike look positively routine.  Indeed,

a federal death sentence is akin to winning (or in this instance losing) the lottery.") (noting that there

were 424 deaths by lightning in the years 1999-2008).

**B.  The federal death penalty as actually sought and imposed and what the figures mean.**

The current state of the post-*Gregg* federal death penalty, as it has been sought and imposed, is

summarized in the following table.

**TABLE 1: <u>THE STATUS AND DISPOSITION OF ALL POTENTIAL
FEDERAL CAPITAL CASES FROM NOVEMBER 1988 TO SEPTEMBER 2018</u>**

- Potential cases:                                          4,144

- Presently pending DOJ review:                    305

- Defendants authorized for capital prosecution:     520

- Presently pending or in trial:                      23

- Jury sentences of death:                            85

- On federal death row, active death sentence     62

- Executed:                                              3

Exhibit A at 3-5. Attachment A to the declaration is an Excel spreadsheet summary of the outcome of

every completed authorized federal capital case since 1988, current as of October 12, 2018. *Id.* at 15-

43.

Subtracting the cases presently under review, the Department of Justice has authorized local

_____

[6] Available at: https://deathpenaltyinfo.org/documents/StruckByLightning.pdf

prosecutors to seek the death penalty in approximately 14% (520/3,389) of cases of individual federal defendants charged with death-eligible offenses and therefore potentially exposed to a capital prosecution. In *Furman*, the Court cited the infrequency with which the death penalty was sought and imposed as a circumstance virtually guaranteeing the arbitrary and capricious application of the ultimate penalty. This conclusion was reached on the basis of a showing that, on a nation-wide basis, fewer than 20% of defendants convicted of capital crimes were actually sentenced to death. In the federal system, the figure is lower by a factor of 10. In fact, far fewer than 20% of those eligible for federal capital punishment are even *exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to death. Taking the highest figure for actual death sentences returned against federal defendants by federal juries at 85, approximately 2.0% (85/4,144) of all potentially death-eligible federal defendants—one in fifty—were in fact sentenced to death. In terms of federal executions to date—three—the figure is infinitesimal. This baseline figure includes 23 authorized cases that are pending trial or re-trial. It is reasonable to predict that a certain number of those cases will be resolved by plea agreement and that a certain number will proceed to trial, with an overall statistical likelihood of very few resulting in death sentences. It is also reasonable to assume that some of the 62 federal inmates now under an active sentence of death will succeed in appellate or post-conviction challenges to their convictions or sentences.

These figures demonstrate that in terms of decisions reached by juries and judges, even in the case of defendants who qualify as the "worst of the worst" and were therefore targeted for the federal death penalty, life sentences result in two-thirds of the cases that actually proceed to a penalty-phase. As noted *infra*, there are truly shocking regional variations in where death sentences are returned. Two-thirds of federal defendants who stand trial for their life in the Fifth Circuit are sentenced to death. In the Second Circuit the figure is 10 %. In the D.C. Circuit, the figure is 0%.

Thus, utilizing an analysis that was persuasive to the Supreme Court in *Furman*, the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf. Roper v.*

*Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books"); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon"); *see also Thompson v. Oklahoma*, 487 U.S. 815, 822 n.7 (1988) (plurality) ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance.").  Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational manner.   On this basis, the court should strike it down.

   **C.  The absence of any discernible principled basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

   The Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious.  In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."  More recently in *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008), the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  For that reason, the Court wrote, "[C]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them 'the most deserving of execution."  *Id.* (citations omitted).  In practice, the federal death penalty has failed to meet this constitutional standard and operates in an arbitrary and irrational manner.  This point was made both in the *Glossip* dissent and in the Connecticut Supreme Court's *Santiago* opinion.

11

An examination of the federal death penalty in operation shows that there is no consistency or predictability in the manner in which federal juries (and in three cases, federal judges) have imposed or declined to impose the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to trial.  The Federal Death Penalty Resource Project, described by Mr. McNally in his declaration (Exhibit A at 1-2) maintains a compendium of penalty-phase verdict sheets returned in virtually every federal capital case that has proceeded to trial since 1988.[7]  Those hundreds of federal verdict sheets offer clear insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system.  There is no rhyme, reason, or predictability concerning who is sentenced to death and who is spared or who simply never has to face a jury on a life-or-death decision.  The Project website also maintains a summary of the factual circumstances and outcome to hundreds of capital cases, whether tried or not, and much other useful information regarding the federal death penalty.

This argument is not refuted by simply pointing out that there are always difficulties inherent in comparing cases.  A review of summaries of the cases and the verdict sheets available to this court on line should put that reflexive and simplistic argument to rest.  Some examples of the outcomes in federal capital cases follow:

- *United States v. Joseph Sablan and William Guerrero* (C.D. Ca.): Two inmates murdered a federal corrections officer at USP/Atwater in 2008.  Both had prior murder convictions and were serving life sentences.  One defendant had murdered a prison guard previously while serving a sentence in Guam.  In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Jessie Con-Ui* (M.D. Pa.): Federal inmate, with prior murder conviction and life sentence, murders federal correctional officer at USP/Canaan; murder captured on videotape, more than 200 stab wounds inflicted.  Defendant convicted and sentenced to life.

- *United States v. Anthony Battle* (N.D. Ga.): In 1994 a federal inmate serving a life sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer.  Tried, convicted, sentenced to death.  Remains on death

---

[7] The following is a link to those verdict sheets, last visited November 4, 2018: https://fdprc.capdefnet.org/verdict-forms

12

row 24 years later.

- *United States v. Roy C. Green* (C.D. Ca.): In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second.  Three other officers were also seriously injured. Mr. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Larry Lujan*, (D.N.M.): Lujan was convicted of what the Tenth Circuit described as "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]."  *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010).  In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome."  *Id.* at 853.  These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire…. The victims' eleven-year-old daughter discovered the bodies the next afternoon."  *Id.*  Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future.  On October 5, 2011, after the jury was unable to reach a unanimous verdict, Larry Lujan received a life sentence.

- *United States v. Dzohkhar Tsarnev* (D. Mass.):  Bombing of Boston Marathon, murder of a police officer, total of 4 killed, dozens injured.  Tried, convicted, sentenced to death, on appeal.

- *United States v. Timothy McVeigh*, (D. Co.): The Oklahoma City bombing case. 168 dead. Hundreds injured.  Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols*, (D. Co): McVeigh's co-defendant. Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*, (S.D.N.Y.):  Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph*, (N.D. Al.): The Olympic and abortion-clinic bomber. Victims included a police officer.  Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive."  Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui*, (E.D. Pa.): Defendant convicted of causing thousands of deaths in the September 11, 2001, attacks on the United States.  Sentenced to life by jury.

- *United States v. Theodore Kaczynski*, (E.D. Pa.): The Unabomber.  Three murders by mail-

bombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner* (D. Az.): Mass shooting at public event resulting in 6 deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Basciano*, (E.D.N.Y.): Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

- *United States v. Duong*, (N.D. Ga.): Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in 1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3 capital homicides (arising out of a string of robberies), and an additional 5 RICO murders. On December 15, 2010, a federal jury sentenced Mr. Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort*, (N.D. Ga.): Attorney General approved 40 year plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v. Joseph Minerd*, (W.D. Pa.): Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean*, (D. Vt.): Defendant sends pipe bomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

- *United States v. Billy Cooper*, (D. Az.): Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard*, (W.D. Tex..): Car-jacking double homicide. Tried, convicted, sentenced to death.

- *United States v. Gary Sampson*, (D. Mass.): Two murders during separate car-jackings. Plead guilty, sentenced to death by jury. Later set aside. Again sentenced to death on re-trial. On appeal.

- *United States v. David Paul Hammer,* (M.D. Pa.): Prison inmate guilty of strangling to death cellmate at USP/Allenwood. Sentenced to death. Sentence later vacated. Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll*, (M.D. Pa.): Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood. Same judge, same courtroom, same defense attorneys as *Hammer*. Sentenced to life.

14

- *United States v. Storey*, (D. Kan.): Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth.  Plea agreement.  Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle*, (D. Co.): Inmates at USP/Florence attack two suspected "snitches," one killed one injured.  Plea agreements.  Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan*, (D. Co.): Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers. Defendants tried separately.  Life verdicts in each case.

- *United States v. Barry Mills*, *et al.* (C.D. Ca.): A RICO mega- indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders.  Initially 27 defendants were death- eligible and 14 defendants were actually authorized for capital prosecutions.  After two lengthy trials, juries spared the first four defendants facing the death penalty—the alleged leaders of the gang—and the government has withdrawn its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng*, (E.D.N.Y.): Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen enter plea agreements.  Attorney General withdraws death authorization shortly before Peng trial. Peng convicted after trial.  All three sentenced to life.

- *United States v. Louis Jones*, (N.D. Tex.): Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

- *United States v. Chevy Kehoe and Daniel Lee*, (W.D. Ark.): Triple murder of two adults and small child in connection with activities of white supremacist organization.  Tried and convicted together.  Kehoe—considered more culpable – sentenced to life.  Lee sentenced to death by the same jury.

- *United States v. Michael Jacques*, (D. Vt.): Defendant with prior convictions for sexual assaults kidnaps, rapes and murders 12-year-old niece.  Allowed to enter guilty plea; sentenced to life.  Case authorized for federal capital punishment.  Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa*, (E.D.N.Y.): Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul*, (W.D. Ark.): Murder of elderly retired National Parks employee.  Victim shot while bound and gagged.  At separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

15

- *United States v. Kristen Gilbert*, (D. Mass.): VA nurse murders four patients and attempts to murder three more.  Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, (E.D. Pa.): Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

- *United States v. Bille Allen and Norris Holder*, (W.D. Mo.): Fatal shooting of bank teller during robbery.  Tried, convicted, and both defendants sentenced to death.

The disparities are particularly striking in cases where murder has taken place in the context of drug-dealing:

- *United States v. Azibo Aquart*, (D. Conn.): Three drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Azikiwi Aquart* (D. Conn.): Same three drug-related murders committed with his brother Azibo.  Pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton*, (E.D. Pa.): Eleven drug-related murders.  Tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford*, (E.D. Pa.): Six drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff*, (S.D.N.Y.): Fourteen drug-related murders.  Plea agreement.  Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez*, (S.D.N.Y.): Torture murder of suspected informant.  Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (S.D.N.Y.): Execution-style triple murder by father and son.  Tried, convicted, sentenced to life.

- *United States v. Thomas Pitera*, (E.D.N.Y.): Nine drug-related murders in organized crime and large-scale drug trafficking context.  Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz*, (W.D. Mo.): One drug-related murder and one attempted murder.  Tried, convicted, sentenced to death.

