JBI7SAIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                              17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

           Defendant.

------------------------------x
                              New York, N.Y.
                              November 18, 2019
                              3:00 p.m.


Before:

                  HON. VERNON S. BRODERICK
                              District Judge


                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW LAROCHE
     SIDHARDHA KAMARAJU
     Assistant United States Attorneys

DAVID PATTON
JENNIFER BROWN
SYLVIE LEVINE
ANDREW DALACK
DAVID STERN
DAVID RUHNKE
     Attorneys for Defendant

ALSO PRESENT:  Sanjar Babadjanov, Interpreter
               Michael Deluca, Paralegal

JBI7SAIC

(In open court)

(Case called)

MR. LAROCHE:  Good afternoon, your Honor.  Matt Laroche and Sidhardha Kamaraju for the government.  With us at counsel table is Michael Deluca, parallel at the U.S. Attorney's office.

THE COURT:  OK, good afternoon.

MR. PATTON:  David Patton for Mr. Saipov, and at counsel table is Jennifer Brown, Sylvie Levine, David Stern, Andrew Dalack and David Ruhnke.

THE COURT:  Good afternoon.  You may be seated.

So, I received the defense letter of earlier today.  It was filed on ECF.  I assume the government has received a copy of it?

MR. LAROCHE:  Yes, your Honor.

THE COURT:  Was the government going to respond in any way?

MR. LAROCHE:  Yes, your Honor.  I think the parties have a proposal on that front, which is that the parties confer and submit a letter to the Court by December 6.  I think by that time we will hopefully have reached an agreeable solution to this, or we can at least flag for your Honor what the remaining issues are.

THE COURT:  OK.  Well, let me first go down some of the issues that I think may not be that controversial that we

JBI7SAIC

can get out of the way right now.

First, does the government have an objection to a jury with six alternates, so 12 and six?

MR. LAROCHE:  No, your Honor.

THE COURT:  OK.  In addition, what I'd like the parties to do is meet and confer.  The defense has indicated that they want to have 70 folks from whom I assume peremptories will be exercised, and I assume from that, Mr. Patton, that you agree there is going to be a request to have additional peremptories.  Is that correct?

MR. PATTON:  There will be, your Honor.

THE COURT:  So, I don't know if 70 is the right number.  If the parties could meet and confer about that, and also the number of peremptories.

MR. PATTON:  I was just going to suggest, your Honor, even if there aren't additional peremptories, I think it makes sense to have more than a sufficient number qualified.

THE COURT:  The only reason -- because, you know, 36 would be the number in order to get -- in other words, that's almost double, so I just wanted to have an understanding of exactly what that means.  And I'm not at all saying that even if you get additional challenges the math will work out so that we don't have some leeway there, because once we have them, I understand things could come up, and that may result in us going below that number.  We don't want to do that.

JBI7SAIC

So, Mr. Patton, in the letter there is a recommendation that there be a hardship questionnaire that gets mailed out initially.  Let me ask, what I had envisioned is having the hardship questions basically front loaded on a questionnaire so that for the ease of the parties when you get it, to review it.  I'm sorry, Mr. Saipov, can you hear the interpreter?

THE DEFENDANT:  No.

THE COURT:  OK.  Let's see if we can check the equipment.

THE DEFENDANT:  It's not working.

THE COURT:  If I could ask the interpreter if you could sit next to Mr. Saipov.

So, just to review for Mr. Saipov's sake, we're going to have a jury of 12 plus six alternates.  The parties are going to meet and confer with regard to the venire from which the parties are going to exercise peremptory challenges, 70 or whatever the number is, as well as discuss how many additional challenges the sides are going to get.

So, the question I had, Mr. Patton, was with regard to that initial questionnaire.  I envisioned having the hardship questions all at once.  And part of my concern is that, as I understand it, the response rate to summonses is about 26 percent, and it has been 26 percent over the past several years, and so my concern is if we send out this questionnaire,

JBI7SAIC

the rate is going to drop even more.  And I think there is something to be said for potential jurors coming here to court, and it would only be a few additional questions and filling out the whole form all at once, rather than doing the hardship part at home, which I have no doubt that everyone would answer truthfully, but it's a different atmosphere when they're sitting over the 500 in the jury room.