- *United States v. John Bass* (E.D. Mich.): Four drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore*, (D.D.C.): Thirty-one drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson*, (N.D. Ill.): Two drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Peter Rollock*, (S.D.N.Y.): Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

- *United States v. Tommy Edelin*, (D.D.C.): Fourteen drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal*, (E.D. Tex.): Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson*, (E.D. Pa.): Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza*, (S.D. Tex.). Three drug-related murders. Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis*, (E.D. Pa.): Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Emile Dixon*, (E.D.N.Y.): Two drug-related murders, including machine-gunning death of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Anthony Jones*, (D. Md.): Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker* (N.D.N.Y.): Two defendants kill a drug-dealer and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years- old. Both defendants tried, convicted, sentenced to life.

These are just selected cases from the larger pool of potential and authorized federal capital cases. This argument draws further force from the cumulative effect gained from reviewing the summaries of authorized cases compiled by the Federal Death Penalty Resource Counsel Project and the verdict sheets available on-line. By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the

"worst of the worst" the federal system has to offer.  Indeed, it is likely there is not a crime on the list as to which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case—indeed, in the overwhelming *majority* of such cases—juries (and in three instances judges) returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

The point is that one cannot read these chronicles of the many ways in which man can demonstrate his inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors.  Yet, for indiscernible reasons, some defendants were sentenced to death, while an overwhelming majority were not. If any basis can be discerned, it is, as the following discussion illustrates, race, region, and gender and, perhaps, plain bad luck; none of which are permissible criteria for selecting defendants for capital punishment.

In *Walker v. Georgia*, 129 S. Ct. 453 (2008), Justice Stevens, dissenting from the denial of *certiorari*, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "[T]he likely result of such truncated review … is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment."  *Id.* at 457 (Stevens, J., dissenting).  *See* B. Sarma, *Furman's Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill* Furman's *Promise*, 2009 Cardozo L. Rev. de novo 238 (2009).  As argued in the Cardozo article:

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness.  In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*.  If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

*Id.* at 242.

Mr. Saipov urges this court to strike down the death penalty for the above-stated reasons.

### D. The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect.

1.  <u>Introduction</u>.

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African- Americans and Hispanics.

The grossly disproportionate racial targeting of racial minorities for federal capital prosecution has remained unchanged for 30 years. By 1994—barely six years after the return of a "modern" federal death penalty—obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

> Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on The Judiciary, 103rd Congress, 2nd Session, March 1994. That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87%) were black or Hispanic. *Id.* Presently the figure is 71%, hardly an "improvement" to boast of. Exhibit A at 5.

Earlier evidence of the potential race-effect of the death penalty had been examined by the

agency formerly known as the General Accounting Office (now the Government Accountability Office).  At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty.  21 U.S.C. § 848(o)(2) (Repealed).  The GAO in fact undertook that study in 1990 and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.

> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and low quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-57, Feb. 1990) at p. 5.  In a 1999 law review article, Professor Rory Little, writing from the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. R.K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 450-90 (1999).

Thus, from the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematic.  This shameful pattern remains in place.  Two-thirds of the defendants authorized for a federal capital prosecution are members of racial minority groups.  This includes Mr. Saipov.

2.    The 2000 DOJ Study.

In a press conference that took place on June 28, 2000, President Bill Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the

death penalty." In response, Clinton said the following about the application of the federal death penalty, acknowledging concerns about race and regional practices:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of both those issues at this time.

 (Transcript of President Clinton's June 28, 2000 press conference: available online at

http://www.presidency.ucsb.edu/ws/index.php?pid=1666 (Last visited September 22, 2018).

On September 12, 2000, the Department of Justice released the comprehensive study alluded to by President Clinton in his remarks. The study detailed how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[8] The essence of the 2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. The Study reported that federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row had been sentenced to death in the South. Virginia and Texas had contributed four defendants to federal death row. At the time of the Study's release, no other federal jurisdiction had sentenced more than a single defendant to death.

In terms of which defendants faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%). *See* Table 1A at p. T-2 of DOJ Study. Thus, as of the summer of 2000, more than 70% of the federal defendants targeted for the death penalty had been non-whites.

---

[8] Available at:
https://www.justice.gov/sites/default/files/dag/legacy/2000/09/13/_dp_survey_final.pdf

In addition to the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

> From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.

DOJ Study at 14.  The release of the report drew the following public comment from officials at the Justice Department and the White House.

> Saying she was "sorely troubled" by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, *Reno Troubled by Death Penalty Statistics*, N.Y. Times (September 13, 2000).[9]

The *Times* also reported the reaction of then Deputy Attorney General Eric Holder, who was, at the time, the highest-ranking African American at the Justice Department:

> I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity.

*Id.*

The DOJ Report noted additionally that the recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  DOJ Study at 43.  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.*  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-

---

[9] Available at: https://www.nytimes.com/2000/09/13/us/reno-troubled-by-death-penalty-statistics.html

protocol" period—November 1988 through January 27, 1995—the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization. The approval rate for those cases was 90%. DOJ Study at 10.

In *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *rev'd*, 532 U.S. 1035 (2002) (per curiam), the Sixth Circuit quoted at length from the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. 266 F.3d at 538. Considering the impact of the study, Judge Sand in *United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence (unchanged 18 years later) "indeed troubling," but ultimately rejected a challenge to that capital prosecution. In confirmation hearings the year following the Study's release, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." Quoted in *United States v. Bass, supra*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations or remedy arbitrary and invidious practices. As this discussion continues, it will be seen that nearly two decades later, nothing has changed. If anything, to quote the title of Mr. McNally's DePaul Law Review article, a "non-existent" problem has gotten worse. K. McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DePaul L. Rev. 1615 (2004).

The pursuit of the death penalty on the basis of race is shameful and cannot be tolerated under the Eighth Amendment. This Court is respectfully urged to do something about it by striking down the death penalty.

       3.      <u>The persistent capricious circumstance of region</u>.

As to the regional bias of federal capital prosecutions, the FDPA remains a largely Southern phenomenon. Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states of the former Confederacy. Additionally, these states sentence federal defendants to death at a significantly higher rate than elsewhere in the country.

**TABLE 2: 1988-2018**

**STATES WITH MORE THAN ONE
FEDERAL DEATH VERDICT**

Texas—16
Missouri—10
Virginia—8
Louisiana—4
North Carolina—4
South Carolina—3
Georgia—3
Oklahoma—3
Maryland—2
Pennsylvania—2
Arkansas—2
California—2
Florida—2
Illinois—2
Iowa—2
New York—2
Massachusetts—2
West Virginia—2

Exhibit A at 6-13.

The table on the following page summarizes the chances of receiving a death sentence by the happenstance of the circuit in which the case is tried.

**TABLE 3**

**DEATH SENTENCING RATE BY CIRCUIT**

| CIRCUIT | DEFENDANTS TRIED | DEATH SENTENCED | RATE |
|---------|------------------|-----------------|------|
| FIRST | 12 | 2 | 17% |
| SECOND | 31 | 3 | 10% |
| THIRD | 18 | 2 | 11% |
| FOURTH | 72 | 15 | 21% |

| | | | |
|---|---|---|---|
| FIFTH | 31 | 21 | 68% |
| SIXTH | 19 | 3 | 19% |
| SEVENTH | 9 | 3 | 33% |
| EIGHTH | 32 | 15 | 47% |
| NINTH | 11 | 4 | 18% |
| TENTH | 18 | 5 | 28% |
| ELEVENTH | 20 | 6 | 30% |
| D.C. | 3 | 0 | 0% |

Exhibit A at 6-13.

It should go without saying that a sentence of death should not depend on where a federal prosecution happens to be brought. This is the essence of an Eighth Amendment claim of the arbitrary and capricious infliction of the ultimate punishment.

In *Santiago*, noting the regional caprice of the death-penalty on a nation-wide basis, the Connecticut Supreme Court examined the death-penalty sentencing rates of the 13 states that made up the Confederacy and concluded that those states were responsible for 75% of the executions carried out in the United States since 1976. *Santiago*, 122 A.3d at 52.

In terms of federal death verdicts and the confederacy (the number of federal executions—three—is too low to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas) shows that 49 of 81 federal death verdicts have come out of the states that formed the confederacy, more than 62% of all federal capital verdicts. Just three of those former confederate states—Texas, Missouri and Virginia—account for 32 federal death verdicts, 40% of the total. The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

When one examines the numbers on a circuit basis, the results reflect the same regional bias. To put it bluntly, if we have a national death penalty it should not matter whether you are tried in Texas or New York in terms of the likelihood of receiving a death sentence. But that very much is the unconstitutional reality.

25

Historically, the death penalty has been a largely Southern phenomenon; that remains the case today. As of November 2, 2018, there have been 1,490 post-*Gregg* executions carried out in the United States.  Exhibit A at 74.  Of these, 1,217—or 82%—have been carried out by Southern states.  *Id.* at 76.  Five states alone—Texas, Oklahoma, Virginia, Missouri and Florida—have accounted for 968 executions, substantially more than half (65%) of all post-*Gregg* executions.  *Id.*  With this historical perspective in mind, it is no surprise that those federal jurisdictions in states with an established "culture of death"—often with an history of *de facto* and *de jure* racial discrimination, and slavery—reflect that culture, consciously or not, in decisions to pursue the death penalty.  Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same.  Regional bias, however, is inimical to a national penalty that is, theoretically at least, that sought and imposed using consistent national standards.  The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in a given case.  The Department has failed miserably at this.

The "ideal" of a national standard aside, the federal death penalty well into 2018 continues to be a Southern phenomenon and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts.  Thus, "[o]f the 85 federal death sentences imposed by juries since 1988, 55 [65%] have come from the traditional 'death belt' states, the states that have historically executed the most people." Exhibit A at 7.  In a study of this issue published in 2010, the authors noted:

> Geographic disparities … persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization.  Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations.  More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row.  Two-thirds of districts have not sentenced anyone to death.  Nearly one-third of

federal districts have not sought a death sentence.  Fewer than 20% of
federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty", 85 Wash. L.

Rev. 425, 429-430 (2010).  As of 2015 25% of the 94 federal districts have *never* had an authorized

federal capital case.  Exhibit A at 7.  The reality is there has been no appreciable change since the 2000

DOJ Study, and the federal death penalty remains a disproportionately and distinctly regional

phenomenon.  It thus appears—whether one takes a micro or macro view—that the irrational caprice

of geographical location has as much to do with facing the federal death penalty as does the crime

committed.  This is the essence of arbitrariness and caprice.