MR. PATTON:  Understood.  I think there are some countervailing reasons.  So, one being if we do it that way the number who have to actually personally come in to fill out the questionnaire -- which is fairly lengthy and will require a fair amount of time -- will have to be increased substantially.

THE COURT:  Correct.  And just in line with that, if we send out 3,000 summonses at 26 percent, that comes out to 780 folks, if that percentage holds true.  So, that's what I was thinking.  Then we can bring them in 250 at a time in the morning and in the afternoon until we -- and I will obviously hear from the parties on this -- until we get through the 780.  So that was my thought.  And I'm sorry, go ahead, because I want to hear the other countervailing issues.

MR. PATTON:  In addition to requiring more people to show up, there is a chance when the hardship questions go out under our proposal the potential jurors don't know what the case is, and you may end up getting a little bit of cleaner hardship response that is not in fact in response to the case

JBI7SAIC

itself.  So, we think we might get better responses to the hardship separated and not tied to the case itself.

THE COURT:  OK.

MR. PATTON:  And, in addition, it would just allow us, once the questionnaire process starts -- the fuller questionnaire in March -- if we stick to the schedule we're talking about -- to just be more efficient.  It will go faster, we will have already taken care of if not all at least a sizeable chunk of the hardship issues.

THE COURT:  I mean again I think what we would run into is we would run into a different problem on the back end, which is folks coming in realizing what the case is about, and all of a sudden there are things that have come up, hardships that have come up.  So, I'm not sure we avoid that issue.

In addition, I have concern about mailing things out and then having the requirement that the folks mail it back.  Obviously, they would have a postage paid return envelope, but again I think that would probably eat into the 26 percent and it would be much less of a return.  And since it hasn't, as I understand it, been done in this district, I don't know what the percentage return would be, so we would be flying a little bit in the dark.  And obviously if we need to, I don't want to have to go back to get another set of folks.

MR. PATTON:  Understood.  I wonder if perhaps along the timeline the government mentioned about trying to come to

some sort of agreement about the procedures, in the interim we could provide the Court -- it has been done in other districts, and we could find out if that information exists, about how it impacted the response rate.  I know we've largely based our proposal on Mr. Ruhnke's most recent capital trial in which it was done this way.  And so perhaps we can get other examples and see how it in fact has affected the response rate.

THE COURT:  That's fine.  You know, I'm not wed to it. I should mention that I was thinking about moving that week of March 2 a little bit earlier since the questionnaires will be mailed sometime in December, sometime based on the schedule, not too much earlier, maybe several weeks earlier, so sometime in February rather than in March, again to give us some cushion there.  I don't know if you have any thoughts with regard to that.

MR. PATTON:  I think I would probably like an opportunity to discuss it with our folks and the government.

The other thing that we are in discussions with the government about are Rule 15s and potentially scheduling that.

One possibility -- we by no means have figured any of this out -- but one possible was in February to do that, which would involve, you know, a fair amount of time out of the district.

THE COURT:  All right.  Why don't the parties meet and confer about that, but again it would be moving it up a little

JBI7SAIC

bit sooner.

Is there any objection to the proposal?  And one of the things that's also in the letter is the individual voir dire.  I don't know whether the government has a view right now or not, or whether that's something that you are going to meet and confer about.

MR. LAROCHE:  We're going to meet and confer, your Honor.

THE COURT:  OK.  With regard to the issue of an anonymous jury -- and I have to admit I haven't completely studied your letter -- I'm not sure, did you address it?

MR. PATTON:  We didn't, your Honor.  We had some discussions last week with the government, and they were going to let us know what their position on that was going to be.

THE COURT:  All right.  Yes?

MR. LAROCHE:  We anticipate seeking an anonymous jury, your Honor, and we can do that pursuant to the schedule your Honor sets or with motions in limine.

THE COURT:  And you would object.

MR. PATTON:  We will be opposing that, so we should probably set some sort of briefing schedule.