> 4.  <u>The continuing and unabated practice of targeting minorities for the federal death
> penalty, the long-documented "white-victim effect," and the emergence of a "white
> female victim effect" further demonstrate the arbitrary and irrational operation of the
> federal death penalty.</u>

After more than 25 years of a federal death penalty, it is undeniable and clear that the patterns

of race and region that disturbed and troubled government officials 15 years ago persist.  It seems

undeniable that these problems are intractable and part of the DNA of capital punishment, including

the federal version.  The following tables reflect the present state of affairs (Exhibit A at 5):

TABLE 4

THE RACE OF THE 520 FEDERAL DEFENDANTS
<u>TARGETED FOR FEDERAL EXECUTION 1988-2018</u>

| <u>RACE OF<br>DEFENDANT</u> | <u>NUMBER</u> | <u>PER CENTAGE</u> |
|---|---|---|
| African-American | 258 | 49% |
| Caucasian | 139 | 27% |
| Latino | 97 | 19% |
| "Other" | 26 | 5% |

As Table 4 demonstrates, in terms of targeting decisions, 81% of those selected for capital

prosecutions are members of minority groups.  At the time of the 2000 DOJ Study, the figure was

70%.  As the pie chart on the following page demonstrates, the disproportionate targeting of

27

minorities for the federal death penalty has had what would be the expected effect on the population

of death row.  Thus, as of the fall of 2018, 60 percent of those presently on federal death row are non-

white.  This is an unacceptable state of affairs and, bluntly, one that should be a source of intense

concern to the Justice Department.  The chart here reproduced would have looked the same in the

year 2000.



(a)      <u>The law on race and the death penalty</u>.

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan,

Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-

American defendant charged with capital murder asked his attorneys what the chances were that he

would be sentenced to death and what would factor into that process.  Based on the statistical analysis

presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense counsel would have to level with their client and tell him that his race would play an important role—perhaps a determinative one—in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).  In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans.  One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks."  481 U.S. at 287.

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Id.* at 373-74.

The historical truth is that in the United States capital punishment and race have always been intertwined. That state-of- affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society.  *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DePaul L. Rev. 1591 (2004).

In Connecticut's recent *Santiago* decision, the issue of race and the death penalty in that affluent northeastern state was examined with the following conclusion:

> [D]ata from three authoritative governmental sources…all suggest that the death penalty in Connecticut continues to be imposed

> disproportionately based on the race and ethnicity of the offender and
> the victim. The alleged disparities are significant and hold across
> hundreds of cases. We are not aware of any study or report to have
> reached a contrary conclusion.

*Santiago*, 122 A.3d at 91.  Most recently, the Supreme Court of the State of Washington reached the

same conclusion, invalidating its capital-punishment statute on a finding that jurors in that state were

three times more likely to reach a death verdict in a case involving a black defendant than for a white

defendant in a similar case.  *State v. Gregory*, 427 P.3d 621, 633-34 (Wash. 2018).

In *Furman*, Justice Douglas had explored the ugly correlation between race and the death

penalty and concluded:

> In a Nation committed to equal protection of the laws there is
> no permissible "caste" aspect of law enforcement. Yet we know that
> the discretion of judges and juries in imposing the death penalty enables
> the penalty to be selectively applied, feeding prejudices against the
> accused if he is poor and despised, lacking political clout, or if he is a
> member of a suspect or unpopular minority, and saving those who by
> social position may be in a more protected position. In ancient Hindu
> law, a Brahman was exempt from capital punishment, and in those
> days, "[g]enerally, in the law books, punishment increased in severity as
> social status diminished." We have, I fear, taken in practice the same
> position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted).  As recently as 1991, the

execution of a white man for the murder of a black man was front- page news as an event that had not

occurred in the nation for 50 years.  *See* D. Margolick, *Rarity for U.S. Executions: White Dies for Killing*

*Black*, N.Y. Times, (September 7, 1991, p.1, col. 1).  And the Death Penalty Information Center reports

that since executions resumed in the wake of *Gregg,* there have been 20 executions of a white defendant

for killing a black victim; but there have been 288 executions of black defendants who killed a white

victim.  Exhibit A at 75.

Mr. Saipov's showing in this motion is sufficient to establish a case of arbitrariness in the

enforcement of the federal death penalty. It is difficult to imagine how, other than racism, one can

explain the arbitrary manner in which the federal death penalty has been administered in terms of the

race of those who are targeted. *See Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

There is strong and consistent evidence that minority defendants are many times more likely than white defendants to face the death penalty at the hands of the federal government. This is a problem that demands our government's "most rigid scrutiny" of the kind described in *Loving*. The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments. *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences—but not other mandatory sentences—are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases).

Secondly, it is obvious that racial discrimination is a species of the arbitrariness condemned in *Furman*. This is apparent from the opinions of the Justices in the majority and of those in dissent alike. For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and thus ran directly counter to "the desire for equality … reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-366 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J. dissenting); *id.* at 449-50 (Powell, J., dissenting). Later Supreme Court cases have applied this interpretation. Thus, for example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman* would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as … the race …

31

of the defendant."  462 U.S. at 885.

Taken together, then, these two points can be summarized as follows: The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the (implicit) equal protection clause of the Fifth Amendment.  In *Graham v. Collins*, 506 U.S. 461 (1993), Justice Thomas' concurring opinion summed this point up succinctly when he noted that racial prejudice or bias in the context of capital punishment "is the paradigmatic capricious and irrational sentencing factor."  *Id.* at 484.  Where a death penalty appears to operate so as to institutionalize racism, it offends the same constitutional values that yielded *Furman* and this nation's abandonment of capital punishment.

(b)    *The effect of race and gender of victim in the application of the FDPA.*

For obvious reasons, a capital punishment scheme which explicitly provided that the death penalty is more appropriate where the victim is white or white and female would not be constitutional. A scheme that operates in practice to the same effect is no better.  On the question of race-of-victim, research that is consistent across several decades has demonstrated that those who kill whites are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups.  A race-of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system.  In their *Glossip* dissent, Justices Breyer and Ginsburg noted, "Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty."  *Glossip* dissent, 135 S. Ct. at 2760.  The dissenting justices also noted that "[M]any studies have found that the gender of the victim makes a not- otherwise-warranted difference."  *Id.* at 2761.

For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, *Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception*, 53 DePaul L.  Rev. 1411, 1423-1428 (2004).  Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83%

range, while whites were victims of murder in only approximately 45% of such cases.  *Id* at 1423.  *See also,* K. McNally, *Race and the Federal Death Penalty: A Non-existent Problem Gets Worse*, 53 DePaul L. Rev. 1615 (2004).  The dissenters cited the following law review article which had synthesized more than 20 studies conducted between 1990 and 2013, all reaching the same conclusion, *i.e.*, that the race of the victim is a significant factor in which defendants receive the death penalty with those who kill whites significantly more likely to be sentenced to die.  Shatz & Dalton, *Challenging the Death Penalty With Statistics:* Furman, *McCleskey, and a Single County Case*, 34 Cardozo L. Rev. 1227, 1245-12551 (2013).

Recent studies have begun to demonstrate that there is a gender-based irrationality to capital punishment schemes as well, with the net effect that those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males.  This is further evidence of the arbitrary, capricious and biased nature of the death penalty.

Studies of state capital schemes have uniformly detected a significant race- of-victim effect. *See, e.g.*, Marcia Wilson, *The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: an Empirical Analysis*, 38 N.M. L. Rev. 255, 260 (2009) ("The data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die.").  In addition, research commissioned by state governments in, for example, California, Maryland, Nebraska and Illinois has consistently found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. *See, e.g.*, *Maryland Commission on Capital Punishment: Final Report To the General Assembly* (2008), p. 10 ("The evidence shows that the troublesome factor of race plays a dominant role in the administration of the death penalty in Maryland.  Research presented to the Commission showed that cases in which an African-American offender killed a Caucasian victim are almost two and a half times more likely to have death imposed than in cases where a Caucasian offender killed a Caucasian victim."); State of Illinois, *Report of the Governor's Commission on Capital Punishment* (2002), p. 196 ("When certain facts in

aggravation, such as previous criminal history of the defendant, are controlled for, there is evidence that the race of the victim influences who is sentenced to death.  In other words, defendants of any race who murder white victims are more likely to receive a death sentence than those who murdered black victims.") (emphasis in original).

Although the significance of the victim's race in death sentencing outcomes has been discussed for at least 40 years, very little prior research has examined whether the combined effect of victim race and gender improperly skews sentencing outcomes in capital cases.  This area has only recently gained the attention of researchers.  Research has identified just three empirical studies, all very recent, that considered the joint effects of victim race and gender in capital prosecutions.  Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present.[10]  A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases spanning the two decades from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination.  *See* Hindson, Potter and Radelet, *Race, Gender, Region and Death Sentencing in Colorado*, 1980- 1999," 77 Col. L. Rev. 549 (2006).  The authors concluded:

> The death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization.

*Id.* at 577.

A November 2007 study analyzed state court data from Georgia cases in the 1970s and

---

[10] As noted earlier, in the *Glossip* dissent, it was observed, that "[M]any studies have found that the gender of the victim makes a not- otherwise- warranted difference."  *Glossip*, 135 S.Ct. at 2761.

concluded:

> Defendants who murder females are more likely to receive a death sentence than defendants who murder males. Furthermore, we show that large differences exist in the likelihood of receiving a death sentence when the variables "victim race" and "victim gender" are considered jointly. Cases that involve white female victims are treated the most harshly…."

Marian R. Williams, Stephen Demuth & Jefferson E. Holcomb, *Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization, and Jury Decision Making*, 45 Criminology 865, 869, 872, 874-77 (2007).  In a 2004 Ohio study, the same research group found that death sentences were a product of a strong association between one victim race-gender group—white female victims—and the imposition of a death sentence.  Holcomb, Williams, DeMuth, *White Female Victims and Death Penalty Research*, 21 Justice Quarterly 877-902 (2004).

As stated previously, the issue of the "white victim effect" has been studied and found to exist before.  It now also appears that there is a "white female victim effect."  When the gender of the victim is considered, the evidence of an arbitrary and capricious operation of the federal death penalty becomes apparent.  When the penalty decisions of juries are examined, the results are nothing short of astonishing.  Accordingly, this Court should find that the existence of a "white female victim" effect renders any death sentence in this case presumptively unconstitutional and/or in violation of 18 U.S.C. §§3593(f) (special precaution to ensure against discrimination).

**E.  Conclusion: the federal death penalty experiment has failed.**

Failed efforts to apply the federal death penalty in a manner that minimizes, rather than reflects, arbitrariness, illustrate is the inherently contradictory nature of two lines of Supreme Court cases.  *See* Mary Sigler, *Contradiction, Coherence and Guided Discretion in the Supreme Court's Capital Sentencing Jurisprudence*, 40 Amer. Crim. L. Rev. 1151 (2003).  In *Gregg*, the Court posited the concept of "guided discretion" as a check on the untrammeled discretion given juries in the pre-*Furman* era, requiring that a sentencing body's discretion "must be suitably directed and limited so as to minimize the risk of

wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.  However, in cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings Oklahoma*, 455 U.S. 104 (1982), the Court held that while a jury's discretion to impose a sentence of death must be guided and channeled, a jury's discretion to impose a *life* sentence could not be limited.