THE COURT:  I think that's right.  And in addition -- and I don't know whether the government is thinking about this -- but I think that Judge Garaufis in a relatively recent death penalty case also had utilized a partially sequestered

JBI7SAIC

jury.  And I'm not at all raising it because I think I'm weighing in one way or the other, but I'm just raising it to find out what the government's position would be.  And the briefings -- to the extent the government is going to seek that -- the briefing should be the same as with regard to an anonymous jury.

When do you think, Mr. Laroche, you would be able to get me something with regard to an anonymous jury?

MR. LAROCHE:  I think we would request that we set that schedule with the December 6 letter, after the parties have conferred about the broader jury procedures.

THE COURT:  OK.  All right.  Mr. Patton, does that work for you?

MR. PATTON:  That's fine, Judge.

THE COURT:  OK.  Was there anything else with regard to the selection process?  And I guess -- well, is there anything else with regard to the selection process that the parties want to discuss right now?

MR. LAROCHE:  Not that I can think of right now.  If anything comes up, we will raise it in the letter.

THE COURT:  OK.  So, with regard to the suppression motion, the parties have proposed January 22 and 23.  I have a criminal trial that's scheduled to start January 13; it's supposed to last about a week and a half.  Would the parties be available the following week?  I don't have a calendar in front

JBI7SAIC

of me.  The 22nd is what day of the week, Ms. Williams?

DEPUTY COURT CLERK:  Wednesday.

THE COURT:  Would the parties be available the following week?

I've just been informed I have another trial.

All right.  What we will do is the following --
because the trial I have beginning January 13 there has been a
request -- although I'm not inclined to move it, but there has
been a request that I delay that trial.  So, why don't we
schedule the suppression hearing for January.  Can the parties
do it a little bit later in that week, in other words,
Wednesday and Thursday?  Or is that something -- like Thursday
and Friday?

MR. LAROCHE:  It's fine with the government.

MR. PATTON:  Fine with us.

THE COURT:  So why don't we set it for that Thursday
and Friday.

DEPUTY COURT CLERK:  23rd and 24th.

THE COURT:  For the suppression hearing.

Was there anything else with regard to the suppression
hearing that the parties want to raise?

MR. LAROCHE:  No, your Honor.

THE COURT:  All right.  From the defense?

MR. PATTON:  No.

THE COURT:  OK.  The next item on the order that I

JBI7SAIC

issued on November 8 is defense counsel's request to seek access for the records relating to jury selection.  I think as has been discussed there are still some things that need to occur.

The jury administrator is reviewing the materials.  I also provided, just so you know, Mr. Patton, the letter that was filed on the docket today to the jury administrator, and I had a brief conversation with her just about again the logistics and the percentage of return rates on the summons and stuff.

There was one issue though I wanted to raise, and it's a legal issue with regard to the request for the grand jury materials.  There appears to be -- although I haven't found a case in the Second Circuit -- there may be an issue with regard to timeliness with regard to that.  So, what I have asked the parties to do is to look at some case law.  One is United States v. Buzic, 2009 WL 2230808.  And there are several cases from other circuit courts cited there that talk about the timing issue with regard to the request for grand jury materials.  I'm making a distinction between that and obviously the trial materials.

This was a Western District of New York case, and the court held that courts throughout the United States have strictly enforced the seven day limitation period and have held that where the challenge is to a grand jury selection the seven

day period begins to run from the date of the indictment as opposed to the voir dire, I think which was in connection with the request for the -- and I recognize that under the statute, under subsection F it's not the paragon of clarity in dividing up what applies to the grand jury versus a trial jury, but I'd like to get the parties thoughts on that from a legal standpoint.

Next, as I mentioned, the jury administrator is not only speaking with folks here but also in Washington about that.  And thank you for submitting that letter.  I think it will be helpful to facilitate any conversation.

I'm contemplating participating, and by participating I mean just listening.  I'm not sure right now whether or not this is something that I think needs to be on the record or not, but I think it just makes sense so that everybody is on the same page as to what is being said, so just to let you know that.

Lastly, at least with regard to the order, in defense counsel's October 31 letter there was a reference on the third page, the first full paragraph on the third page of that letter, and I know that the request was for me to send a correspondence to the embassy.  I have not yet, because I wasn't quite sure how that was to be communicated, Mr. Patton.  But I made revisions.  I will hand them to you for your side of the V to take a look at, and just let me know whether this is

something that was going to be sent by e-mail -- because there is an e-mail address there -- or how you expected it to get there.