This battle had long been fought in the Supreme Court principally by the late Justices Scalia and Blackmun.  *See, e.g.,* Justice Scalia's concurrence in *Callins v. Collins*, *supra*, 510 U.S. at 1141-42, and his dissent in the since- overruled *Walton v. Arizona*, 497 U.S. 639, 657-73 (1990).  It was Justice Scalia's basic view that cases such as *Lockett* and *Eddings* are incompatible with the idea of guided discretion and that those cases should be overruled.  Other critics, however, point out that if the lines of cases are in fact irreconcilable, it is the death penalty that must be overruled.  *See*, Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. U. L. Rev. 67 (1992).

Since the Supreme Court delegated significant responsibility to the States and Congress to develop procedures that would satisfy the heightened reliability required when death is on the line, "[a]lmost 40 years of studies, surveys, and experience strongly indicate, however that this effort has failed." *Glossip*, 135 S. Ct. at 2755 (Breyer and Ginsburg, JJ., dissenting).  As *Santiago* held:

> [I]t has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases.

122 A.3d at 13.

> The question is whether this individualized sentencing requirement inevitably allows in through the back door the same sorts of caprice and freakishness that the court sought to exclude in *Furman*, or, worse, whether individualized sentencing necessarily opens the door to racial and ethnic discrimination in capital sentencing.  In other words, is it ever possible to eliminate arbitrary and discriminatory application of capital punishment through a more precise and restrictive definition of capital crimes if prosecutors always remain free not to seek the death penalty for a particular defendant, and juries not to impose it, for any reason whatsoever?  We do not believe that it is.

*Id.* at 67-68.

In support of its conclusion, the *Santiago* court aptly noted that "the United States Supreme Court itself has expressed serious doubts as to whether its own commandments can be reconciled." 122 A.3d at 68.  In *Tuilaepa*, the Court recognized that "[t]he objectives of these two inquiries can be in some tension…." 512 U.S. at 973.  Then, 14 years later in *Kennedy*, the Court acknowledged that "[t]he tension between general rules and case-specific circumstances has produced results not altogether satisfactory."  554 U.S. at 436.  "Our response to this case law," the Court conceded, "is still in search of a unifying principle…."  *Id.* at 437.  *See also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) ("[b]ecause of the range of discretion entrusted to a jury in a capital sentencing scheme, there is a unique opportunity for racial prejudice to operate").

In *Godfrey v. Georgia*, 446 U.S. 420, 442 (1980) Justice Marshall elaborated on this "fundamental defect" in the Court's Eighth Amendment jurisprudence:

> [T]he task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system.  For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether.

<u>Id.</u> at 439-42 (Marshall, J., concurring in the judgment).  Even Justice Antonin Scalia, not known to have harbored any hostility towards the death penalty, was persuaded that the Supreme Court's *Furman* and *Woodson/Lockett* lines of jurisprudence are fundamentally incompatible:

> Our cases proudly announce that the Constitution effectively prohibits the States from excluding from the sentencing decision *any* aspect of a defendant's character or record, or *any* circumstance surrounding the crime[]….  To acknowledge that there perhaps is an inherent tension between this line of cases and the line stemming from *Furman* … is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II.  And

> to refer to the two lines as pursuing twin objectives … is rather like
> referring to the twin objectives of good and evil.  They cannot be
> reconciled.

*Walton v. Arizona*, 497 U.S. 639, 663, 664-65 (1990) (internal citations and quotations omitted) (Scalia,

J., concurring in part and concurring in the judgment), overruled in part on other grounds by *Ring v.*

*Arizona*, 536 U.S. 584 (2002).  Whatever rationality and predictability the *Furman* line of cases sought to

achieve, the Court's prohibition on channeling the sentencer's consideration of relevant mitigation

"quite obviously destroys" it.  *Id.* at 664-65.

"Four decades ago, the Court believed it possible to interpret the Eighth Amendment in ways

that would significantly limit the arbitrary application of the death sentence.  But that no longer seems

likely."  *Glossip*, 135 S. Ct. at 2762 (Breyer and Ginsburg, JJ., dissenting) (citing *Gregg*, 428 U.S. at 195

(joint opinion of Stewart, Powell and Stevens, JJ.) ("[T]he concerns expressed in *Furman* that the

penalty of death not be imposed in an arbitrary or capricious manner can be met")).  It is now clear—

based upon current data and the analysis in *Santiago* and the *Glossip* dissent—that the death penalty

suffers from too many flaws to remain constitutional.

**II.    The Evolving Standards of Decency that Mark the Progress of  Maturing Society
Have Rendered the Federal Death Penalty Invalid as Both Cruel and Unusual in
Violation of the United States Constitution.**

The "evolving standards of decency that mark the progress of a maturing society"[11]  have

reached that point where the federal death penalty is out of place with current societal values.  In Point

One of this memorandum, counsel pointed out the arbitrary, capricious, irrational and invidious

manner in which the FDP operates in practice.  But there is more to the argument than a reiteration of

the same historical state of affairs that existed at the time of *Furman*.  In essence, society's acceptance

---

[11] The idea that the Eighth Amendment is not static has long been a key element of Eighth
Amendment analysis.  *See, e.g., Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014); *Trop v. Dulles*, 356 U.S. 86,
101 (1958) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 378 (1910).

of a death penalty as such has waned to the point that present standards of decency decree an end to

capital punishment.

Justices Breyer and Ginsburg in their *Glossip* dissent,[12] made four essential points:

1.  The death penalty is "cruel" in the Eighth Amendment sense because it is not reliably applied. 135 S. Ct. at 2756-2759.

2.  The death penalty is "cruel" in the Eighth Amendment sense because it is imposed in an arbitrary manner and without the reasonable consistency required by the Eighth Amendment and is further marred by the irrational circumstance of region and the invidious circumstance of race. 135 S. Ct. at 2759-2764.

3.  The death penalty is "cruel" in the Eighth Amendment sense because of the excessive delays between the imposition of a death sentence and its carrying out, a necessary byproduct of the care with which such sentences are reviewed. 135 S. Ct. at 2764-2772.

4.  The death penalty is "unusual" in the Eighth Amendment sense because the imposition and implementation of the death penalty is becoming increasingly rare. 135 S. Ct. at 2772-2780.

Each of the circumstances described in the *Glossip* dissent is present in the federal death penalty.

In assessing the extent to which society's standards evolve, the courts have made it clear that it

is the *direction* in which the trend is moving rather than arrival at a final destination.  As noted in

*Santiago*, *supra*:

> [A]lthough a sudden sea change in public opinion would be sufficient to demonstrate a constitutionally significant shift in contemporary standards of decency, such a dramatic shift is not necessary for us to recognize that a punishment has become repugnant to the state constitution. If the legally salient metaphor is *evolution* of our standards of decency, then a gradual but inexorable extinction may be as significant as the sociological equivalent of the meteor that, it is believed, suddenly ended the reign of the dinosaurs.

122 A.3d at 34.  In *Roper v. Simmons*, 543 U.S. 551 (2005), the Court noted that in deciding whether the

death penalty could be applied to those under the age of 18, "it is not so much the number of States

---

[12] As stated earlier, although there was a second dissent in *Glossip* on the merits of the issue presented—the constitutionality of the drugs utilized in lethal injections—this memorandum utilizes the shorthand "*Glossip* dissent" to refer to the opinion of Justices Breyer and Ginsburg.

[abolishing the practice], but the consistency of the direction of change."

In reviewing a claim that societal standards of decency have evolved, courts look to five basic factors: (1) the historical development of the punishment; (2) legislative actions; (3) the current practices of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions and (5) the opinion and recommendation of professional associations. *See, e.g., Graham v. Florida,* 560 U.S. 48, 61-67 (2010); *Atkins v. Virginia*, 536 U.S. 304, 311-16 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 830 (1988); *Enmund v. Florida*, 458 U.S. 782, 788-89 (1982). This requires a larger context than simply looking at how these principles apply to the federal death penalty, just as an examination of a single state's experience with the death penalty (Texas vs. Wisconsin, for example) would fail to address the necessarily broader point. Having said that, however, the federal death penalty, as will be seen, falls short on the important issue of how it is reflected in the practices of prosecutors and juries.

On nationwide basis, as documented in the *Glossip* dissent, there has been a sharp decline in the numbers of death sentences returned by juries and death sentences carried out by the states. (*See* graph, Exhibit A at 74.) From a high of 98 executions in 1999, the number has declined steadily to 35 executions in 2014 and, as of November 2, 2018 there have been only 20 executions in 2018. Thus, this year is likely to set or match a new benchmark for fewest executions on an annual basis since the historical high in 1999. Exhibit A at 74. In the federal system, there have only been three executions since 1988. There have been none since 2003. In terms of nation-wide death sentences returned by juries, that figure has also declined precipitously. From a high in 1999 of 279 death sentences, the figure has dropped by nearly 85 per cent to 39, nation-wide, in 2017. Exhibit A at 76.

In terms of the regional nature of the death penalty nationwide, that point has been made earlier in this brief that both the death penalty in general and the federal death penalty in particular are largely unknown outside the south. The following three charts illustrate this sharp decline in federal authorizations, federal trials, and federal death sentences.







What these charts document is the dramatic fading away of the federal death penalty from its "heyday" in 2003 when 49 defendants were authorized for a federal capital prosecution to 2014 when just four defendants were authorized. In 2005, 32 federal defendants stood trial in capital cases. In 2018 there were two such trials and none are scheduled for the remainder of the year. In 2009, there were nine defendants sentenced to death. In 2018 there have been two.

Where a particular penalty ceases to serve a valid penological purpose it is, by definition, excessive. *Gregg v. Georgia*, 428 U.S. at 183 (joint opinion of Justices Stewart and Powell). As detailed in the *Glossip* dissent, if any basis for a death penalty can be identified it is for deterrence and retribution. *Glossip dissent*, 135 S. Ct. at 2767. However, where sentences of death are imposed with increasing rarity and the number of executions falls, neither purpose is met.

The federal death penalty is unconstitutional in all cases, and as applied to Mr. Saipov, for the following reasons: (1) the death penalty is racist to its very core; (2) the death penalty has in the past, and inevitably will in the future, lead to the execution of innocent people; (3) the process by which individuals are selected for capital prosecution vests an unacceptable level of unreviewable discretion

in prosecuting authorities, producing irreconcilable inconsistencies; (4) there is no principled basis for distinguishing between defendants who are sentenced to death from defendants who are not; and (5), evolving standards of decency have reached the point where this court can declare that the death penalty is no longer consistent with the values embodied in the Eighth Amendment.