But let's address the issue that was raised in the letter. I mean, I guess, Mr. Patton, the question I have is are you saying -- I know there was language in there that at least from the potential witness's prospective that I think the language was something like less than voluntary or something like that. So I guess I wanted to get some clarity on that, and then I will hear from the government.

MR. PATTON: Your Honor, just so the Court is aware, we did raise the particulars of the incidents we're referring to last week with the government, and they have agreed to look into it. I hesitate to go into too many details publicly because we don't want to exacerbate the problem.

THE COURT: I guess what I would say is the following -- and if it's not the time for me to get involved, that's fine. It sounds like the government is going to be doing some additional investigating or looking into it, so I will leave it to the parties to meet and confer about that.

Obviously, when I read it it's something that I thought I needed to address, or at least move it forward, to try and get to the bottom of it, but right now it sounds like the parties -- well, why don't we do this: Mr. Laroche, how much time would you need to sort of I guess from your

JBI7SAIC

perspective vet the issues that the defense has raised with regard to this potential witness?

MR. LAROCHE:  Your Honor, we have already started, based on the information we got on Friday, asking the appropriate folks.  Out of deference to defense, I won't go into the details of what was provided.

I think I'd ask that if there is any need for a follow-up, that we alert the Court in the same December 6 letter.

I would also just note for the record, your Honor, that we have on several occasions -- it has been suggested to us that witnesses have felt like they shouldn't talk to defense, and on several occasions we have reiterated to the defense that from the government's perspective in any discussions with potential witnesses -- whether it be from the prosecutors or with agents -- we have been very clear that it's entirely their decision whether they speak to defense; we are not discouraging it; we are neutral on it.  And any suggestion otherwise we think is inaccurate.

And we have also told the defense on several occasions that we understand the importance of speaking with potential witnesses for their defense.  So, we have reiterated that to the defense on Friday.  We take issues like this extremely seriously, and we will do everything we need to do to investigate that.  We are certainly aware of absolutely no

inappropriate actions at this point on behalf of law enforcement, and we remain willing and we want to help the defense if there are any such issues, to remedy misimpressions that there might be out there.

THE COURT:  I appreciate that.  And is that timeframe, Mr. Patton, all right with you?

MR. PATTON:  It is, your Honor.  And I just want to be clear on this point.  Sometimes it's not just the words used but how they're used and the whole context of an environment.

We are talking about obviously a highly charged case, and people who sometimes don't have immigration status, or who even if they are citizens or do have immigration status are members of a community that's being closely scrutinized, and so visits from law enforcement agents can often be seen as quite intimidating regardless of the words that are actually used.

Now, we have heard that words have in fact been used that we're concerned about but, regardless, this is going to be an issue I think moving forward not just for people who know Mr. Saipov or knew him either in Uzbekistan or here in the United States but also potentially victims and survivors.

So, this is obviously a very delicate matter for a lot of people, and we just want to be sure that we have the same access to speak with people as the government does.

THE COURT:  OK.  Well, what I would say is the following.  I mean if there are specific -- and I mean

JBI7SAIC

obviously you have communicated with the government.  The specific words we can deal with, I think, fairly easily by communicating that the defense has heard people use certain language which is not conducive to folks being as amenable as they might otherwise be with speaking to the defense.  On the other hand, though, there are certain things that would be very difficult to avoid, and that is just the reaction of someone being approached by law enforcement.  I mean people have that reaction when they're approached by law enforcement to a certain extent.

So, I will leave it to the parties to discuss this and to figure out both in this specific instance and more generally how to reach a place as best we can where folks aren't concerned about participating in this, whether it's as a defense witness or as a government witness, as best we can, because obviously the defense does need to have access to folks.

OK.  So, I will expect to get that at around the same timeframe as the parties discuss the jury selection issues.

Let me just see if there is any -- let me ask, are there any other issues that the parties think we should take up at this stage?  And I may have missed something and I apologize if I did.

MR. PATTON:  Your Honor?

THE COURT:  Yes, Mr. Patton?