In *Callins v. Collins*, *supra*, the late Justice Blackmun, four months prior to his retirement from the Court, dissented from the denial of *certiorari* in a Texas death-penalty case and expressed at great length why his 20 years of experience on the Supreme Court had convinced him that this nation's death penalty schemes—even if theoretically permissible and constitutional—were, in practice and reality, incapable of fair and even-handed application and therefore retain many of the arbitrary and capricious features, including race, ostensibly struck down in *Furman* and "corrected" by *Gregg* and its progeny.  Justice Blackmun stated:

> From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored – indeed, I have struggled – along with a majority of this Court, to develop procedural and substantive rules that would lend more than the appearance of fairness to the death penalty endeavor.
>
> Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved, I feel morally and intellectually obligated simply to conclude that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question – does the system accurately and consistently determine which defendants "deserve" to die? – cannot be answered in the affirmative. It is not simply that the Court has allowed vague aggravating circumstances to be employed [citation omitted], relevant mitigating evidence to be disregarded [citation omitted], and vital judicial review to be blocked [citation omitted]. The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

510 U.S. at 1145-46.

In a 1995 *en banc* opinion from the Third Circuit, reviewing sentences of death imposed in

Delaware, Circuit Judge Lewis, joined by Circuit Judges Mansmann and present Chief Judge McKee,

expressed agreement with Justice Blackmun's conclusions:

> Although I have concluded that the errors in both trials were not harmless and would, accordingly, reverse the death sentences as to both Bailey and Flamer and remand for reweighing, the tortuous analytical route it has taken both the majority and me to set out our respective views in these cases compels me to add that I believe they perfectly illustrate— perhaps epitomize—why, in the words of Justice Blackmun, we should "no longer tinker with the machinery of death." See Callins v. Collins, 127 L. Ed. 2d 435, 114 S. Ct. 1127 (Blackmun, J., dissenting).

> To be sure, Justice Blackmun was correct. I realize that I sit on a court charged with the responsibility of applying the law as it is interpreted by the Supreme Court, and in circumstances such as these, by the highest court of a state. That is precisely what the majority and I have sought to do, despite our disagreement. But there are times when it becomes appropriate for a judge to reflect upon the law that he or she is called upon to apply, and to express views, genuine and unfeigned, that reveal a sincere and earnest belief. And in doing so here, I can only say that more than any I have seen, these cases exemplify the extent to which death penalty jurisprudence has become so complex and theoretically abstract that the only way to try to understand the reasons for and impact of its many subtle distinctions is to resort to carefully crafted hypotheticals. Something is terribly wrong when a body of law upon which we rely to determine who lives and who dies can no longer, in reality, reasonably and logically be comprehended and applied; when, in examining a statutory scheme and analyzing instructions and interrogatories, we are left to reach conclusions by piling nuance upon nuance; when we cannot even agree upon the appropriate standard of review in cases in which lives hang in the balance. Yet this is how cluttered and confusing our nation's effort to exact the ultimate punishment has become. This cannot be what certain fundamental principles of liberty and due process embodied in our Constitution, principles upon which I need not elaborate here, are all about.

> It does not dilute my profound respect for the highest court in the land, an admiration and honor that knows no bounds, to voice an apprehension, sincerely felt, that much more guidance in this serious moral dilemma must be forthcoming. Elusive and complicated distinctions, replete with incomprehensible subtleties of the highest order, must not be the talisman that decides whether one should live or die. Until this guidance is forthcoming, the plaintive voice of Justice Blackmun, truly crying in the wilderness, should continue to haunt and remind us that "the desired level of fairness has [not] been achieved."

*Flamer v. Delaware,* 68 F.3d 736, 772 (3d Cir. 1995) (*en banc*) (Lewis, Cir. J., dissenting).

The federal death penalty is arbitrary in the sense that it is rarely sought or imposed, is not imposed consistently or predictably, and is almost never carried out. Its arbitrariness is further apparent in the regional, racial and gender biases that are clear and present. The federal death penalty operates in an invidious manner in that it disproportionately targets members of minority groups for capital prosecution and elevates the status of victims by race and gender. Its very rareness strips the federal death penalty of any valid penological purpose. The fact that there are federal inmates who have now been on federal death row for nearly three decades since their crimes and, in many cases, since their sentence of death further erodes its legitimacy as a valid exercise of governmental power. Those numbers will only grow.

Our standards of decency have evolved to the point that the federal death penalty no longer serves a valid governmental purpose and lacks a penological justification or rationale. This court should strike it down.

### III. The Supreme Court's *Ring* Decision Has Rendered the Federal Death Penalty Unconstitutional and the FDPA May Not Be Saved By A Judicial "Construction" That Creates a New Criminal Offense Whose Elements and Intertwined Procedures Have Neither Been Considered, Nor Enacted Into Law, By Congress.

"It is the legislature, not the court, which is to define a crime and ordain its punishment."

*United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.).

### A. Introduction and summary of the argument.

In enacting the FDPA in 1994, and the predecessor ADDA scheme in 1988, Congress granted exclusive statutory authority to allege aggravating factors to the prosecutor. If that aspect of the FDPA is not operative, the statute lacks any congressionally-approved method of alleging aggravating factors. But that is exactly the case. In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), the FDPA[13]

---

[13] For the purposes of this argument, the abbreviation FDPA will be utilized to refer to both the 1988 and 1994 federal death-penalty schemes. Although the procedural provisions of the ADAA have been repealed, both statutes are relevant to demonstrate Congressional intent that the prosecution have exclusive authority concerning aggravating factors.

lacks any legislatively-selected method of initiating a capital prosecution. While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, chose another route. And it is up to Congress to make the necessary corrections. Thus, the Federal Death Penalty is presently unconstitutional and this court should resist and reject the government's efforts to invent a "*Ring* fix."

In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'…." *Ring*, 536 U.S. at 585, *quoting Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000). That holding, coupled with the Court's earlier holding in *Jones v. United States*, 526 U.S. 227, 251-52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt[,]"*see also Harris v. United States*, 53 6 U.S. 545 (2002) ("those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis"), in effect rendered the FDPA unconstitutional because under *Ring*, the statute's aggravating factors that, like the factors at issue in the Arizona statute, are necessary for a death sentence are elements of the capital offense, and must be charged in the indictment and proved to a jury beyond a reasonable doubt. Under the FDPA, and for the purposes of this discussion only, therefore, the "elements" of capital murder are *at least* murder + intent + one or more statutory aggravating factors.

The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's—and the set of relevant facts'—eligibility for a capital sentence. As in the Arizona system addressed and invalidated in *Ring*, under the FDPA, the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence. It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, what constitute the new elements of "federal capital murder," a crime

that presently exists only by judicial fiat.

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury. But neither is the statute silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor. This court must not allow the government to re-write the FDPA to its own liking. Instead, the FDPA must be declared unconstitutional pending further congressional action.

In a closely analogous circumstance, the Supreme Court, in *United States Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue, *i.e.*, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality. In that case, the court declined to do so. As a result, the Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

> It is unnecessary to decide here whether this conclusion [the Government's proposed "fix" of the death-penalty aspects of the federal kidnapping statute] would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted.

390 U.S. at 573.

The principles which flow logically to the conclusion that the FDPA cannot survive *Ring* are presented as follows:

(1)    In *Ring* and related cases such as *Jones* and *Harris*, the Supreme Court held that aggravating factors necessary elements of capital murder and must be alleged by indictment;

(2)    The FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because, as the Supreme Court held in *Jackson*, and consistent with centuries of constitutional jurisprudence and statutory construction, it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute, and the presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA; and

(3)    Contrary decisions from Courts of Appeals have been wrongly decided because they have failed either to (a) address *Jackson* and the

fundamental separation of powers principles incorporated therein; and/or (b) acknowledge, much less reconcile, the explicit allocation of authority to the prosecutor to determine the propriety of aggravating factors. Nor do severability analysis or the post-*Apprendi* drug cases, or the principle of "constitutional avoidance" save the FDPA; indeed, those doctrines and the cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, U.S. 542 U.S. 296 (2004), establish that a judicially imposed solution cannot redefine or reconfigure a federal criminal statute to do what Congress has not intended.

**B. Aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.**

In *Ring*, in which the Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639 (1990), and in subsequent cases, the Court established beyond dispute that aggravating factors necessary to imposition of the death penalty under the FDPA must be charged in the indictment, and proved to the satisfaction of a jury beyond a reasonable doubt. As noted earlier, the Supreme Court explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the defendant create new, different, and "greater offense[s]." In *Harris*, 536 U.S. at 555-566, the Court noted repeatedly that any "fact" which increases the maximum possible penalty beyond that authorized by the findings implicit in the jury's verdict of guilt is an element of an offense:

> [r]ead together, *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis.

536 U.S. at 567. Concurring in *Ring*, Justice Scalia famously observed:

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

In *Apprendi*, the Court had observed that, "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements'

of a separate legal offense." 530 U.S. at 483, n.10. *See also Harris*, 536 U.S. at 560 (stating that the

principle "by which history determined what facts were elements. . . defined elements as 'fact[s] legally

essential to the punishment to be inflicted,'") *quoting United States v. Reese*, 92 U.S. 214, 232 (1876)

(Clifford, J., *dissenting*).

In *Jones*, the Court had presaged what has since occurred by holding that all elements of a

federal offense "must be charged in the indictment, submitted to a jury, and proven by the

Government beyond a reasonable doubt." 526 U.S. at 227.  *See also United States v. Cotton,* 535 U.S. 625

(2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in

the indictment").

As stated earlier, *Ring* does not address the grand jury issue because the case arose in the

context of a state statute, to which the Fifth Amendment's Grand Jury Clause does not apply.  *Hurtado

v. California*, 110 U.S. 516 (1884).  However, *Jones* and *Cotton*, discussed above, make it plain that the

Fifth Amendment requires the inclusion of such elements in the indictment.

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged in the "Special

Findings" section of the indictment in this case constitute elements of an offense, since they "are facts

that expose [this] defendant to a punishment greater than that otherwise legally prescribed … ," *i.e.*, the

death penalty.  That conclusion is further confirmed by the Supreme Court's subsequent decisions in

*Blakely* and *Booker*, in which first state and then federal sentencing guidelines factors, respectively, were

held to constitute the functional equivalent of elements that required proof to a jury beyond a

reasonable doubt. 542 U.S. at 303; 543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein.  For example, in *Sattazahn v.

Pennsylvania*, 537 U.S. 101 (2003), in which the Court considered whether double jeopardy was a bar to

the second prosecution of a capital case when the Commonwealth of Pennsylvania again sought (and

received) a sentence of death after a divided jury at the first trial had spared the defendant's life and the

defendant then succeeded in having the underlying conviction set aside on appeal, with the Court

ruling 5-4 that double jeopardy did not bar a second opportunity to seek a death sentence, Justice

Scalia—joined by the Chief Justice and Justice Thomas—discussed the implications of the Court's

decision in *Ring*:

> [i]n *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating
> circumstances that make a defendant eligible for the death penalty
> "operate as 'the functional equivalent of an element of a *greater offense*.'"
> *Id.*, at 609 (emphasis added). That is to say, for purposes of the Sixth
> Amendment's jury-trial guarantee, the underlying offense of "murder"
> is a distinct, lesser included offense of "murder plus one or more
> aggravating circumstances": Whereas the former exposes a defendant to
> a maximum penalty of life imprisonment, the latter increases the
> maximum permissible sentence to death.