JBI7SAIC

MR. PATTON:  If I may, just two issues that I wanted to follow up with the Court on about the MCC.  One is that we had written to the Court about the dental issues for Mr. Saipov, and I just wanted to report back that Adam Johnson has in fact been quite helpful; that elevated it to the regional level -- which apparently is required -- and he seems optimistic that we will be able to get the care that's needed.

THE COURT:  OK.

MR. PATTON:  But we will follow up with the Court if that's not the case.

THE COURT:  And when I received your letter, I communicated with Mr. Johnson, and so I'm glad, because he similarly sent me an e-mail back and indicated that they have to apparently, I don't know, go up the chain in order for it to happen.  So, let me know if you need me to get involved.

MR. PATTON:  Will do.

THE COURT:  And hopefully it gets resolved before Mr. Johnson -- yeah, you know what I was going to say.

MR. PATTON:  That would be nice, and I appreciate the Court's assistance.

Then, secondly, the Court may have done this but we are just not aware of it.  We had a pending request upon the government's consent that the wall team monitor the next family visit.

THE COURT:  I apologize, because I wasn't --

JBI7SAIC

MR. PATTON:  We can renew it with chambers.

THE COURT:  Yes, if you could.  Or I can go back and look.  If you can renew it, that will be great.  I apologize.

And everybody should get Mr. Sugarman's e-mail address.  Obviously, Ms. Rice is no longer in my chambers. Just in case there are e-mails sent to the chamber's inbox, you should also copy Mr. Sugarman and Ms. Williams, to make sure that we get things promptly.

MR. PATTON:  Will do.

THE COURT:  OK.  Anything else, Mr. Patton?

MR. PATTON:  No, your Honor.

THE COURT:  All right.  From the government?

MR. LAROCHE:  No, your Honor.  Thank you.

THE COURT:  OK.  And what was the date again for the December submission?

MR. LAROCHE:  December 6, your Honor.

THE COURT:  The 6th.  All right.  OK.  That's all that I had.  And remember, you know, the more time we can give ourselves after we get the questionnaires filled out, the better, but I look forward to getting the parties' letter of December 6.

MR. PATTON:  Your Honor, Mr. Saipov has asked if he may speak.

THE COURT:  OK.  You know, Mr. Saipov, you recognize that anything that you say can be used against you by the

JBI7SAIC

government.  You're not at all required to say anything.  In fact I would suggest that you allow your lawyers to do the talking here.  But having said that...

THE DEFENDANT:  I want to say something.

THE COURT:  You can speak, if you're more comfortable speaking your native language.  Go ahead.

THE DEFENDANT:  I'm here listening to you, and I do understand it very well, but there is some interesting thing.  There is one thing, the orders that have issued here have absolutely nothing to do with me, because the reason -- because the orders issued here, it says order from you, and I am following the orders of Allah, of the God who gave me the life:  Everything that's happened here has just one reason.  So, these things happen as the result and response to multiple occasions when Muslims all over the world, the women and the kids, are dying under the bombs of the American government.

THE COURT:  OK.  Mr. Saipov, you had made a statement at an earlier court proceeding, and I recognize that you don't recognize me or perhaps my authority here with the orders, and I understand that, but this isn't the time for you to be making statements.  And I understand what you're saying, but I think that can be saved for a different time.

THE DEFENDANT:  If it was said a few times, I still want to say that.  So, now I'm in court and you're judging me for the eight people killed, and you're not judging the

JBI7SAIC

prosecuting when the thousands and thousands of Muslims are dying all over the world.

Question for you. I have a question. So I have a question. This is what I said before, so why now you are judging me and not judging those who killed thousands and millions of Muslims all over the world?

THE COURT: To be clear, Mr. Saipov -- and just to explain the process here -- I am here to preside over your trial; I am not going to decide your guilt or your innocence. I'm not going to decide an issue of penalty, so I'm more like a referee, just to give you a sense of what the process is.

And I understand that you don't agree with that, and I have let you speak, but now I think we're done. OK?

THE DEFENDANT: OK.

THE COURT: All right. Thank you. You may be seated.

OK. Anything else from the government?

MR. LAROCHE: No, your Honor.

THE COURT: All right. Thank you. Thank you very much. We will stand adjourned.

(Adjourned)