537 U.S. at 111.

The three justices who joined that portion (Part III) of the main opinion concluded that there

could be no principled reason to distinguish between what constitutes an offense for purposes of the

Sixth Amendment and an "offence" for purposes of the Double Jeopardy Clause of the Fifth

Amendment.  *Id.* Yet even the four dissenting justices agreed with Justice Scalia's proposition with

respect to capital murder constituting a *greater* offense based on the additional elements—the

aggravating factors—needed to prove that offense:

> [t]his Court has determined … that for the purposes of the Double
> Jeopardy Clause, capital sentencing proceedings involving proof of one
> or more aggravating factors are to be treated as trials of separate *offenses*,
> not mere sentencing proceedings.  *See, ante*, at [537 U.S. at 736-738, 739-
> 740]; *Ring v. Arizona*, 536 U.S. 584 (2002);*Bullington v. Missouri*, 451 U.S.
> 430 (1981).

537 U.S. at 126 n.6 (emphasis in original) (Ginsburg, J., *dissenting*).

Thus, at least seven justices agreed that, under the principles set forth in *Ring*, capital

sentencing schemes that employ aggravating factors create, from a constitutional perspective, new

offenses, greater than ordinary willful homicide, that are distinguished by the additional *elements* those

aggravating factors represent.  Pursuant to *Jones* and *Cotton*, when those greater offenses are prosecuted

under federal law in federal court, it is equally beyond question that they must not only be proved to a

jury beyond a reasonable doubt, but that they must first be presented to a grand jury and included within the indictment.

As with the Arizona scheme at issue in *Ring*, under the FDPA, a jury's verdict finding a federal defendant guilty of murder cannot support a sentence of death without additional fact-finding. For example, although a guilty verdict in a case of a federal prison murder carries with it an *authorized* potential death sentence, such a defendant is not actually exposed to a death sentence unless and until the jury (or the judge, where a jury has been waived) makes determinations, unanimously and beyond a reasonable doubt that the crime was committed with one of the four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A-D) and that there is present in the case at least one of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)(1-16). In addition, arguably, a defendant may not be sentenced to death unless it is also established that the attorney for the Government believes that executing the defendant is justified, 18 U.S.C. § 3593(a), that the defendant was not less than 18-years old at the time of the offense, 18 U.S.C. § 3591(a), and that he is not mentally-retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002). It is also argued in this memorandum, at Point Three, *infra*, that the ultimate decision on whether aggravating factors substantially outweigh mitigating factors is itself an element of capital murder.

It thus follows that the aggravating factors the government has alleged by indictment in this case are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that requires the proof of those elements before a death sentence can be imposed.

**C. The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests exclusive authority to identify aggravating factors exclusively with the prosecutor.**

With respect to federal capital offenses prosecuted in federal court, *Ring* and the Fifth Amendment's indictment clause require that aggravating factors necessary to a death sentence be presented to a grand jury and included in the indictment. The FDPA neither contemplates affording, nor permits, the grand jury any role in determining which aggravating factors are to be alleged in a

federal capital prosecution.  Pursuant to the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified…." 18 U.S.C. § 3593(a).  If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death" 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof – and allegation in the notice by government attorneys—of one or more of four "gateway" state-of-mind factors.  18 U.S.C. § 3591(2).  The notice, in addition, is required to set forth the aggravating factors—statutory and non-statutory statutory—the government proposes to prove if the defendant is convicted which may include victim-impact evidence.  18 U.S.C. § 3593(a).  The ADAA scheme was similar.  *See* 21 U.S.C. § 848(h) (Repealed).  Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else, not grand juries, not the court, and not any other individual or entity.  Nonetheless, the government seeks to establish in this case a substitute method for introducing aggravating factors now that *Ring* rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid.  Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties."  *Ford v. Wainwright*, *supra*, 477 U.S. at 411.

**D. The Separation of Powers Doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA.**

As noted, this is not an instance in which Congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation.   Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring*, a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

  1.  Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

That view, of course, conforms with centuries of federal criminal jurisprudence.  Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812) (Marshall, C.J.), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor.  *See also*, *United States v. Worrall*, 2 U.S. (2 Dall.) 384, 393-4 (1798); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson*, 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department").  *See also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted). *See also United States v. Lanier*, 520 U.S. 259, 267-68 n. 6 (1997) ("[f]ederal crimes are defined by Congress, not the courts")*; Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] … no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States"). Applying these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964), in which the state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger. See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

      2.    <u>*United States v. Jackson* provides a direct and "all fours" analogy to the circumstances present herein, and compels invalidation of the FDPA.</u>

It is in that context that the Supreme Court's decision in *United States v. Jackson*, 390 U.S. 570 (1968), provides precedent directly and specifically applicable to capital statutes, and to improper attempts to cure them by judicial fiat rather than by legislative action. As stated earlier, this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional muster. In *Jackson*, the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it—thereby making the death penalty possible only for those defendants who exercised

their right to trial by jury.

In an effort to salvage the death penalty provision, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed by other district courts as "cures" for the constitutional problems.  However, the court, after finding the statute unconstitutional rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government because those proposals represented judicial, rather than *legislative* action.  *Id.* at 572-81. For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free … to convene a special jury for the limited purpose of deciding whether to recommend the death penalty."  *Id.* at 572.  The Government also suggested that the court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

In analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, the *Jackson* Court pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty."  *Id.* at 571.

Thus, the Court declined to read into the statute congressional authority for the courts to develop such a procedure.  The Court was concerned principally with overreaching its authority by imposing the alternate sentencing scheme.  According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy[,]" *id.* at 579, absent "the slightest indication that Congress contemplated any such scheme."  *Id.* at 578.

Applying *Jackson*'s analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth

no procedure" for alleging aggravating factors.  Indeed, as the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands."  *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecution's] hands" the responsibility for alleging aggravating factors under the FDPA.  Consequently, in this case, "construing" the FDPA to allow the grand jury to assume that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process.  Presented with the option, Congress, in light of the change of law from *Walton* to *Ring*, might very well enact a comprehensive death penalty scheme that allocated a role to the grand jury.  Congress might also choose to enact a wholly new and different scheme, one which fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.  *Jackson*, however, proscribes a court from implementing what Congress *might* do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute.  Instead, *Jackson*, requires that courts, under such circumstances, invalidate, and not legislate:

> [i]t is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions, *for it is not the scheme that Congress enacted.*

*Id.* at 573 (emphasis added).

The Court in *Jackson* further recognized that the government's proposal "would be fraught with the gravest difficulties."  *Id.* at 579.  As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality."  *Id.* at 580. *See also Blount v. Rizzi*, 400 U.S. 410, 419 (1971) (statute that permitted the Postmaster General to determine that material was obscene struck down by the Court which, in the process of rejecting the government's suggestion that Congress's plain language could be

"construed" to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute"). In *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), the court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of *several* statutory aggravating factors not so included. 327 F.3d at 284-87.

The same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *United States v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (hereinafter "SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *Booker*, 543 U.S. at 245-46) severed the offending section—that which made the guidelines mandatory—but retained the essential character of the remainder of the SRA. Indeed, in *Blakely v. Washington*, *Booker*'s predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. 542 U.S. 296, 334-5 (2004) (Breyer, J., *dissenting*). Justice Breyer's admonition about the practical implications of presenting sentencing factors to a jury absent any legislative or procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA—none of which the government recognizes or addresses. For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two

57

phases of the trial.  Here, as discussed *infra*, severance of the invalid section of the FDPA does not

save the statute because it cannot function as a capital statute without a mechanism for alleging

aggravating factors.

The government's position, by implication, is that prosecutors can fashion their own remedy

independent of both Congress' intent and clear and limiting legislative language.  This view, however,

mirrors the position taken by the government, and rejected by the Supreme Court, in *Booker*:

> Severing the requirement that judges, not juries, apply the
> Guidelines would require courts to make the legal and policy decisions
> necessary to resolve all of those questions.  There is no indication that
> Congress delegated that role to the courts.  It is one thing to
> recharacterize a single factor that increases a statutory maximum and
> treat it as an element of the crime.  It is quite another to take an entire
> system expressly designed to channel sentencing discretion and treat it
> as if Congress was attempting to rewrite the criminal code.

*Id.* at 363.

Accordingly, *Jackson* is precisely on point and controls this case.  In enacting the FDPA,

Congress, relying on *Walton*, created a scheme in which the prosecutor was granted the exclusive

authority to make the threshold determination whether to seek the death penalty, and, once a decision

was made to pursue death, which aggravating factors to allege.  Allowing the Government to seek

indictment of what Congress unambiguously defined as sentencing factors would give "to the [grand

jury] the ultimate duty that Congress deliberately placed in other hands," *i.e.,* those of the government

attorney – precisely the kind of end-run that *Jackson* forbids.

As a result, if the FDPA's treatment of aggravating factors is unconstitutional after *Ring*, then it

is undeniable, under *Jackson* and the doctrine of Separation of Powers, that only Congress can cure the

problem, and only by enacting – should it choose to do so in light of the changed constitutional

landscape augured by *Ring*—a new death penalty scheme.  Conversely, if aggravating factors (and other

aspects of the FDP, such as the required "gateway" findings and the age of the defendant) are not

elements of the offense, the grand jury has no business investigating or finding them, since the

authority of the grand jury is limited to determining "if there is probable cause to believe that a crime has been committed," *Branzburg v. Hayes*, 408 U.S. 665, 686 (1972) and "whether criminal proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S. 338, 343-33 (1974).

      3.    <u>The Non-Delegation Doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action</u>.

"The non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); U.S. CONST., ART. 1, § 1. As Justice Scalia stated in his dissent in *Mistretta*:

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.
>
> * * *
>
> That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of Government ordained by the Constitution.

488 U.S. at 415 (Scalia, J., *dissenting*). The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated, because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform," 488 U.S. at 372, quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Mistretta*, 488 U.S. at 374. Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." 488 U.S. at 371-72, *quoting Field v. Clark*, 143 U.S. 649, 692 (1892).

      Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to

determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA. Plainly, Congress must have the opportunity to determine, in light of *Ring*, the precise elements of federal capital and how *Ring* has affected the legislative balancing which produced the FDPA in the first place.

In *Touhy v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress' delegation to the Attorney General of the authority to *temporarily* classify a drug as a controlled substance in order to bring its use and/or distribution within reach of criminal prosecution. This delegation of authority was based on the advent of "designer drugs" which were only marginally different in chemical composition from drugs that were already controlled. The Court held that the intelligible Congressional principle at issue not only meaningfully constrained the Attorney General's discretion to define criminal conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct." *Id.* at 167.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy.

4.      A federal grand jury lacks any authority to issue "special findings."

In this case, the indictment contains a section labeled, "Notice of Special Findings." Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment. Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348 (2004),

held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive

criminal law, 542 U.S. at 354-55, that does not place the method of alleging the FDPA's aggravating

factors within the purview of the government's authority or role in a three-branch form of

government. Rather, the principles established in *Jackson* continue to apply, and the express language

of the statute remains controlling and dispositive. Consequently, the prosecutor's attempt to rescue

the FDPA via the grand jury's "Special Findings" is void.

### E. Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.

1.    <u>The decisions by the courts of appeal have been wrongly decided</u>.

While various Courts of Appeals have considered the issue herein and concluded that there is

no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury

in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case has been fatally

flawed for two principal reasons: the decisions all fail to address *Jackson*, and/or to distinguish its

clearly applicable holding and principles; and the decisions ignore the plain language of the FDPA with

respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not

only failed to mention *Jackson* at all, but also joined other circuits in claiming that while "'nothing in the

FDPA requires prosecutors to charge aggravating factors in an indictment, … there is nothing in that

law inhibiting such a charge.'" 441 F.3d at 1367, *quoting United States v. Robinson*, 367 F.3d 278, 290 (5th

Cir. 2004). *See also United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[t]he major flaw in LeCroy's

argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the

additional step of including the statutory aggravating factors in the indictment and submitting same to

the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense

to the grand jury"); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) ("[w]hile it is true that the

FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment"); *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004).  In *Brown*, the Court also stated the defendant's argument in a manner different from what Mr. Saipov presents here.  In *Brown*, according to the Court, the defendant "argue[d] that the FDPA is facially unconstitutional [] because it does not *require* [aggravating] factors to be alleged in the indictment."  441 F.3d at 1367.  Here, Mr. Saipov states the converse: that the FDPA is unconstitutional because it requires that aggravating factors be alleged exclusively in a manner that precludes presentation to the grand jury.

Again, this is not an instance in which a statute simply does not expressly provide for submitting elements of an offense to the grand jury; rather, the FDPA *expressly and comprehensively provides for another, exclusive method for alleging aggravating factors.*  Significantly, neither *Allen*, nor *Robinson*, nor *Barnette*, nor *LeCroy*, nor *Brown* discuss or even cite *Jackson*.  Thus, none of those decisions can be deemed to have considered the issue sufficiently, or comprehensively.

This Court should, rule consistently with *Jackson* and the clear language of the FDPA, that the statute is unconstitutional as applied to Mr. Saipov.

> 2.      The post-Apprendi drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

Nor can the FDPA find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt.  *See, e.g., United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) (*en banc*).  *See also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling

of aggravating factors is striking and dispositive.  Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug.  For those statutes, though, Congress was silent on whether drug quantities were elements of the offense or sentencing factors.  Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the drug laws, or offend Congressional intent.

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to constitute elements of the offense.  Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as sentencing factors, patently described them as such, and directed that they be determined and identified in each case *not* by a grand jury (or any other body or institution), but by the prosecutor *alone*.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent. Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is *whether Congress intended* the statutory references … to define a separate crime or simply to authorize an enhanced penalty." 530 U.S. at 123 (emphasis added).  *Accord, Jones*, 526 U.S. at 232–39. *See also Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *Harris*, 536 U.S. at 582.

In both *Harris* and *Almendarez-Torres*, the Court found the aspects at issue to be sentencing factors; in *Castillo* and *Jones*, they were found to be elements of the offense.  In both sets of cases, the Court proceeded by the same exhaustive statutory, not constitutional, analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does *not* afford the courts authority to recast statutes so that they fit within those limits.

For example, in *Harris*, the Court comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence."  536 U.S. at 549.  The Court reaffirmed that the threshold question of statutory construction is *whether Congress intended* relevant facts to be offense elements or sentencing factors.  536 U.S. at 551.  The Court further

63

explained that the distinction is significant because "*[l]egislatures define crimes in terms of the facts that are their essential elements*, and constitutional guarantees attach to these facts." 536 U.S. at 549 (emphasis added). Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor. As a result, the government is not empowered to subvert Congressional intent and, in effect, create by prosecutorial fiat, a brand new criminal statute.

       3.    <u>Severability analysis cannot save the FDPA from unconstitutionality</u>.

Finally, the severability cases also undercut any analogy to the drug cases discussed earlier. Under those cases, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently. For example, in *Booker*, as noted, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the sentencing guidelines' mandatory nature because that *preserved* the character of the SRA, and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended with regard to the FDPA is an easy task—it is obvious from the FDPA that Congress, relying on *Walton*, believed it was creating sentencing factors. It is

equally clear that after *Ring* aggravating factors constitute elements of an offense. Accordingly, the statute may not be construed; it must be voided.

    4.    <u>The doctrine of "constitutional avoidance" is inapplicable</u>.

The doctrine of constitutional avoidance applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General, v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). Here, since the FDPA is, for the reasons set forth *supra*, plainly not "susceptible of two constructions[,]" the simple answer is that the doctrine of constitutional avoidance does not apply.

In *Harris*, for example, the Court found the doctrine of constitutional avoidance inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the *minimum* punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan*'s continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's analysis, and the Court, in accord with Congress' intent, concluded that "brandishing" was a sentencing factor. *See id.*

Here, too, Congress relied on the state of the law existing at the time it enacted the FDPA—in *Walton v. Arizona,* 497 U.S. 639, 649 (1990), the Court had permitted a judge to decide sentencing factors in capital cases—and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors.  Reconstructing the FDPA based on *Ring*'s precedence over *Walton* would constitute the type of "dynamic" statutory interpretation that was precluded by *Harris*, and would vitiate Congress's clear intent.

Consequently, the doctrine of constitutional avoidance is as inapplicable here as it was in *Harris.*  As with §924(c), with the FDPA there is no ambiguity about Congress's choice.  As stated in *Miller v. French*, 530 U.S. 327, 341 (2000) (quotations omitted), "[w]here Congress has made its intent clear, we must give effect to that intent."  Similarly, in *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833(1986), the Court stated:

> Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. Where such serious doubts arise, a court should determine whether a construction of the statute is fairly possible by which the constitutional question can be avoided. *It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute … or judicially rewriting it.*

478 U.S. at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA—the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation.

Accordingly, it is respectfully submitted that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and that, because those aggravating factors are

elements pursuant to *Ring*, the FDPA is unconstitutional as applied to Mr. Saipov. The capital aspects of this case should be dismissed.

IV.    **Even If the FDPA Can Be Rendered Constitutional By a Finding by the Grand Jury of Gateway and Statutory Aggravating Factors, the "Special Findings" in the Indictment Should Be Stricken and the Death Notice Should Be Dismissed Because the Government Has Not Obtained an Indictment Consistent With the Requirements of the Fifth Amendment.**

A.    **Introduction**

As outlined above, the indictment does not allege any non-statutory aggravating factors. Neither does the indictment allege that the "special findings" should subject Mr. Saipov to the death penalty or otherwise indicate that the grand jury intended to return an indictment charging a capital offense. Neither does the indictment allege that the aggravating factors present in this case outweigh the mitigating factors and do to an extent that is sufficient to justify imposition of a sentence of death. Under these circumstances, the indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

B.    **The grand jury was not given the choice of holding Mr. Saipov to answer for a capital crime because it was (presumably) unaware of the consequences of its "Special Findings."**

The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process. The Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution.... The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.' It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime.*

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (emphasis supplied). *See also Vasquez v. Hillary*, 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in the hands of the grand jury); Fed.

R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death.  In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws.  Laws that authorized the death penalty mandated it; they left no other sentencing option.  An example of one such law provided that "such person or persons on being thereof convicted [of willful murder] shall suffer death."  An Act for the Punishment of Certain Crimes against the United States, ch.9, § 3, 1 Stat. 112, 113 (1790).  *See generally*, R. Little, *supra*, 26 Fordham Urban L. J. at 361-63.  This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses." *Woodson*, 428 U.S. at 289.  Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which defendants would receive a sentence of death upon conviction.

The grand jury's historical role in choosing which defendant would receive a death sentence upon conviction is well-documented.  *See* LaFave, W.R., *et al.*, 1 *Criminal Procedure* 1.5(b) (2d Ed.) (noting that grand juries played a critical role in reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, *The Rise of the Penitentiary* (1992) ("[a]t the indictment stage, grand juries often refused to charge person with capital crimes.  They simply downgraded indictments to non- capital charges of their own devising"). The Supreme Court has acknowledged this historical role, writing in *Vasquez*, 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  *In the hands of a grand jury lies the power to charge* a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, *a capital offense or a noncapital offense…*."

In this case, the government appears to have presented to the grand jury some of the elements of capital murder so as to make Mr. Saipov "death-eligible" for Eighth Amendment purposes—the

intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). But Mr. Saipov has a due process right to examine whether the government informed the grand jury of the consequences of those special findings, *i.e.*, that by returning the indictment, Mr. Saipov would be held to answer to an offense punishable by death. Certainly nothing on the face of the indictment shows that the grand jury was aware that it was being asked to determine if Mr. Saipov should be held to answer for a capital offense. By not informing the jury that it was returning an indictment charging a capital offense, the government turned the proceeding into one that gave only the appearance of complying with the Fifth Amendment, depriving Mr. Saipov of his constitutional and statutory rights.

The Supreme Court, in a related context, has refused to countenance such disregard for the Fifth Amendment. In *Smith v. United States*, 360 U.S. 1, 9 (1959), the Court reversed a kidnapping conviction initiated by information even though it was a capital offense. The Court stated:

> The Fifth Amendment made the [grand jury indictment] rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings…. [T]o permit the use of informations where . . . the charge states a capital offense, would … make vulnerable to summary treatment those accused of our most serious crimes.

*Id.* (citations omitted). Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but not informing the grand jury that by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier … between the liberties of the people and the prerogative of the [government])." *Harris v. United States*, 536 U.S. 545, 564 (2002) (grand and petit juries "form a 'strong and two-fold barrier'").

The grand jury's constitutional and historical role in deciding whether a defendant should face the death penalty is perhaps more critical now than ever—especially in a case like this where the

President arbitrarily demanded his Justice Department seek the death penalty. *See* ECF Nos. 75, 89. Few checks exist on the federal government's power to pursue the ultimate punishment against one of its citizens and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case. Prosecutorial decision making in capital cases is centralized at the Department of Justice in Washington, D.C. *See United States v. Navarro-Vargas*, 367 F.3d 896, 902 (9th Cir. 2004) (Kozinski, J., dissenting) ("[a]n independent grand jury—one that interposes the local community's values on prosecutorial decisions that are controlled by policies set in Washington as to the enforcement of laws passed in Washington—seems like an important safeguard that is entirely consistent with the grand jury's traditional function"), *rehearing en banc*, 408 F.3d 1184 (9th Cir. 2005). Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government]." *Harris*, 536 U.S. at 564. This is because petit jurors, to-date, have been "death-qualified." Individuals with disqualifying scruples against the death penalty, no matter how many exist in a given community, have not been permitted to sit in judgment in a capital case. Instead, capital juries consist exclusively of individuals who believe that the death penalty is an appropriate punishment and who express a willingness to impose it. Empirical evidence shows that such "death-qualified" jurors are more prone to believe government witnesses, generally evaluate evidence differently than other jurors, and give little meaning to the presumption of innocence, *i.e.*, death qualified jurors are more conviction prone.

The death-qualifying process also tends to exclude women and African-Americans from jury service. Public opinion polls "consistently show that opposition to capital punishment runs around 45% to 55% for black Americans, while for whites it is much lower, ranging from 17% in 1992 to 24% in 2000. That is opposition to the death penalty is about twice as high among black Americans as among white, and a much larger majority of whites than blacks support the death penalty." Rory Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and*

*the Specter of Timothy McVeigh*, 53 DePaul L. Rev. 1591, 1596 (2004).

The net effect of death qualification is that capital jurors do not represent the conscience of the local community or its rich diversity; at best, they represent only those members of the community who share similar views on the death penalty. Jurors that represent such a small segment of the community are ill-equipped to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will.

Thus, the Constitution and the Bill of Rights sets up a carefully crafted system of checks and balance. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell v. Louisiana*, 523 U.S. at 398 (citations omitted). Unless the grand jury is aware of its capital charging power it cannot serve its constitutional purpose, and the consequences of returning an indictment with "special findings" like those in this case, it cannot perform its constitutionally assigned function and make "*the important decision to charge a capital crime.*" *Id.* Because the grand jury did not perform its constitutionally assigned role of deciding whether Mr. Saipov should be held to answer for a capital crime, the death notice should be dismissed and the indictment's "special findings" stricken.

## C. The Government did not obtain an indictment alleging all elements of a capital crime.

Even if the grand jury had been aware that it its "special findings" would hold Mr. Saipov to answer for a capital crime, the notices should be dismissed because the Government did not present further elements necessary for the grand jury to make the decision as to whether Mr. Saipov should be subject to the death penalty, *i.e.*, whether (1) the aggravating factors outweigh the mitigating factors and (2), whether they outweighed the mitigating factors *sufficiently* to justify a sentence of death. The failure of the grand jury to examine all relevant factors to determine if the death penalty was justified conflicts with the framers' intent, discussed above, that the grand jury retain the power to decide which

defendants should receive a sentence of death upon conviction.  Moreover, as argued earlier, the process followed violated Mr. Saipov's Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration.  *See Jones v. United States*, 526 U.S. at 251-52.

The elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified.  In truth, then, the "selection" decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e) (emphasis added).  A simple "outweighing" is not enough.  As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is not sufficient to justify imposition of a sentence of death.  It is not until the moment that finding is made that the defendant's potential punishment increases to death.  Recall Justice Scalia's point: "[All] facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane— must be found by the jury beyond a reasonable doubt."  *Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors.  That is precisely why, as argued in these motions, the legislature needs to amend this statute.  It is not the role of courts and prosecutors to "fix" a statute that no longer reflects what congress intended.  The grand jury's failure to indict on all elements of capital murder—even assuming the viability of a "*Ring* fix"—means the notice must be dismissed.

### V.    The FPDA Fails to Provide a Structure Which Permits Jurors to Make a Reached Choice Between a Sentence of Life in Prison Without the Possibility of Release and Execution.

The FDPA has created a scheme that mixes concepts, burdens of proof, ideals of justice and

mercy, all folded into a process likely incomprehensible to jurors.  In the penalty phase of the trial, 12 jurors previously indoctrinated in the traditional culture of unanimity will be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors.  Jurors will be expected to segregate the mental state threshold factors from aggravating and mitigating factors, but be barred from considering these matters in the weighing process because they are not aggravating factors.  In the final analysis, jurors are asked, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death.  It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this complex mélange of concepts and come out with an understanding of the process or a principled verdict.  This substantial risk of confusion causes the FDPA to be unconstitutional.  In essence, the FDPA has returned the process to an era of un-guided discretion.

Because death is qualitatively different from other forms of punishment, the greater need for the reliability of the process by which a death sentence is arrived at has been long recognized.  *E.g.*, *Woodson v. North Carolina*, 428 U.S. at 303-305.  The Eighth and Fourteenth Amendments therefore require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause.  *See Simmons v. South Carolina*, 512 U.S. 154 (1994).  In order for a jury's decision to impose a death sentence to withstand Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Godfrey v.*

*Georgia*, 446 U.S. at 427.

Study after study shows that jurors, no matter how sincere and well-intentioned, misunderstand what they are supposed to do during the penalty-phase of a death penalty trial.  One such study was detailed in C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 Journal of Social Issues 149 (1994).  The authors interviewed 57 capital jurors from 19 death penalty trials conducted under a California system that was very similar to the FDPA construct.  Among the study's findings were the following:

- One third of the California jurors sampled focused in the penalty phase discussion solely on the nature of the crime itself in a way that essentially created a presumption of death;

- For many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;

- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the instructions, indicating a failure to understand what constituted mitigating evidence;

- 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime;

- 60% of the sampled jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

- Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and

- 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly alarming and comprehensive misunderstanding of the sentencing mission in general, and mitigation in particular, among jurors deciding death penalty cases.

*See, e.g.*, Peter Meijes Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah L. Rev. 1 (1995). Juries in actual death penalty cases often believe, completely erroneously, that once an aggravating factor has been found, death is mandatory. *See, e.g.,* U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brooklyn L. Rev. 1011, 1031-41 (2001). Indeed, statistically valid surveys of capital-case jurors who served on actual capital cases overwhelmingly, and with no peer-reviewed research to the contrary, establish the disturbing extent of confusion on the part of jurors making life and death decisions. The article draws on the findings of the Capital Jury Project, an ongoing study funded by the National Science Foundation of decision-making by interviewing actual capital jurors. As noted in the article, at the time it was written the ongoing CJP had completed interviews of 1,155 capital jurors from 340 trials in 14 states. 66 Brooklyn L. Rev. at 1017. For a full description of the Project, and its methodology, *see* W.J. Bowers, *The Capital Jury Project: Rationale, Design & Preview of Early Findings*, 70 Ind. L.J. 1043, 1079 (1995). Professor William J. Bowers, who holds a Ph.D. in Sociology, is Principal Research Scientist, College of Criminal Justice, Northeastern University, and serves as the Principal Investigator for the Capital Jury Project. 66 Brooklyn L. Rev. at 1011. Indeed, the studies demonstrate that a substantial number of jurors who actually serve on capital cases *automatically* vote for death if the defendant is found guilty of murder. *See, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*" 15 Am. J. Crim. L. 1, 41 (1989), ("A significant number of jurors in death penalty cases believed that the death penalty was mandatory or presumed for first degree murder" … "In the cases in which the jury recommended death, over half of the jurors believed that death was to be the punishment for first degree murder, or at least that death was to be presumed appropriate unless defendant could persuade the jury otherwise"); S.P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Columbia L. Rev. 1538 (1998) ("Many jurors wrongly think they must return a death sentence if they find the defendant's

crime was especially heinous, or the defendant is especially likely to present a risk of future danger");

T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44

Buff. L. Rev. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that

the law required a death sentence if they found heinousness or dangerousness, a result replicated in the

multi-state study of the interview data"); W. S. Bowers, *The Capital Jury Project: Rationale, Design and

Preview of Early Findings*, 70 Ind. L.J. 1043, 1091, n.32 (1995) ("Many jurors believe that the death

penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner,

*Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*," 83

Cornell L. Rev. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt

justifies the death penalty); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital

Cases*, 79 Cornell L. Rev. 1, 12, 38 n.12 (1992) ("There is a 'presumption of death'"). Jurors in death

penalty cases misunderstand what they are permitted to consider much more often than not, and that

instructions rarely cure the profound misunderstandings.

   The most comprehensive study to date on the actual means by which death sentences are

meted out is, as noted earlier, the one undertaken by the Capital Jury Project.  The Capital Jury Project

("CJP") is a consortium of studies of the methods of death penalty juries over a long period of time.

Supported by the National Science Foundation, the CJP had, by 2003, interviewed 1201 members of

354 different juries sitting in death penalty cases in 14 states.  *See* W. Bowers and W. Foglia, *Still

Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. Law Bulletin 51

(2003).  The CJP's findings include the propensity (more than 50% of the time) by juries to decide the

penalty issues before the penalty phase begins, which means that the jurors never allow mitigation into

their deliberations; a comprehensive lack of understanding of what constitutes mitigation and how it

applies; a broad-based lack of understanding of the instructions given by the judge; and that the jury

decision-making process in death penalty cases is so flawed that it violates constitutional principles.

For example, the CJP's comprehensive, on-the-ground research on these issues demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped these critical features of the law. 39 Crim. Law Bulletin at 68-69. The CJP's findings provide a window into a process which has been designed with as much care as this politically sensitive issue permits, but which in practice is grossly arbitrary, unfocused and very often influenced by racial factors. The CJP underscores what seems obvious— that this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether or not a defendant should be put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed. This makes the FDPA unconstitutional as applied.

The Supreme Court's decisions in various death penalty cases are based on assumptions shown by the CJP's research to be unfounded. For example, in *Boyde v. California*, 494 U.S. 370 (1990), the Court's decision was based on inaccurate assumptions about how the jurors assessed categories of information presented during trial. Likewise, the court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994) included the conclusion that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." *Id.* at 976. Conventional as the instructions may be, the CJP research clearly demonstrates that they are not understandable to jurors.

In *Tuilaepa*, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* at 975. The perhaps most shocking lesson from the CJP is that criminal juries are incapable of understanding and applying the trial court's instructions. By the reasoning of *Tuilaepa*, the instructions, and the process and overarching scheme which has produced them, is unconstitutional. The Supreme Court's decisions upholding the death penalty are based on assumptions which are belied

by the most reliable empirical evidence available.  Rory Little, an Associate Deputy Attorney General from 1996-1997 who served on the capital case review committee, wrote an article about this process. In Little, R., *supra,* 26 Ford. Urb. L.J. 347, he writes that considering the "generality of these statutory aggravating factors and their commonality in many murders are considered together with the added authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." *Id.* at 402.

This Court should declare the FDPA unconstitutional and permit this case to proceed as a non-death penalty case.  In the alternative, Mr. Saipov requests an evidentiary hearing to permit the presentation of expert testimony and empirical evidence in support of the argument that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence.

## CONCLUSION

For the reasons set forth above, the Court should deem the death penalty and the Federal Death Penalty Act unconstitutional, or hold a hearing.

Dated:  December 14, 2018          Respectfully Submitted,
        New York, NY


                                   /s/ Jennifer Brown
                                   Jennifer Brown
                                   David Patton
                                   Sylvie Levine
                                   Annalisa Mirón
                                   Federal Defenders of New York, Inc.
                                   (212) 417-8700

                                   David Stern
                                   Rothman, Schneider, Soloway & Stern, LLP
                                   (212) 571-5500