UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

Defendant.

Trial
------------------------------x

New York, N.Y.
January 9, 2023
10:20 a.m.

Before:

HON. VERNON S. BRODERICK,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: AMANDA L. HOULE
JASON A. RICHMAN
ALEXANDER N. LI
ANDREW S. DEMBER
Assistant United States Attorneys

DAVID E. PATTON
Federal Defenders of New York, Inc.
Attorney for Defendant
BY: DAVID E. PATTON
SYLVIE J. LEVINE
ANDREW J. DALACK
-and-
ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
BY: DAVID M. STERN
-and-
RUHNKE & BARRETT
BY: DAVID A. RUHNKE

(In open court; defendant present)

THE COURT: If I could ask, Mr. Saipov, can you hear and understand the interpreter?

THE DEFENDANT: (In English) Yes.

THE COURT: Okay. So I received counsel's e-mail from earlier today, this morning, with regard to Jurors 185 and 660. We can call them out individually and ask them these questions at sidebar.

My law clerk has, I think, handed out the transcript pages for Juror 37. I would like to call out Juror 37 first just to ask some questions related to a request to assist the juror in hearing the proceedings. I would have to send 37 to go downstairs. I would propose speaking with 37 first.

Does that make sense to the government?

MS. HOULE: Yes. Thank you, your Honor.

MR. PATTON: Yes, your Honor.

THE COURT: Okay.

Ms. Rodriguez if we could have Juror 37. We are going to speak with the juror at sidebar.

Thank you.

(At sidebar)

THE COURT: Mr. Patton, I could ask the interpreter to come over if you want your client to be able to --

MR. PATTON: That's okay, your Honor.

THE COURT: All right.

Juror 37, if you could step this way, please.

JUROR: Hi, everybody. Happy holidays.

THE COURT: All right. So Ms. Rodriguez told me about your cell phone.

JUROR: The cell phone and my ear pods, yeah.

THE COURT: Do you need to have Wi-Fi?

JUROR: No, that is a Bluetooth thing.

THE COURT: We prepared an order.

Let me just say a couple of things. You are only to use your phone for purposes of your hearing aids.

JUROR: Yes, sir.

THE COURT: You are not to use it for any other purpose, either here in the courtroom or in the back.

JUROR: Fine.

THE COURT: Again, just for your hearing aids.

JUROR: Great.

THE COURT: Don't look at your e-mails, don't --

JUROR: I will keep my adoring fans at bay.

THE COURT: That's fair.

I have an order which is already signed for you. You can go downstairs to get your phone.

JUROR: I don't have my AirPods. I thought this might happen. Tomorrow I will probably have them. For the most part, as long as everyone is on their microphone, I can hear fairly well. It is those quiet talkers I got to worry about.

THE COURT: Everybody is going to speak into the microphone.

JUROR: If you see me doing this, you know what the sign is.

THE COURT: Okay. Thank you very much.

JUROR: Thank you.

MS. HOULE: Your Honor, if I may have a moment to speak with the court separately.

(Juror not present)

MS. HOULE: Your Honor, in light of the fact that the juror doesn't have his AirPods today, if you can instruct him if he does have any trouble hearing to signal to you to let you know.

THE COURT: Sure. Excuse me, Juror 37, before you head back just one more second.

(Juror present)

I know you said you would do this, but why don't you raise your hand.

JUROR: I will do that. I am used to doing it at this point.

THE COURT: Thank you.

JUROR: Thank you.

(Juror not present)

MS. HOULE: Thank you, your Honor.

THE COURT: Yes.

I am going to ask her to get Juror 185.

Could we have Juror 185, please.

THE DEPUTY CLERK: Okay.

THE COURT: Off the record.

(Discussion off the record)

(Juror present)

THE COURT: Just a few questions, Juror 185.

JUROR: Yes.

THE COURT: Let me ask, did you recognize anyone in the jury room today?

JUROR: In the jury room? Other than from the selection process?

THE COURT: Other than that.

JUROR: Yes.

THE COURT: Do you know someone named [redacted].?

JUROR: No.

THE COURT: And the name can be redacted from the record.

He is a coach at [redacted].

Is or was.

JUROR: I think I know who you mean, yes.

THE COURT: Okay.

Do you know him just from seeing him.

JUROR: I know the name. I know a [redacted].

THE COURT: Okay. I think he was a gym teacher. I can't remember.

THE COURT: Do you know anybody in common with him, or is it just other students perhaps?

JUROR: I didn't really have a lot of interactions.

THE COURT: All right.

And so you attended [redacted]?

JUROR: Yes.

THE COURT: Are you still in touch with any of the staff of the high school?

JUROR: [redacted], no.

THE COURT: All right. Okay. If you could step back for one second. I want to see if there are any additional questions.

(Juror not present)

MR. PATTON: I am okay with that. We will see what [redacted] says. One thing I think would be important is to instruct both of them not to speak to each other at all about things related to the high school, keep a wide berth, out of concern that they might have people in common and that conversation could inadvertently spill into people they both know.

(Juror present)

THE COURT: Juror 185, I am going to ask that you refrain from having any conversation with Mr. [redacted].

JUROR: Okay.

THE COURT: Who is Juror 660.

JUROR: Okay. I didn't know he was --

THE COURT: That's fine. We just want to make sure that there isn't any issue where you start and then all of a sudden you mention somebody and then you know somebody in common. Okay?

JUROR: Sure.

THE COURT: Thank you very much.

JUROR: No problem.

(Juror not present)

THE COURT: Juror 660.

Apparently, and I have never seen this before, there is an oath for the jurors, 12, and then there's an oath for alternates. I have never used the alternate oath. I just want to check with the parties that you are fine with swearing them all in.

MR. PATTON: I don't know that I was ever aware of the different oaths.

THE COURT: I think deputy clerks get these cards and they have been around for decades. I think that is an artifact of days gone by.

MR. PATTON: Got it.

THE COURT: All right. Thank you.

MR. PATTON: Just like there is a baby defender school

and a baby judge school, there is a baby clerk school.

THE COURT: Yes. Although these cards, Melissa Williams was my deputy before, and it was just handed down to Leyni. I am sure Melissa got them from somebody else.

MR. PATTON: I once had a very energized discussion with Judge Owen many years ago about something, and his final retort to me was that's how they taught me to do it in baby judge school in 1972, and that's how I am doing it.

THE COURT: Off the record.

(Discussion off the record)

(Juror present)

THE COURT: Hi. It is good to see you again.

JUROR: Good to see you, Judge.

THE COURT: Let me ask, did you recognize anybody in the jury room other than folks you saw perhaps during the jury selection process?

JUROR: No.

THE COURT: Do you know someone named [redacted], who was a former student at [redacted]?

JUROR: No.

THE COURT: All right. So what I am asking, and I have asked Mr. [redacted] also, for you guys not to speak to one another. Mr. [redacted] is Juror 185. And that's just because, you may not know one another, but you may have people in common. It will just be easier if you don't speak to one

another. I apologize if that's inconvenient, but if you could do that.

JUROR: Absolutely.

THE COURT: All right. Thank you very much.

JUROR: Thank you.

THE COURT: Ms. Rodriguez will walk you back.

JUROR: Thank you.

(Juror not present)

THE COURT: Do we need any other jurors?

MS. HOULE: No, your Honor.

MR. PATTON: I don't think so.

THE COURT: Thank you very much.

(In open court)

THE COURT: I have the parties' letters with regard to Government Exhibits 404A, 410, and 1145.

Let me just ask, is it the government's intent, if I allow it, to show Government Exhibit 1145 or just to show the translation, 1145T?

MS. HOULE: We will not be showing either, your Honor, but we do intend to reference the substance of the translation in our opening statement.

THE COURT: Okay.

And with regard to the 404A, I take it you do want to show that and 410?

MS. HOULE: No, your Honor. It's the same for those,

that we would just reference generally what those videos depict.

THE COURT: Okay.

MS. HOULE: Your Honor, you are specifically referencing our intentions with regard to opening statements?

THE COURT: That's correct. I apologize. I had thought that with regard to each of them that there were some things that the government wished to display.

Is there anything else that the parties wish to say with regard to those exhibits?

MS. HOULE: No, your Honor.

THE COURT: The defense?

MR. PATTON: No, your Honor.

THE COURT: All right.

On January 6, 2023, the government informed me that the defense intended to challenge the government's use of GX 404A, GX 410, and GX 1145 during its opening statement. It now has been clarified to me that the government merely intends to reference those exhibits without actually showing them to the jury.

The next day, on January 7, the government filed a letter asserting that the defense "continues to object to the admission of the ISIS claim of responsibility for the defendant's attack," and that's Government Exhibit 1145, on the basis of authenticity and "objects on the grounds of relevance

and/or prejudice" to 404 and 410 "showing the defendant's truck crashing into the school bus and showing the damaged school bus with visible" -- let me ask, and I apologize, Ms. Houle, does that reference include a description that will include the folks who were in the school bus, the children and the attendant and the driver?

MS. HOULE: It generally describes the occupants of the school bus.

THE COURT: Okay.

Government Exhibit 404A, which the government intends to reference in its opening statement, is an excerpt from Government Exhibit 404.

Saipov submitted a letter on January 8, 2023, asking that I deny the government's request, and again I think the reference was to use them, but here to reference them in the government's opening statement.

With regard to Government Exhibit 1145, Saipov argues "because the government has not yet properly authenticated Government Exhibit 1145 and because the out-of-court statement is not relevant and is otherwise inadmissible under Federal Rule of Evidence 403, 702, and 703, the proposed exhibit is inadmissible."

With regard to Government Exhibit 404A, and 410, Saipov argues that because the exhibits are "cumulative and substantially more prejudicial than probative, the videos are

also inadmissible."

I have read Government Exhibit 1145T, which is the translated excerpt from Government Exhibit 1145, and I have watched Government Exhibits 404, 404A and 410 several times. I find that the government's proffer concerning the authenticity of Government Exhibit 1145 is sufficient at this stage to permit the government to reference Government Exhibit 1145 and Government Exhibit 1145T in its opening statement.

I also find that the relevance of Government Exhibits 404A and 410 is not outweighed by the prejudice and the exhibits are not cumulative such that it would preclude reference to them during opening statement.

However, with regard to Government Exhibit 410, I direct the government not reference the statements made by, I believe, the individual taking the video during the video.

Accordingly, Saipov's motion to preclude Government Exhibits 1145, 1145T, 404A, and 410 is granted in part and denied in part.

With regard to ultimately the admission of these exhibits, I hold that in abeyance until such time as the foundation is laid.

Let me ask, with regard to 404, Government Exhibit 404, is there a witness who is going to be testifying about that video?

MS. HOULE: Yes, your Honor.

THE COURT: Is it the person who took the video?

MS. HOULE: No, your Honor.

THE COURT: Okay.

With regard to 410, is there someone who is going to be laying the foundation for that?

MS. HOULE: There will be someone who will testify. Someone who was inside the bus will be testifying, your Honor.

THE COURT: Okay.

The only other thing, the question I had, there are children depicted in various of the videos. Is it necessary or will the government be blurring the faces of the children? Has there been consent obtained with regard to use of their depiction?

I didn't think about this until literally last night. So the parties can meet and confer about that. But let me ask, Ms. Houle, has the government taken steps? And, again, this is a later-on issue when the government seeks to admit those exhibits.

MS. HOULE: We will confer with defense counsel on that, your Honor. The answer is that we have conferred with the family of the child in Government Exhibit 410, and we will discuss whether any further steps are appropriate given your Honor's preliminary ruling with regard to 404A.

One other issue, your Honor. We understand that the Court's limitation in terms of the reference to 410 is to the

individual who was taking the video and not to the driver, whose statements were described in the parties' briefing and your Honor saw is the individual who is outside the bus in the first few seconds of the clip.

THE COURT: That's correct.

MS. HOULE: Thank you.

THE COURT: I took it to be the person whose comments the defense had focused on was the person I believe who was taking the video. Are the parties in agreement that that is the case?

MS. HOULE: I believe so, your Honor.

THE COURT: All right.

Mr. Patton?

MR. PATTON: Yes, your Honor.

THE COURT: Okay. All right.

Anything else before we bring the jury out to swear them in and begin with my preliminary remarks?

MS. HOULE: One moment, your Honor.

THE COURT: Yes.

MR. PATTON: Your Honor, we did notice, and I'm sorry that we only noticed this belatedly this morning, in the preliminary remarks your Honor gives them some information about the hours of the cafeteria and some closing. I think actually they should be instructed that they should not go to the cafeteria.

THE COURT: Okay. All right.

As you know, this isn't my usual courtroom, so I don't know what the rules are here for jurors and using the cafeteria.

So it's no cafeteria for the jurors.

All right. Okay.

Let me just find where -- okay.

Is there anything else?

From the government?

MS. HOULE: No, your Honor.

THE COURT: From the defense?

MR. PATTON: No, your Honor.

THE COURT: Okay.

Ms. Rodriguez, if you could please bring the jury out.

(Continued on next page)

THE COURT: Ms. Rodriguez, if I could ask you to please swear the jury in.

(A jury of 12 and six alternates impaneled and sworn)

THE COURT: Thank you very much, ladies and gentlemen. You may be seated.

Good morning, ladies and gentlemen of the jury. I'd like to start off by reintroducing the parties and some of the people who will be here throughout the trial.

Now, seated at the back table, as you know, are counsel for the defendant and the defendant. The members of the prosecution team are seated at the first table.

My courtroom deputy, Ms. Rodriguez, is seated in front of me. She is the person who you will talk with most during the trial. If you have any questions or difficulties, she is the person to consult.

My law clerk, Ingrid Eicher, is seated to my right. Her job is to help me research any legal issues that may come up during the trial.

Throughout this trial there will also be court reporters who you saw during the jury selection process. They take down everything that is said during the trial so there is a verbatim record.

In addition, at any given time there may be up to three interpreters in the courtroom. They will be speaking quietly into microphones, connected to headsets used by those

who require translations for the proceedings, including the defendant.

First, a role about my role and your role.

I now address my role as a judge and your role as jurors.

In the American system of justice, the judge and the jury have separate roles. My job is to instruct you as to the law that governs the case. I will give you some instructions now and others from time to time during the trial. At the end of the trial, I will give you detailed instructions about the law you will need to apply when you deliberate.

Your job as jurors is to determine the facts based on the evidence presented at the trial. You are the only triers of fact and your decisions on factual issues will determine the outcome of the case.

You must not take anything I say or do during the trial as an indication of what my opinion is or what your verdict should be. It is not my job to even have such an opinion. And if I did, it should not influence you in any way.

The indictment.

This case was brought by way of an indictment, which accuses Mr. Saipov of intentionally using a truck to run over individuals on a bike path and pedestrian walkway along the West Side Highway in lower Manhattan on October 31, 2017, intentionally killing eight people and attempting to kill 18

others. This I'll refer to as the truck attack.

The first 26 counts of the indictment, one for each alleged victim, allege that Mr. Saipov committed this act in an effort to gain membership into the Islamic State of Iraq and al-Sham, known as ISIS, and that ISIS is a racketeering enterprise. The 27th count of the indictment alleges that Mr. Saipov committed this act in order to provide material support and resources to ISIS. The 28th count of the indictment alleges that Mr. Saipov willfully damaged and/or destroyed the truck which resulted in the deaths of eight people. The indictment is not evidence. Saipov has pleaded not guilty.

Mr. Saipov has pleaded not guilty to the government's charges. Now, and throughout the duration of this trial, you must presume that Mr. Saipov is innocent and not guilty of the crimes charged in the indictment. The government has the burden or obligation to prove each of the essential elements of the crimes charged in the indictment to you beyond a reasonable doubt. The purpose of this trial is to determine whether or not the government can meet this burden.

Evidence.

Now, some words regarding the evidence. You must pay close attention to all the evidence presented. Evidence consists of the testimony of witnesses, exhibits that are admitted as evidence, and stipulations agreed to by the

attorneys. A stipulation is simply an agreement between the lawyers about facts or testimony. Certain things are not evidence in the case, and you must not consider them as evidence. For example:

1. Statements and arguments by the lawyers are not evidence. They are simply arguments in which they will tell you what they think the evidence proves and how they think you should analyze the evidence. You should consider these statements and arguments only to the extent they appeal to your own common sense, and you should, under no circumstances, consider them as evidence. My statements are not evidence either.

2. Questions by the lawyers are not evidence. Only the answers given by the witnesses are evidence. For example, if a witness is asked, it was raining that day, it wasn't it; and the witness says, no, it wasn't, then based upon that question and answer, there is no evidence in the case that it was raining that day, no matter how convinced the lawyer sounded when he or she was asking the question.

3. Objections to questions are not evidence. The lawyers are obligated to make an objection when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by my ruling on it. If the objection is sustained, ignore the question and any answer that may have been given. If it is overruled, treat

the answer like any other.

4. Any testimony that I exclude or strike or tell to you disregard is not evidence, and you must not consider it. If I instruct you that some evidence is only to be considered for a certain purpose, you must follow that instruction.

5. And of course anything you may see, hear outside of the courtroom is not evidence, and you should disregard it. You are to decide the case only on the evidence presented here in the courtroom. As I mentioned, the indictment is not evidence.

Witnesses.

Now, regarding witnesses, in deciding the facts of the case, you will have to decide the credibility of the witnesses, that is, how truthful and believable they are. How do you decide what to believe and what not to believe? You are going to listen to the witnesses, observe them, and then decide just as you would decide such questions every day in your ordinary life. Do they know what they are talking about? Were they honest, open, and truthful? Do they have a reason to falsify, exaggerate, or distort their testimony? Is there any reason to think they might be mistaken about what they are telling you? What was their demeanor or manner when testifying? How did their testimony square with the other evidence in the case? In other words, is there other evidence that supports their testimony or undermines it? Considering these sorts of issues

will help you determine what testimony to accept and what testimony to reject.

Keeping an open mind.

As the trial proceeds, you may have impressions of a witness or a subject, but you must not allow these impressions to become fixed or hardened because, if you do, in a sense, you foreclose consideration of the testimony of other witnesses and other evidence that is to come. This would be unfair to one side or the other.

A case can be presented only step by step, witness by witness, until all the evidence is before you. We know from experience that frequently we hear -- we know from experience that frequently we hear a person give his version of an event, which sounds most impressive and even compelling, and, yet, when we hear another person's version of the same event or even the same witness questioned further with respect to it, what seemed quite compelling and impressive may be completely dissipated or weakened. Likewise, if a witness testifies about something and it does not make much of an impression but later evidence supports what the witness said, what did not seem particularly compelling or impressive when you first heard it may be considerably strengthened.

Remember that there may always be another side to any witness' story and there may be more to come on any issue. Now, I can't emphasize this strongly enough that you must keep

an open mind until the trial is over. You should not reach any conclusions until you have all the evidence before you.

Some rules of conduct.

Now, regarding the rules of conduct during trial, in order to ensure you decide the case only on the evidence and that you not be influenced in any way by anything that might occur outside the courtroom, I must give you a specific set of instructions:

First, do not discuss this case with anybody while the case is ongoing. That includes even members of your own family and close friends. You may tell your family, friends, and employer that you are a juror in a case and how long it is expected to last, but do not tell them anything else about the case until after you have been discharged. Not discussing the case includes not blogging, tweeting, texting, using Facebook and the like. Until you are discharged you cannot say anything by any means or in any forum other than that you are on a jury. Here again, I cannot emphasize strongly enough how important it is you do not discuss the case in person, by social media, or otherwise, until the case is over.

My instruction that you not discuss the case also includes not discussing it among yourselves while the trial is ongoing. You will have the opportunity and indeed the duty to discuss the case among yourselves later on, but that can only happen after all the evidence is in and the case is given to

you to discuss and decide in the jury room. This rule is important because experience has shown that when people express an opinion about the case or about a witness, they may become attached to that opinion and their views may harden, and it is important for that not to happen and for you to keep an open mind until you have heard all the evidence. So do not talk about the case, even with each other, until I tell you to do so. Not talking to each other about the case includes not texting, emailing, creating a Facebook group, or doing anything like that.

Second, you are not to read anything in the newspapers or anywhere else about this case if that should occur. Also, you are not to listen or view any reporting about this case if it should be broadcast on TV, over the radio, or on the Internet.

Third, do not do any research or any investigation about the case on your own. Do not go to visit any place you may hear described during the trial. Do not do any research on the Internet or in the library or any other reference source. Do not Google anyone or anything related to the case. I know it is hard in this day and age to not go to the Internet when you are curious about something. Here again, I cannot emphasize to you strongly enough how important it is that you do not do that or conduct any form of outside research relating to this case while the trial is going on.

The reason for these rules against media reports or independent research are that what you might learn could be wrong, and it would be unfair to the parties if you were to have information from outside sources that the parties did not know about and did not have the opportunity to address.

Fourth, be sure that I'm informed if any person that you recognize comes into the courtroom. This is a public trial, so this could happen. But it is important that you not hear from them what may have happened in court while the jury was not present. If you should see a friend, relative, or acquaintance, come into the courtroom, please send a note to me through Ms. Rodriguez at your first opportunity.

Fifth, you are not to allow anyone to speak to you about this case. If you are approached by anyone to speak about it, politely tell them that the judge has directed you not to do so. If any person approaches you or seeks to contact you about the case, you are required to report the incident promptly to me, and you can do that by telling Ms. Rodriguez.

As I mentioned earlier, the lawyers, the parties, and the witnesses are not supposed to talk to the jury outside the courtroom, even to offer a friendly greeting. If you happen to see any of them outside the courtroom, they will and should ignore you. Please take no offense to this. They are only acting properly by doing so. Experience has shown that even innocent conversations with jurors can sometimes be

misinterpreted. So courts have a hard and fast rule that the lawyers, parties, and witnesses cannot speak to jurors, period.

The parties are entitled to have you personally render a verdict in this case based on your independent evaluation of the evidence presented here in this courtroom. Speaking to others about this case, or exposing yourself to information outside the courtroom, would compromise your fairness to the parties. So that is why you cannot communicate about the case or learn anything about the case from any source other than what is presented in the courtroom during the trial.

Finally, if anything should happen during the trial involving any juror which is of an unusual nature, or which you think I should be told about, do not discuss it with any other juror. Simply give Ms. Rodriguez a note to the effect that you want to speak to me about it, and I can then hear what it is and what you have to say. I make these remarks not expecting anything unusual or improper to happen. It's just safer to take the precaution of alerting you in advance.

Trial procedure.

Finally, let me say a few words about trial procedure. The trial essentially has four parts:

First, each side will have the opportunity to make opening statements to you. As I have told you already, these statements are not evidence. Their purpose is to give you an idea in advance of the evidence -- the purpose is to give you

an idea in advance of the evidence that the lawyers expect you to hear and see. These statements allow the lawyers to give you a preview of what this case is about, but the only evidence comes from the witnesses, exhibits, and stipulations. The government has the burden of proof, so it will go first. The defendant has no burden of proof and does not have to do anything at this trial. So the defendant does not have to give an opening statement, but if he chooses to do so, the defendant's lawyers will go next.

Second, after the opening statements, you will hear the testimony of the witnesses. This is the longest part of the trial. The government's witnesses go first. Each witness will give direct testimony, and then he or she may be cross-examined by the other side. Sometimes there will be redirect testimony and occasionally recross-examination. Again, a defendant does not have to question witnesses but may choose to do so. Documents or physical objects or stipulations will be received in evidence. Following the government's case, the defendant may, but need not, present witnesses and other evidence. If the defendant does call witnesses, those witnesses will be examined and cross-examined, just as the government's witnesses were. If the defendant chooses to present evidence, it is possible the government would then present some brief rebuttal to that evidence.

Third, after all the evidence has been received, each

party will have an opportunity to make closing arguments. The lawyers will review the evidence and make arguments to you as to what conclusions they think you should or should not draw from the evidence. These arguments also are not themselves evidence, but they may be helpful to you in summarizing the case before your deliberations.

Fourth, after the arguments or summations, as they are called, I will give you detailed instructions as to the law that applies and controls in this case, and you must follow those instructions. These instructions to the jury are sometimes referred to as the jury charge. After the jury charge, you will go to the jury room to deliberate and discuss the evidence in order to decide the facts and render a verdict.

Final mechanics.

A few housekeeping matters before we begin.
Ms. Rodriguez, later on, will show you to the jury room. You already are familiar with that space. That is where you will report in the morning. In other words, do not report to the courtroom. Only report to the jury room. She will also give you her telephone number where you can reach her if there is an emergency. Please give her your home, work, and cell phone numbers just in case we have a last-minute schedule change or other problem.

As I mentioned, this trial is scheduled to last approximately three months. We will sit Mondays through

Thursdays, so we will not sit on Fridays. The one exception to the schedule will be during deliberations during which we may sit on Fridays.

Our trial day will begin at 10 a.m. We will take a lunch break from around noon to 1 p.m., and we will end at 5:30 each day. We will also have one morning break and two breaks in the afternoon. For the lunch break you are welcome to bring a lunch for that break, or you may walk out and get something. If you need a break before the scheduled morning or afternoon breaks, just raise your hand. But if you can wait until the scheduled break, please do so.

Be on time after the breaks and in the morning. If you are late, you will be keeping everyone waiting. If there are days when we deviate from the 10 a.m. to 5:30 p.m. schedule, I will let you know in advance.

If you wish, you may take notes. Ms. Rodriguez will provide you with paper and pen for that purpose. But if you do take notes, you must leave them in the jury room when you go home for the night and, remember, any notes you take are for your own personal use, to help you recall or focus, but they are not to be relied on by anyone else. It is completely up to you whether you take any notes. Some people find it helps them concentrate or remember. Other people find it distracting. It is your call. If you do not take notes, you should rely on your independent recollection of the evidence. Either way,

when you deliberate, you should discuss what the evidence was, not what one juror's or another's notes do or do not say.

Do we need any setup for the opening statements or are we ready to begin?

MS. HOULE: We are ready, your Honor.

THE COURT: We will now begin with the government's opening statement.

MS. HOULE: Thank you, your Honor. It will be delivered by Mr. Li.

THE COURT: Mr. Li. You may proceed.

MR. LI: Thank you, your Honor.

On the West Side of Manhattan, not far from this courthouse, there is a bike path that runs along side the Hudson River. On October 31, 2017, it was a scene of destruction and horror. Mangled bicycles covered the path. The riders, human beings, lay unconscious or dead. Survivors staggered around, wounded and dazed, searching for their family and friends. Screams filled the air. Near the bike path was a school bus with a truck-sized hole in the side. The bus driver pleaded for help on the street because inside that school bus were two children, and one of them was badly hurt.

The man who did this was Sayfullo Saipov, the defendant. With the truck as his weapon he raced onto the bike path, and he drove, and he drove, plowing through bikers until he crashed into a school bus. He rammed his victims, ran over

them, crushed their bodies, sent them flying into the air, left them bleeding to die. He ended eight lives in his vicious attack, and he forever devastated the lives of so many others.

Why did he do it? Right after the attack the defendant proudly declared why. He did it for ISIS, the brutal terrorist organization that tells its followers to kill innocent civilians in the United States and around the world. The defendant killed to become a member of ISIS, and he did it right here in New York.

It began in 2014, three years before the defendant's attack. That's when the defendant became a follower of ISIS. The evidence will show that the defendant joined other ISIS followers using an encrypted messaging application, and he also accessed ISIS materials online, including speeches from the leader of ISIS.

One ISIS image that the defendant stored on his phone showed a bloody car tire with a caption: Run over them without mercy, just as the defendant would eventually do when he used a truck to run over and murder innocent civilians on the bike path in New York.

In 2016, in the year before the attack, the defendant began planning his attack. He was ready to transition from a follower of ISIS to a full-blown member by carrying out an attack in the name of ISIS. He was ready to become a soldier of ISIS, a soldier of the Caliphate, a member of ISIS. The

defendant watched the video of the leader of ISIS calling for attacks, and he answered that call. He began to design his attack.

Now, the evidence will show that other ISIS soldiers have used vehicles for attacks. The defendant decided to do the same. He picked New York City because he knew it was a busy, crowded city, with people always out. He targeted a path by the Hudson River that is designated for bicyclists, and he planned to continue on to the Brooklyn Bridge, where he could mow down and kill even more people. He chose October 31, Halloween, because he knew there would be lots of people out on the street. He plotted out the place, the time, and the method to maximize the number of people he would kill and maim for ISIS. A week before the attack the defendant began to practice how he would carry out his attack. He rented a pickup truck from a Home Depot store in New Jersey, the same kind of vehicle rented from the same store that he would later use in his attack. He drove to a different Home Depot and he bought a serrated knife, one of several knives that he would bring with him on the day of the attack. He got into the rental truck and he practiced driving it near his house. He prepared to attack, to kill.

The evidence will show that, on October 31, 2017, the day of the attack, the defendant went back to the Home Depot in New Jersey, and he rented the public truck that he would use in

the attack. He drove it into Manhattan, and he headed south on the West Side Highway. Now, the bike path runs alongside the highway, right by the Hudson River. It was a beautiful, sunny afternoon, and there were people out on the path, people just biking and enjoying their day, with no idea that the defendant was about to unleash terror and carnage in the name of ISIS.

As the defendant approached Pier 40, near Houston Street, he struck. He pulled off the West Side Highway, and he raced onto the bike path. Almost immediately the defendant plowed through a family that was visiting from Belgium. The defendant rammed into a young woman in the group, Ann-Laure Decadt. She laid bleeding on the ground. Her mother and sisters ran to her, trying desperately to help her, to talk to her, to save her life. Despite their efforts Ann-Laure Decadt died that day. The defendant had murdered his first victim and he was far from done.

Just after he plowed through the Decadt family, the defendant struck a second family of bicyclists who also happened to be visiting from Belgium to celebrate their birthdays in New York. The defendant devastated that family. The wife lost both her legs. The husband had to undergo brain surgery. Their son suffered head injuries. Their nephew was knocked unconscious. The defendant roared on in his truck.

A few hundred feet past the Belgium victims the defendant smashed into a group of ten friends from Argentina

who were riding in pairs, one pair behind the next. The defendant struck and killed every single rider on the left side of the column. Their names: Hernan Ferruchi, Hernan Mendoza, Alejandro Pagnucco Diego Angelini, Ariel Erlij. The defendant had just murdered those five men. Of the surviving five friends, the defendant also hit two of them, hurting one so badly that he was rushed to the hospital with injuries to his head, his eye, his spine, his ribs.

As the defendant cut through the ten Argentinians, he swerved his speeding truck towards his next target on the path. That target was a young woman who lived in New Jersey and was visiting New York for Halloween. She saw the truck and she tried to avoid it, but the defendant still managed to hit her, crushing her foot and breaking her leg.

The defendant kept going faster and faster as he flew through the next stretch of the path. He ran over a young American named Darren Drake, crushing his body and killing him.

Moments later, the defendant slammed into another young American, Nicholas Cleves, his eighth murder victim, sending his body flying into the air.

The defendant was now racing on the bike path. As he reached the intersection with the street, a school bus crossed his path, and he crashed into the side of the bus. Inside that school bus were two children, a driver, and a woman accompanying the children. One of the children suffered

serious brain damage. The woman suffered broken ribs, a lacerated liver, a fractured spine.

Even though his truck was now a smoking ruin in the middle of the intersection, the defendant still was not done. The evidence will show that he had brought several knives with him to the attack. They had rolled out of reach in the crash. He had also brought two fake firearms, which looked real. He grabbed them, and he burst out of the truck screaming Allahu Akhbar, a celebratory phrase that other ISIS members have also used when conducting terrorist attacks.

A responding NYPD officer ran towards the defendant. The defendant aimed his apparent guns at the officer. The officer fired, hitting the defendant, who went down to the ground.

The defendant's attack was finally over. He had killed eight people and severely injured many more. His victims were innocent men and women and children just going about their day, bodies lay strewn across the bike path, some dead, some critically injured, but clinging to life. It was a scene of devastation and horror, all caused by the defendant for ISIS.

At the hospital, doctors treated the defendant. Once medical staff cleared him to be interviewed, he was eager to speak with the FBI. He was proud of his attack. He told the FBI agents how he planned and practiced his attack. He told

them that his goal was to kill as many people as possible. He told them that the leader of ISIS had called for attacks and the defendant responded. He even asked to display an ISIS flag in his hospital room.

The defendant carried out his truck attack to become a member of ISIS, one of their soldiers. Two days later, ISIS confirmed that the defendant got what he wanted. ISIS issued an announcement proclaiming that the defendant had become a soldier of the Caliphate, meaning a soldier of ISIS, and claiming responsibility for his attack.

That's what the evidence will show. The defendant committed a terrorist attack right here in lower Manhattan in the name of ISIS.

Here is how we are going to show it. We will present six types of evidence over the course of this trial:

First, we will show you the crime scene. Some of it you will see in photographs and maps, the mangled bicycles, the locations of the bodies, the pieces of the truck littering the length of the bike path. For some of the evidence we will bring the physical items into this courtroom and show them to you, the knives that he brought with him to the attack, the notes he wrote, both before and after the attack declaring his allegiance to ISIS and containing his drawings of the ISIS flag. He brought some of those notes with him in the truck.

The second kind of evidence that you will hear is

witness testimony. Survivors and witnesses who are on the bike path will tell you what they saw and heard on that horrifying day. Some will tell you about the roar of the engine, the flash of the truck, the horrible grinding noise as it ran over bicycles and people, the searing pain. Some will tell you about the body and bicycles they saw flying in the air. Some will tell you how their friends and loved ones died right in front of them. You'll also hear from police and first responders. You will hear from the NYPD officer who finally stopped the defendant. You will hear from the FBI agent who managed the crime scene, the collection of evidence, the recovery of the bodies. You will hear from the agent who interviewed the defendant at the hospital when he smiled at the memory of his attack and asked for an ISIS flag to hang in his hospital room. You will hear from the agents and analysts who searched the defendant's truck and house. They found the defendant's note at the scene declaring that the attack was for ISIS, and they found his writings stating his allegiance to ISIS at his home.

The third kind of evidence you will see and hear is forensic. A medical examiner will describe to you the devastating injuries suffered by the victims who died. An FBI lab analyst will tell you about the DNA from three of the defendant's victims found on the truck that he used to mow them down, to crush their bodies. A crash reconstruction expert

will explain how he calculated the defendant's speed from surveillance footage along the bike path and from data recovered in the truck itself, a speed that reaches as high as 66 miles per hour in the moments before the defendant crashed into the school bus.

Fourth, you will see video footage of the defendant preparing for and carrying out his attack. We will show you video of the defendant walking into the Home Depot a week before the attack to get his practice rental truck, video of the defendant walking to another Home Depot that day to buy a serrated knife, video of the defendant leaving his house on the afternoon of the attack, video of the truck racing down the bike path, video of the school bus with a hole in its side as a child looks out the window and a woman lays unconscious by his side, and video of the defendant running in the street and the police finally stopping him.

Fifth, you will see ISIS materials and messages recovered from the two phones that the defendant brought with him in the truck, including audio recordings that the defendant downloaded telling ISIS followers to kill nonbelievers, and ISIS videos with violent imagery and instructions, including a video urging followers to find an American and crush him with your car, and the encrypted messaging application used by the defendant on which ISIS followers urge each other to kill nonbelievers on behalf of ISIS.

To give you context, to help you understand the structure, language, and methods of ISIS, you will also hear from an expert who studies ISIS. The expert will tell you how ISIS publishes messages and propaganda containing instructions for its followers. The expert will explain key terms used by ISIS and go over ISIS statements calling for attacks and announcing responsibility for attacks, including the official ISIS announcement after the defendant's attack when ISIS confirmed that the defendant was a soldier of the Caliphate, solder of ISIS, a member of that terrorist organization.

Sixth, and finally, you will learn about the defendant's own statements. Not just the proud confession he gave to the FBI after his arrest, but words he later said in this very court nine months after the attack continuing to proclaim his support for ISIS. You will hear the defendant's recorded phone calls in jail, like the one when he told his family that he was a solder of the Caliphate, and you will see the defendant's prison writings, some recovered from his cell as recently as last May, in which he drew pictures of swords and guns alongside of ISIS phrases, and even a car flying the ISIS flag.

That's what I expect the evidence to show and how we expect to show it.

Let me just take a few minutes now to talk briefly about the charges in this case. As a result of committing his

terrorist attack for ISIS, the defendant is charged in 28 counts.

Counts One through Eight charge the defendant with committing murder for the purpose of joining a racketeering enterprise. Racketeering enterprise is simply a group that engages in certain kinds of criminal activity, such as murder. The racketeering enterprise charged in this case is ISIS. Each of Counts One through Eight relates to one of the eight victims whom the defendant killed in his attack for the purpose of joining ISIS.

Counts Nine through Sixteen charge the defendant with committing assault and attempted murder for the purpose of joining ISIS. Each count relates to one of the eight surviving victims whom the defendant seriously injured in his truck attack.

Counts Seventeen through Twenty-Six charge the defendant with attempted murder for the purpose of joining ISIS. Each count relates to one of ten surviving victims on the bike path or in the school bus whom the defendant tried unsuccessfully to kill.

Count Twenty-Seven charges the defendant with providing material support to a foreign terrorist organization and causing death. The foreign terrorist organization is ISIS. The support that the defendant provided was committing the terrorist attack and killing eight victims.

Finally, Count Twenty-Eight charges the defendant with damage and destruction of a motor vehicle because he killed his victims while damaging the rental truck.

At the end of this trial we will have a chance to speak with you again. Between now and then, you will see and hear the evidence. We ask that you follow Judge Broderick's instructions on the law and you use your common sense, the same common sense that you use every single day. If you do that, you will reach the only conclusion consistent with the evidence, the defendant murdered eight people in a terrorist attack or ISIS, and he is guilty as charged.

THE COURT: Thank you, Mr. Li.

The defense opening statement.

It's almost noon, Mr. Patton.

MR. PATTON: I think we will need to break now, if it's OK with the Court.

THE COURT: We are going to take our lunch break now, ladies and gentlemen.

My instructions that I gave you earlier apply. You are not to discuss the case, no Googling, nothing. If you brought your lunch, obviously, you are free to eat it in the back, but you can go out and grab lunch.

We are going to come back at around 1:00 to continue with the jury addresses and the defense opening statement. Thank you very much.

Ms. Rodriguez will escort you back.

(Jury not present)

THE COURT: If I could ask everyone, please, in the gallery, we are still proceeding.

Yes, Mr. Patton.

MR. PATTON: Your Honor, can I have one moment to speak with the government?

THE COURT: Yes, please. Go ahead.

MR. PATTON: May we have a sidebar, your Honor?

THE COURT: Yes.

(At sidebar)

MR. PATTON: Your Honor, both the parties agreed that the interpreters in the back are quite loud. I'm having trouble paying attention. I'm sure the jurors can hear it. If you could maybe instruct them that they really need to take it down a couple of notches.

THE COURT: If you like, I'll mention it, or if you want to handle it through the victim witness folks from the U.S. Attorney's Office.

MS. HOULE: Yes, your Honor. We are happy to do that. And the instruction will just be that for right now they can remain in the courtroom, but they need to speak much more quietly.

THE COURT: Correct. If need be, they can position themselves in a place -- the problem is, it's not the line of

sight. I don't actually know where they are currently sitting, but perhaps in a position that's a little bit further away, but they need to keep their voices down, understanding they have a microphone, so that should be sufficient.

MS. HOULE: Yes, your Honor.

THE COURT: Thank you very much.

Mr. Patton, I apologize. I thought that's what you wanted to do. In the future, if we are approaching the time, I'll just say we will take a break.

MR. PATTON: Thank you.

THE COURT: Thank you very much.

(In open court)

THE COURT: Is there anything we should take up before the lunch break?

From the government.

MS. HOULE: No, your Honor.

THE COURT: From the defense.

MR. PATTON: No, your Honor.

THE COURT: I'll see everyone about 1:00. Thank you very much. We will stand adjourned.

(Luncheon recess)

AFTERNOON SESSION

(1:15 p.m.)

THE COURT: Could I see counsel at sidebar, please.

(At sidebar)

THE COURT: A few things.

The reason why I took so long this morning is because the jurors are actually in 11B because if they are eating there's more space down there. We are going to figure out exactly what the protocols call for. There are 18 of them, so it is somewhat tight back there. We have the seats, but we don't have the surface for people to eat.

Juror 407 has indicated to Ms. Rodriguez that he thinks he knows another juror but is not sure and does not know the juror's name, but his suggestion is at 5:30 he will call a friend and ask the friend, "Is this the person?" And then he will figure it out.

My thought is tell him not to do that, not to talk with the person. See if he can, when he comes out here, tell us where the juror is sitting, and we will speak to both of them and tell them they shouldn't talk to one another.

Does that make sense?

MR. PATTON: Yes, your Honor.

MS. HOULE: Yes, your Honor.

THE COURT: Rather than starting literally a game of telephone.

Ms. Rodriguez went down to get the jurors. When they come up, we'll bring them out.

MR. PATTON: Okay.

THE COURT: We will figure out the meal situation. That's why it takes a while.

Yes, Mr. Patton?

MR. PATTON: I had forgotten this morning to invoke the rule against witnesses. I have spoken with the government about it. They have some victim witnesses for both liability and penalty, which we don't object to, but any nonvictim witnesses we would like excluded from the courtroom.

THE COURT: Okay. All right.

Is there an issue with that?

I guess is there a case agent or something like that who is going to testify who is at counsel table or who may be?

MS. HOULE: No, your Honor. There are no nonvictim witnesses in the courtroom.

THE COURT: Okay.

MS. HOULE: And the victim witnesses have the right to be present under the statute.

THE COURT: Yes. And that is one of the reasons -- yes.

Okay. As I understood it, Mr. Patton, you weren't objecting to the victim witnesses.

MR. PATTON: Correct.

THE COURT: Okay. All right.

MR. PATTON: As for our afternoon break, 2:29.

THE COURT: I think I put it -- hold on. We had it at 2:28, but okay.

MR. PATTON: I don't think it actually needs to be that precise.

THE COURT: And we have another one at 4:47?

MR. DALACK: That's right.

THE COURT: That means we come back --

MR. PATTON: It is not optimal.

How late can we go beyond 4:47? Can we go to five?

MR. DALACK: Maybe. Probably.

MR. PATTON: If we can push it a little bit, and then just end.

MS. HOULE: Next week, it looked like the prayer time was getting so close to 5, that it wouldn't make sense to take the break. Then so if we could set a schedule where we end at 5, that could be better.

THE COURT: Yes. If you will let me know, I will let the jurors know that today because of other things I have to deal with, with the lawyers, we are going to break at 5.

MR. DALACK: Great.

THE COURT: If it works.

MR. DALACK: I will let you know at the 2:28 break.

MS. HOULE: The jurors will come out and then we will

just come up to the sidebar with Juror 407?

THE COURT: Perhaps we should have Juror 407 come out now.

THE DEPUTY CLERK: Now?

THE COURT: Yes, please.

Thank you.

What I intend to say is, "I understand you think you may know one of the other jurors. I am directing you not to have any future conversations with the juror. And I would ask that, as the jurors come out, you let us know where the person is seated in the jury box."

MR. DALACK: 5 o'clock is good, Judge.

THE COURT: I will let them know initially when they come out there are some things we have to deal with today so we have to break at 5.

MR. PATTON: Thank you.

MR. DALACK: Thank you.

THE COURT: All right. Thanks.

MR. DALACK: I expect that when we break at 5 you will find --

THE COURT: Step on up.

(Juror present)

THE COURT: I understand you think you may know one the other jurors.

Is that correct?

JUROR: I may and/or might not.

THE COURT: Okay.

JUROR: Like maybe 12, 13 years ago there was someone older around my town and I hung out with a lot of older kids, a couple of years older than me, and there was kind of like a fight, whatever, and my group of friends didn't really like this one gentleman.

I didn't quite recognize this person, but then when we were waiting for 11B to be opened he was saying how he had the long commute and he mentioned the town he came from, Purdys, which is right next to Brewster, where I live, and his face kind of started -- but I would have no idea of the name.

But at 5:30, if one of you guys want to come down with me, I would be able to easily call my friend, who, if I explain the situation that happened however many years ago and he said the name, it would either match or it wouldn't match.

THE COURT: Okay. I don't think we are going to have you do that. I think rather than that I will just instruct you not to have any additional conversations with the gentleman.

JUROR: Yes.

THE COURT: What I would ask you to do, though, is when as you're coming out, if you could note where the gentleman is seated, and we will have a similar conversation with him.

JUROR: All right.

THE COURT: We will have a similar conversation with him.

JUROR: All right. Sounds good.

I just wanted to let you know.

THE COURT: Thank you.

JUROR: Yes.

THE COURT: I guess I need to figure out -- I need to get his name and the other juror's name. If they really know each other, you know -- well, hopefully I will say there is a gentleman you had a conversation with about your commute earlier, I would like you not to have any additional future conversations with him and just leave it at that.

Does that make sense?

MS. HOULE: That is fine, your Honor.

THE COURT: Soon none of the jurors will be able to speak to each other.

MR. PATTON: Given our pool, the fact that people know each other is just amazing.

THE COURT: And work with each other. It's like six degrees of Kevin Bacon.

Okay. All right.

You were about to say, Mr. Dalack?

MR. DALACK: Yes.

So, given the sort of experience today with respect to the lunch arrangements, we had further conversations with

Mr. Steve Wine, and I understand that we can come to an agreement with the marshals that we would like to discuss with you at the end of the day, if that's all right, Judge.

THE COURT: Okay.

So what actually happened today with regard to the food?

MR. DALACK: They didn't transport him with any fresh fruit or anything. They said it is a temperature control issue. The items that they did transport with him he doesn't eat, so he only ate for lunch today crackers and some bread. The marshals agree they are not interested in that and would be amenable to searching food that we brought subject to the Court's order.

THE COURT: All right.

MR. DALACK: I wanted to flesh out some details.

THE COURT: They provided him with peanut butter and jelly.

MR. DALACK: My understanding is that's not what he's typically provided at the jail. It is a temperature-controlled meal. He doesn't eat peanut butter and jelly.

THE COURT: I will hear you out after you have been able to speak to the marshals.

MR. DALACK: Okay.

THE COURT: I don't quite understand the -- we may or may not have apples in our chambers at times, and they are not

refrigerated. They just sit out. So I am not exactly sure what the MDC is referencing. But that's fine. We can deal with that, we can discuss it at the end of the day.

MR. DALACK: Thank you, Judge.

MS. HOULE: I would just say, your Honor, too, I know that when the chief of the criminal division spoke to the MDC he was under the impression that a sandwich plus something else was sufficient. So to the extent that the request is something else, other than a peanut butter and jelly sandwich, we have not yet made that request.

THE COURT: All right. We can explore it. I will hear you out either later today or tomorrow if there is an understanding. Otherwise, you know, I might prevail on the chief to make another call.

MR. PATTON: Your Honor, if I might --

THE COURT: Yes.

MR. PATTON: I am sure that the U.S. Attorney's Office will do its best with him. But we just have so many issues with the MDC screwing things up so often that if the marshals are amenable to it and we can do it --

THE COURT: As I said, I would listen to that, but my view is if they can do it, they should do it, and they shouldn't be recalcitrant just from my perspective in dealing with them.

I understand if it is going to present a problem here,

obviously it takes precedence to make sure things operate smoothly here. Perhaps just separate and apart from this it is going to require me having a conversation with them about what exactly is their policy with regard to providing meals to folks who are on trial and particularly who have dietary restrictions.

So it is not at all -- I mean obviously -- off the record.

(Discussion off the record)

THE COURT: So I understand, Mr. Patton, and I am not saying I am going to delay this if there is an agreement that is reached and the marshals are okay with it. We can proceed from there.

MR. PATTON: Okay. Thank you.

THE COURT: All right.

MR. DALACK: Thank you, your Honor.

THE COURT: All right.

Thank you very much.

(In open court)

THE COURT: Can we bring the jury out?

MS. HOULE: Yes, your Honor.

THE COURT: Mr. Patton?

MR. PATTON: Yes, your Honor.

THE COURT: All right.

Ms. Rodriguez.

(Jury present)

THE COURT: Okay.

Ladies and gentlemen, I hope you had a pleasant lunch. We will now have the defense opening statement.

Mr. Patton.

I'm sorry, if folks in the gallery could just keep their voices a little bit lower, because actually the court reporter has to be able to take down everything and the lawyers need to be able to concentrate.

All right. Thank you very much.

Mr. Patton, you may proceed.

MR. PATTON: Thank you, your Honor.

Good afternoon.

A little over five years ago, Sayfullo Saipov drove a rented truck down the bike path alongside the West Side Highway. He killed eight innocent people and severely injured many more.

It wasn't an accident. He did it intentionally. He did it after consuming all sorts of online ISIS messaging and becoming convinced that it was God's will that he should do it. Mr. Saipov caused unimaginable pain and suffering. There is no excuse for what he did, and we will not offer one to you here.

This trial will not be like most trials you may have seen either in real life or in the movies. There will be no question about who did this. Sayfullo Saipov did it. He did

it because he had become immersed in a world of ISIS messaging, online and social media, in chat groups, hours and hours of audio and video material and other material. And he had become convinced that it was a religious obligation for him to commit a martyrdom attack, to avenge the killing of Muslims around the world, and that it was God's will that he should do that. And as we sit here today, he still believes that. He still believes the ISIS messaging and he still believes it was God's will that he do what he did.

Now, I am guessing you are asking yourselves, well, if he did it, and he did it intentionally and there's no justification or excuse, then what is this first phase of the trial all about, where you will be deciding whether he is guilty of each of the many crimes with which he is charged?

The answer to that is this: Although you won't need to struggle to decide who did this, for certain of the crimes in this case, you will be called upon to determine his motive, his purpose in committing this attack. I want to be very clear. When I talk about motive and purpose, I am not talking about justifications or excuses. Mr. Saipov is responsible for his actions.

Among other crimes, he murdered eight people. Full stop. If this case were only about murder and attempted murder and assault, there would be nothing for you to decide. It would be open and shut.

But for certain of these federal charges, you will be called upon to determine his motive, and in particular the prosecution charges that he committed this attack for the purpose of gaining entrance into ISIS, that he did this in order to join ISIS as a member. And I think you will find during this trial that that is wrong, that that is not why he did this.

He had no real connection to ISIS, the organization, other than being on the receiving end of a bunch of the messaging. And he did not expect to walk away from this attack and become a member of ISIS or any organization. He expected to die. He expected he would become a martyr.

Now, did he believe all the ISIS messaging about this being a religious obligation? Yes, he did. He bought it. He was thoroughly convinced that a true Muslim was required to avenge the killing of Muslims around the world in bombings and drone strikes and other activity and to become one of the mujahideen, a warrior for Islam, and if he did that and moreover if he did the highest thing imaginable, become a martyr, that he and his family would avoid the torments of hell and ascend to the highest reaches of heaven and God would smile one him and he would be a hero to his religion. As hard as it may be for us to wrap our heads around how anyone could believe such a thing, he did, and he still does.

Now, I am sure some of you are thinking, why in the

world should it matter whether he did this terrible thing because he wanted to be a member of ISIS or instead because he believed the ISIS messaging and thought it was God's will that he should do it? The reason I hope you will find that it matters, that I hope you will care is that it's the law. It's what he's charged with.

He's not just charged with murder and assault and attempted murder. He's charged with doing those things for a particular purpose, and that's largely what this first phase of the trial will be all about in terms of contested issues for you to decide.

Thinking about motive here is really thinking about a very fundamental question, which is, why in the world did he do this?

Why did a young man with a wife and three children and a large loving family back in Uzbekistan get it into his head to do this terrible, terrible thing?

How could someone who'd never done anything remotely like this before and who was raised in a family with parents and sisters and grandparents and many others, none of whom believe in or support ISIS, how could he leave his home country of Uzbekistan, come to the United States, and after seven years become convinced that this was the right thing to do?

There are surely no simple, certainly no satisfying answers to those questions. But during the course of this

trial you are going to learn about ISIS messaging, about the content, about the distribution. You are going to see some of it for yourselves, some of the video, some of the other material, and you are going to learn about why national security experts consider it so terribly effective.

I am going to speak with you a little bit this afternoon about those topics and other things I expect you will learn about during the course of this trial. Before I do that I just want to say this: As each of you knows all too well, we spent an awful lot of time selecting you as jurors. When I say "we," I mean those of us at defense table, those at prosecution table, the judge and his staff. We did all that for a reason. We did that because this is no ordinary case. It's not ordinary because there is so much heartache and tragedy here, and you will bear witness to all of it and then be called upon to make decisions about the facts and how they apply to the law regardless of where your emotions may lead you, and that is no easy task. Not everyone can do that. But it is an important task. It is a vital task. I thank you. I know we all thank you for taking it on.

So what are you going to learn during the course of this trial?

Well, let's begin with Uzbekistan. I'm guessing that some of you before being called for jurors in this case may not have given much, if any, thought to Uzbekistan. It is a

country in central Asia. Mr. Saipov was born there in 1988 in the waning days of when Uzbekistan was actually part of the Soviet Union.

It was not an independent country. And when the Soviet Union dissolved in '91, it became an independent country. One of the things I think you'll learn that is significant in this case is that during Soviet times and even post-Soviet times, religion was essentially prohibited outside of very narrow realms.

So Mr. Saipov grew up in a Muslim family, but without much knowledge of Islam. He didn't go to mosque. He didn't study in classes. They were culturally Muslim in that they used greetings and phrases and prayed before meals, but there wasn't a lot of study of the religion.

Mr. Saipov grew up as the oldest of four children and in a large extended family. His father is one of five; his mother is one of three. Both grandparents were in his life. He was constantly surrounded by a large extended family.

When he was a teenager his father along with one of his father's brothers came to the United States. And they stayed for five years, working in construction.

When Mr. Saipov was 21, his father returned. Mr. Saipov finished his studies, was beginning work was a bank clerk in Tashkent, when he applied for and received a work visa to come to the United States. And he came when he was 22 years

old in the year 2010.

When he came to the United States, he lived in Ohio. He didn't know anyone there, but through family acquaintances there was an Uzbek immigrant community there, and through the Uzbek diaspora, he found people there, he got settled, he started working and within a few months found a job that he would have for most of his time in the United States, which is being a long-haul truck driver. He drove tractor-trailers around the country.

In 2012, he married. As is customary in Uzbekistan, it was an arranged marriage. His wife was an Uzbek woman living with her family in Brooklyn, and she moved to live with him in Ohio and they lived there until 2015, when they moved to Florida.

Then in the spring of 2017, they moved to Paterson, New Jersey. During those five years Mr. Saipov and his wife had three children. Up until the time they moved to Paterson, he was a long-haul truck driver. When they moved to Paterson he became an Uber driver, and that of course was six months before the attack in this case.

Needless to say, in the years since leaving Uzbekistan, Mr. Saipov's life had changed dramatically. He went from constantly being surrounded by a large extended family to spending most of his days on the road crossing the country on long-haul trips driving a tractor-trailer. It was

during those years that he became introduced to an extremist strain of Islam and ultimately to ISIS.

He was drawn into an online world of grievance and conspiracy, conspiracy theories that there was a global war on Islam, on the religion, and that instances of Muslims being killed around the world or bombings or drone strikes or other things were not coincidental things, but it was part of a concerted effort, mostly by western countries, to destroy the religion of Islam and kill Muslims and that ISIS was the only organization actually doing anything about it and that ISIS's view of the religion was the only true view, was the only true Islamic view.

As you heard about in the government's opening, ISIS is a brutal terrorist organization. It was founded as an offshoot -- it was called different things, but it was founded as an offshoot of al Qaeda in the wake of the American invasion of Iraq in 2003, and it had different formulations over the next ten years, until 2013, when its leader, Abu Bakr al-Baghdadi, declared ISIS into existence and it is in that name.

The following year, in 2014, he declared the existence of a caliphate. It has long, centuries-old connotations, but essentially it meant a land that would be governed by Islamic law, Sharia law, or at least the version of Sharia law that ISIS subscribed to, and it would be this utopian land where

Muslims could live peacefully and live under the law of God, and they portrayed it in very utopian terms.

You will learn that ISIS had an incredibly well-funded and sophisticated media operation. They put out countless audio and video and other material. They had a radio station, magazines, all sorts of stuff. And you will learn that national security experts consider it to be extremely high quality in terms of its production value, far higher quality than other jihadi groups that had existed before.

A lot of their material looks like what you might be familiar with in terms of western television news documentary shows, like Frontline or 60 Minutes, where you have sort of a talking head expert explain some issue, and it was typically some ISIS leader and then some narrative story to back it up.

And their message was straightforward, which is there are these atrocities being committed against Muslims. And if you do nothing, when you die, God will ask you what you did; and if you did nothing, you will go to hell.

But if you become a mujahideen, if you commit attacks, and most of all, if you commit a martyrdom attack, you and your family will avoid hell and go to the highest reaches of heaven. They combined these religious justifications with very emotional appeals in a number of ways, a lot of materials overlaid with music, called nasheeds, that has particular emotional resonance. And they would also show incredibly

graphic material in different ways.

On the one hand, they would show graphic material of Muslim women and children who had been killed in bombing or drone attacks, but some of it the provenance is not even clear. Who knows where it comes from? But it's gory. It's gruesome. On the other hand, they would show truly gruesome images of violence that ISIS itself had committed, beheadings, other awful things.

And you will learn that experts say there is a reason for this: On the one hand, showing the killed Muslims to stir up moral outrage, and then on the other hand, showing the ISIS violence to show that they were really committed to the cause to terrorize their enemies but also to desensitize their views to violence.

Needless to say, it is a twisted and awful version of Islam, if it actually is. And most, the vast majority of peace-loving mainstream Muslims thoroughly reject it. But you will learn that it was very effective, far more effective than any previous jihadi group had been.

Not only were the productions themselves quite sophisticated, but so was the distribution network. They were very much on the front edge back in 2013 of using the internet and social media. And they used all sorts of platforms that you are very familiar with, Facebook and YouTube and Twitter, until those companies started shutting them down. And then

they would shift their messaging to these encrypted messaging apps, like WhatsApp or Telegram. Telegram was the most popular among ISIS.

And there was a multiplier effect, because it wasn't just the stuff that ISIS was pumping out, but its supporters around the world would pump it out too and create their own stuff and translate the ISIS material into their various languages, including Russian and Uzbek, which are Mr. Saipov's native languages. And they would slice and dice ISIS material, create their own material, and so it spread, like wildfire. Not just the ISIS-produced stuff, but supporter-produced stuff.

You will learn that the ISIS messaging was initially very focused on: "Come to Syria. Come join the Caliphate. Come be a brother in arms and live in this utopia and fight against the Iraqi and Syrian governments."

And it was quite successful. Tens of thousands of Muslims from around the world traveled and joined. At its peak, ISIS controlled territory between Iraq and Syria that was the size of Great Britain. It had a very formalized government structure, a full bureaucracy, a national government, state-level governments, local governments doing all the things that we think of as governments doing. It levied taxes. It had enormous resources and enormous territory.

But over the next few years it started losing for a number of reasons. Iraqis and Syrians began rising up and

battling back. America and other western countries began engaging in military operations against them, the Russians got involved on behalf of the Syrian government, and by 2016 and 2017 they had lost a lot in the way of territory and resources.

And the messaging shifted. The messaging shifted from "come here to join ISIS" to "act where you are," that if you are a true Muslim and you believe in the creation of the Caliphate and Sharia law, you will attack the disbelievers where you are, in the land of disbelief wherever you are, encouraging martyrdom attacks with all the justifications I have been speaking with you about. They did this to try to maintain relevance, to try to have the appearance that they were still powerful and could engage in attacks.

In fact, many people around the world responded. In 2016 and 2017 there was a spike in these external attacks, attacks committed outside of Iraq and Syria, in places like France and Spain and England and, yes, here in America and here in New York, including Mr. Saipov, who were inspired by ISIS messaging to commit attacks in various ways.

Now, after the attacks, ISIS would often claim credit for them whether they had any role in planning them or not, other than simply people responding to their messaging.

The government mentioned in its opening a claim of responsibility for Mr. Saipov's attack that was purportedly issued by ISIS two days after the attack. In that same claim,

they also claimed responsibility for a mass shooting in Las Vegas that you may recall, a horrible incident in Las Vegas where a shooter killed an enormous number of people.

Yet most experts agree ISIS had nothing to do with that, meaning that guy wasn't even inspired by ISIS, he wasn't Muslim, there's no indication or any indication that they had anything to do with it. So they were claiming responsibility for things not only that they didn't have any direct role in, but sometimes for things where people weren't even inspired by it, unlike Mr. Saipov, who was inspired by it.

The fact is Mr. Saipov committed this attack without any real connection other than being inspired by it, by the messaging online in these chat groups and all sorts of other ways.

He watched hours and hours of video and audio and consumed other material and was convinced that ISIS was fighting for a righteous cause and that they were right in their version of Islam and that in fact it was God's will that he should become a martyr and commit an attack, be a mujahideen, a warrior for Islam.

So on October 31, 2017, he rented a truck from Home Depot. He had done the same, as you heard from the government, a week earlier to test the truck, but on this day it was not a trial run. He rented the truck.

He brought with him a pellet gun and a paint ball gun

and a number of knives in a bag and a note that said in Arabic, "There is no God but God and Muhammad is his messenger and the Islamic state will remain."

He crossed the GW Bridge, he drove down the West Side Highway, he veered on to Houston Street and, as you heard in detail, sped down it and killed eight innocent people and severely injured many more, until he crashed into the side of a school bus that had turned from the West Side Highway onto Chambers Street and he T-boned it.

There were two adults and two children in the school bus. One of the adults was severely injured; one of the children severely injured.

He got out of the truck, which was thoroughly disabled at this point. You are going to see images of just how completely crushed the truck and the school bus were. He got out of the truck with the two fake guns that looked quite real, but were not, and began running around on the West Side Highway. Needless to say it did not take the police long to respond. You are going to see video of portions of this. And when the police approached him, obviously carrying very real guns, he pointed the fake guns and was shot.

He was taken to the hospital, and after surgery was recovering. A little before midnight when he was recovering and coming to and conscious again, two members of the Joint Terrorism Task Force interviewed him. They interviewed him for

nine hours. One was a member of the FBI, the other a member of the Port Authority, who their primary focus is terrorism cases.

They interviewed him for nine hours. And he told them exactly what he had done and why. He told them he'd seen a recording in which the leader of ISIS, Abu Bakr al-Baghdadi, told people to commit these attacks, and so he did.

He said he did not want to go to join ISIS in Syria but that instead he wanted to commit the attack in response to all the atrocities he felt were being committed against Muslims around the world and because of his belief that the United States had killed millions of Muslims. And he told them that if God had wanted him to die that day he would have died. And he asked for an ISIS flag and said that he was glad that he had done what he had done.

The agents asked Mr. Saipov how he'd gotten all these ideas about ISIS. He told them that he first started following ISIS a few years earlier, that he obtained their videos online, and then he received invitations to join messaging chat groups, namely Telegram, and that he continued to receive loads and loads of material on Telegram.

The agents then asked for permission to search his phones. He consented. He gave them his passwords, and they searched the phones and they found all the things he was telling them he had been looking at. And you are going to see some selection of it.

The day after the attack, on November 1, 2017, he was brought to court and then taken to jail. Since that time, a little over five years ago, he has been in solitary confinement first at the federal detention center in Manhattan, and more recently at the federal detention center in Brooklyn. In a typical month, with slight variations, he has twos 15-minute calls that are monitored by the FBI, one 15-minute call to his family in Uzbekistan and one with his family here in the United States. Through it all, after five years, right up until here and now, he still believes that it was God's will that he should do what he did.

I am going to wrap up now. When I sit down, you are going to start hearing from the witnesses.

I will finish with this: At the end of the day, there is no making sense of such a senseless act. Mr. Saipov caused extraordinary harm to many, many people, the people he killed, the survivors who live with their injuries, the families and loved ones of them all. And there are surely going to be questions about why Mr. Saipov did this, for which there is no real answer, certainly no rational answer in any conceivable way.

But here in this courtroom during the course of this trial, we can at least do our best to uphold the rule of law by carefully examining the facts and figuring out, to the best of our ability, what really happened here and then applying those

facts to the law. That's all we really ask of you.

I think if you do that, you will find that of all the inconceivable reasons Mr. Saipov did this, joining ISIS, joining any organization was not one of them. And at the end of the trial, I will come back and speak with you a little bit more about that.

Thank you.

THE COURT: Okay. Thank you, Mr. Patton.

The government's first witness.

MR. RICHMAN: Thank you, your Honor, the government calls William Harris.

THE COURT: Okay.

(Continued on next page)

THE COURT: Mr. Harris, if you could remain standing for one moment.

Ms. Rodriguez, if you could administer the oath.

WILLIAM HARRIS,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: Mr. Harris, you may be seated. Make yourself comfortable. You may take your mask off.

Mr. Richman, you may proceed.

MR. RICHMAN: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. RICHMAN:

Q. Good afternoon. How old are you?

A. Forty-six.

Q. Where do you work?

A. The Theatrical Teamsters Local 817.

Q. What do you do for the Theatrical Teamsters?

A. I'm a truck driver.

Q. How long have you worked at the Theatrical Teamsters as a truck driver?

A. About seven years.

Q. What did you do before that job?

A. I was an operating engineer for my family's excavation business.

Q. For approximately how long?

A. About nine years.
Q. Before working for your family business, what did you do?
A. I was in the United States Marine Corps.
Q. How long were you in the United States Marine Corps for?
A. Four years.
Q. What did you do at the United States Marine Corps?
A. I was an aviation ordnance technician.
Q. What does that mean?
A. Weapons systems for any and all aircraft in the Marine Corps inventory.
Q. Directing your attention to October 31, 2017, were you working that day?
A. Yes, sir.
Q. What was your responsibility at work that day?
A. I was transporting materials from our base camp to our set.
Q. Where was your base camp located?
A. On Church Street.
Q. Where was your set located?
A. 7 World Trade Center.
Q. What were you using to transport materials from base camp to set?
A. Box truck.
Q. At approximately 3 p.m. that day, where were you?
A. I was at the intersection of Chambers and West Street.
Q. What was your intended driving route from that

intersection?
A. I was going to make a left onto West Street to go to 7 World Trade Center.
Q. Were you waiting to turn onto West Street at approximately that time?
A. Yes, sir.
Q. While you were waiting to turn onto West Street, did you hear anything?
A. Yes, sir.
Q. What did you hear?
A. I heard, sounded like a car cash.
Q. When you say it sounded like a car crash, what do you mean?
A. Metal impacting metal.
Q. After hearing the noise that sounded like a car cash, did you see anything?
A. Yes. I saw a school bus like teetering right to left and back to the right.
Q. When you saw this school bus teetering back and forth, where was it located?
A. On the opposite side of the intersection from me.
Q. The opposite side of the West Side Highway from you?
A. Yes, sir.
Q. Did you see any other vehicles at this time located near that school bus?
A. Yes, sir.

Q. What vehicle?
A. I saw like an orange-and-white pickup-type vehicle.
Q. What, if anything else, did you notice about that orange-and-white pickup-type vehicle?
A. It looked like a U-Haul or Home Depot rental truck.
Q. When you saw this rental truck, what condition did it appear to be in?
A. It was wrecked from the car accident.
Q. What did you do next?
A. I grabbed my walkie-talkie to communicate with the other Teamsters that we should probably use a different route to get to 7 World Trade Center because of the accident.
Q. What was the next thing you recall seeing?
A. The driver of the vehicle exit the pickup-type vehicle.
Q. What, if anything, did you see him doing next?
A. He ran around the backside of it.
Q. Could you hear the driver of the vehicle saying anything at this point?
A. Not really. I could see him mouthing something, but I couldn't hear him.
Q. Now, before we continue, could you please look around the courtroom today and tell us if you see that individual by indicating where he is sitting and an article of clothing he is wearing.
A. Crap. Sorry.

Q. You can stand up, if you need to, Mr. Harris.

Excuse me one second, your Honor.

Mr. Harris, if you need to and you can put your mask off if you do. You can step outside of the witness box to see if you can see the full court.

Mr. Harris.

A. I'm sorry. I do see him.

Q. If you could step back into the witness box and remove your mask, please. Thank you, Mr. Harris.

What were you saying?

A. I can see him. His face is behind a screen over there.

Q. Could you identify him by an article of clothing he is wearing, please?

A. Looks like he has a green top on.

MR. RICHMAN: Your Honor, may the record please reflect that the witness has identified the defendant.

THE COURT: The record so reflects.

MR. RICHMAN: Thank you, Judge.

Q. Thank you, Mr. Harris.

Mr. Harris, as you saw the defendant exiting that truck, where was he located?

A. He was on the Chambers Street, just west of West Street.

Q. What did you do next after seeing him exit his vehicle?

A. I was on my walkie-talkie talking to the other Teamsters.

Q. What, if anything, did you see the defendant next do after

seeing him exit and come around his vehicle?
A. I saw him brandishing two pistols and threatening the people that were -- that had gathered around the intersection.
Q. What did you do next?
A. I began driving my vehicle at him.
Q. Why did you do that, Mr. Harris?
A. He was waving the pistols in a threatening manner to people in the area.
Q. What happened when you tried to run over the defendant?
A. He sidestepped my truck.
Q. What did you do next?
A. I brought my truck to a safe and complete stop and shut the engine off while exiting to begin chasing him.
Q. Did you then begin chasing him?
A. Yes.
Q. Where did you pursue the defendant after you began chasing him?
A. We started southbound in the southbound lanes of West Street, crossing over the median into the northbound lanes, going north crossing over Chambers Street, then coming back southbound going diagonally across the intersection.
Q. For approximately how long do you think you were chasing the defendant?
A. About five minutes.
Q. What was the defendant doing as you were chasing him?

A. He was continuously waving his pistols about. At this time I heard him shouting Allah Akhbar and just looking back at me running away and continues to just waving his pistols in a threatening manner.

Q. Did you believe that the firearms the defendant was holding were real?

A. Yes, sir.

MR. RICHMAN: Your Honor, I would now like to read a stipulation between the parties, and, with the Court's permission, I would ask to display the stipulation as I read.

THE COURT: Any objection?

MR. PATTON: No, your Honor.

THE COURT: You may. Go ahead.

MR. RICHMAN: Thank you, your Honor.

Mr. Sitko, if we could please pull up Government Exhibit 2005. We will start with the introductory paragraph and the first two numbered paragraphs, please.

It's hereby stipulated and agreed, by and among the parties, that: Government Exhibit, GX-401 through GX-413 are segments of lawfully obtained videos taken on October 31, 2017. The times and locations associated with GX-401 through GX-413 listed below are approximate.

Mr. Sitko, if we can move to paragraph 8, please, on page 2.

GX-406 is an excerpt of a video obtained from the

vicinity of 300 North End Avenue in Manhattan, New York, and depicting the intersection of Chambers Street and the West Side Highway. GX-406 depicts between approximately 3:06 p.m. and 3:08 p.m.

Mr. Sitko, if we can please move to paragraph 15 on page 4.

This stipulation, as well as the government exhibits referenced in this stipulation, may be received into evidence as government exhibits at trial, subject to objections by the defendant based on relevance, hearsay, or under Rule 403.

It's signed by the parties.

Your Honor, the government would offer Government Exhibit 2005 and Government Exhibit 406 at this time.

THE COURT: Any objection?

MR. DALACK: One moment, your Honor.

THE COURT: Yes.

MR. DALACK: Your Honor, no objection at this point, subject to our previous objection, to the admissibility of Government Exhibit 406.

THE COURT: Government Exhibit 2005 and Government Exhibit 406 are admitted in evidence.

(Government Exhibits 406 and 2005 received in evidence)

MR. RICHMAN: Your Honor, we'd like to play portions of Exhibit 406, please.

THE COURT: You may.

MR. RICHMAN: Mr. Sitko, if we could please pull up Government Exhibit 406, which is now in evidence, and play it from the beginning to the eight-second mark and pause there.

THE COURT: Mr. Harris, you should be able to see the video in front of you. OK.

MR. PATTON: Can we have a moment, your Honor?

THE COURT: Yes. One moment, Mr. Sitko.

MR. PATTON: Nothing.

THE COURT: Thank you.

You may proceed.

MR. RICHMAN: Thank you, your Honor.

Mr. Sitko, if we can please play through the eight-second mark and pause there.

(Video played)

Q. Mr. Harris, just to reorient, what intersection are we looking at here?

A. That is Chambers Street and West Side Highway.

Q. Do you see yourself depicted in the still that's currently on the screen?

A. Yes, sir.

Q. Where are you located?

A. I'm the black figure in front of the wrecked vehicle.

Q. Is that sort of in the middle of the screen, Mr. Harris?

A. Yes, sir.

Q. The wrecked vehicle you just mentioned, which vehicle is that?
A. That is the vehicle that impacted the school bus.
Q. Mr. Harris, do you see the defendant in this still image?
A. Yes, I do.
Q. Where is he located?
A. He is the figure in the crosswalk along side the pickup truck.
Q. Mr. Harris, do you see the truck you had been driving in this still?
A. Yes, I do.
Q. Where is that located?
A. It's on the bottom right side of the screen.

MR. RICHMAN: Mr. Sitko, if we can now please play to the 29-second mark and then pause.

(Video played)

Q. Mr. Harris, what were you doing in that clip that we just watched?
A. I was chasing the defendant.

MR. RICHMAN: Mr. Sitko, if we could now please play to the 1:07 mark and pause again.

(Video played)

Q. Mr. Harris, what is the defendant doing at this point?
A. He is looking back to his right and pointing his pistols to the right.

Q. After the defendant looked back to his right and pointed his pistols to his right, do you recall what happened next?
A. Yes. He dropped to the ground like a sack of potatoes.
MR. RICHMAN: Mr. Sitko, can we please play to the 1:18 mark and pause there.
(Video played)
Q. Mr. Harris, did you see yourself in that clip?
A. Yes, sir.
Q. What were you doing there?
A. That's when, after the defendant collapsed to the ground, I went up and kicked pistols out of his hands.
MR. RICHMAN: Mr. Sitko, if we can please play through 1:24 and pause at that point.
(Video played)
Q. Mr. Harris, after you kicked the pistols away from the defendant, what did you do next?
A. I ran over to the shoulder of the West Side Highway and presented myself as a noncombatant surrendering to the police.
Q. Are you located in this still shot?
A. Yes, sir.
Q. Where are you located?
A. I'm the black figure in the shoulder next to the tree.
MR. RICHMAN: Your Honor, may I have one moment?
THE COURT: Yes.
MR. RICHMAN: Nothing further, your Honor.

THE COURT: Cross-examination.

MR. DALACK: One moment, your Honor.

THE COURT: Yes.

MR. DALACK: No cross-examination, your Honor.

THE COURT: Thank you.

Mr. Harris, you may step down. Thank you very much.

(Witness excused)

THE COURT: If we could have the government's next witness.

MR. LI: The government calls Ryan Nash.

THE COURT: Mr. Nash, if I could ask you to step up. Just remain standing for a moment. My deputy clerk will administer the oath.

RYAN NASH,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: You can be seated. You can take your mask off.

You may proceed.

DIRECT EXAMINATION

BY MR. LI:

Q. Good afternoon.

Are you currently employed?

A. I am.

Q. Where do you work?

A. I work with the New York City Police Department.
Q. What is your current title?
A. I'm a detective.
Q. Did you participate in the arrest of an individual on October 31, 2017?
A. I did.
Q. Do you see the person you arrested sitting here in the courtroom today? If it's easier for you, you can stand up.
A. I do.
Q. Please identify that person by an article of clothing and where he or she is sitting.
A. Yes. Second table, appears to be a green overcoat.

MR. LI: Your Honor, may the record note the defendant has been identified by the witness?

THE COURT: It will note, yes.

Q. Detective Nash, let's go back to October 31, 2017. At that time what was your title with the NYPD?
A. I was a police officer.
Q. What was your assignment that day?
A. I was working patrol, sector Adam boy.
Q. What is sector Adam boy?
A. It covers the lower Manhattan area and downtown.
Q. Let me turn your attention specifically to the early afternoon of that day, October 31, 2017.

Did you respond to the vicinity of West Street and

Chambers Street that afternoon?
A. I did.
Q. Why?
A. There was an emotionally disturbed child call at the high school up the street, 347 Chambers Street.
Q. What is the name of that high school?
A. That's Stuyvesant High School.
Q. Is that high school located near an intersection?
A. It is.
Q. What is that intersection?
A. Chambers Street and West Street.
Q. Is West Street known by any other names?
A. It's also known as the West Side Highway.
Q. Did you go to the school?
A. I did.
Q. Did anyone go with you?
A. Yes.
Q. Who went with you?
A. My partner, Officer Haciodos, and also another sector car, which was Officers McGinn and Welsom.
Q. What happened when you got to the school?
A. We entered the school, we met with the guidance counselor and was introduced to the young woman who was having the emotional breakdown.
Q. Did anything out of the ordinary happen while you were at

the school?
A. Yes.
Q. What happened?
A. A school safety officer came into the room that we were in and stated there was a man outside with a gun.
Q. What did you do with that information?
A. I exited the school to the street. I saw what appeared to be a smaller school bus that had been in an accident.

MR. LI: Your Honor, may I publish a stipulation between the parties and read portions of that stipulation?

THE COURT: You may.

MR. LI: Mr. Sitko, please publish Government Exhibit 2017. Turn to paragraph 5, please.

The parties agree, paragraph 5: Government Exhibit 201 through 229, 231 through 242, 244 through 249, and 287 are all fair and accurate depictions of the bike path and the surrounding area taken on or about October 31, 2017.

Mr. Sitko, could you please turn to subparagraph c, please.

More specifically, Government Exhibits 210 through 214 fairly and accurately depict a school bus that was hit by the truck.

Paragraph 6, please.

Paragraph 6: This stipulation and the government exhibits referenced in this stipulation may be received into

evidence as a government exhibit at trial, subject to objections by the defendant based on Federal Rules of Evidence 401 and 403.

At this time, your Honor, the government offers Government Exhibits 210 through 214 and Government Exhibit 2017, which is the stipulation.

MR. STERN: No objection.

THE COURT: Government's Exhibit, is it 217, and what were the other exhibits? I apologize, Mr. Li.

MR. LI: It was Government Exhibits 210 through 214 and Government Exhibit 2017.

THE COURT: Government Exhibit 2017 and Government Exhibits 210, 211, 212, 213, and 214 are admitted in evidence.

(Government Exhibits 210-214 and 2017 received in evidence)

MR. LI: Your Honor, would this be a good time to take a break?

THE COURT: I think it would be. If you need time to set up the technology, you can set it up now.

Ladies and gentlemen, we are going to take an afternoon break. Please remember, do not discuss the case with each other. Take time, have a relaxing break. We will come and get you when we are ready for you. Thank you very much.

I should mention, I need to deal with some issues today with the lawyers, so we are be breaking at around 5:00.

Thank you very much.

(Jury not present)

THE COURT: Counsel, is there anything that we need to take up before we take our break?

MS. HOULE: Not from the government.

THE COURT: From the defense.

MR. PATTON: Your Honor.

THE COURT: I'll see you in a few minutes. Thank you very much.

(Recess)

THE COURT: Mr. Li, you may proceed.

MR. LI: Missing one thing.

THE COURT: If you could get the jury, please.

(Jury present)

THE COURT: Ladies and gentlemen, welcome back. We are going to continue with the direct examination of Detective Nash.

You may continue.

MR. LI: Thank you, your Honor.

Permission to publish Government Exhibit 212, which is in evidence.

THE COURT: You may.

MR. LI: Mr. Sitko.

Q. Detective Nash, do you recognize Government Exhibit 212?

A. I do.

Q. What do you recognize it to be?
A. This is the school bus outside of the high school.
Q. Is this in approximately the same condition as when you encountered it on October 31, 2017?
A. Yes.
Q. Could you please describe the condition of the school bus when you saw it.
A. Looked like it had been in an accident. The rear passenger's side was kind of caved in. All the metal had been like broken in towards the actual vehicle.

MR. LI: Mr. Sitko, you can take down Government Exhibit 212.

Q. Detective Nash, did you approach the school bus?
A. I did.
Q. Did you encounter anyone in the vicinity of the school bus?
A. I did.
Q. Who did you encounter?
A. The bus driver.
Q. What was his demeanor at the time?
A. He seemed very distressed. He was kind of running around in circles.
Q. Did you speak with a school bus driver?
A. I did.
Q. What, if anything, did he say to you?
A. He stated there were young kids on the bus.

Q. Did you see anyone inside the school bus?
A. I did not.
Q. Did you hear anyone inside the school bus?
A. I did.
Q. What did you hear?
A. I heard a lot of screaming.
Q. Could you tell how many people were on the school bus?
A. I could not.
Q. Did you stay with the school bus?
A. I did not.
Q. Why not?
A. I was told by a civilian behind me that there was a man with a gun that went in the direction of West Street and Chambers Street.
Q. When the civilian told you that, what was the civilian's demeanor?
A. He seemed also distressed.
Q. Did the civilian describe the man who had the gun?
A. He stated he had a blue jumpsuit with a red stripe across the chest.
Q. What did you do with that information?
A. I headed down towards the intersection.
Q. Which intersection are you referring to?
A. That's Chambers Street and West Street.
Q. What, if anything, did you see there?

A. I saw a Home Depot truck, like one of those rentable Home Depot trucks that looked light it had also been in an accident.
Q. Could you describe the condition of the truck.
A. The front of the vehicle looked like it was smashed. The bumper looked like it was jammed into the engine area, and there was smoke coming from the front of it.

MR. LI: Mr. Sitko, please establish Government Exhibit 2017, which is a stipulation entered in evidence, and let's turn to paragraph 5A, please.

The parties agree Government Exhibits 201 through 204 fairly and accurately depict the Home Depot rental truck bearing New Jersey license plate XDFF74, referred to herein as the Truck.

Your Honor, the government offers Government Exhibits 201 through 204.

THE COURT: Okay.

MR. STERN: No objection.

THE COURT: Government Exhibits 201, 202, 203 and 204 are admitted in evidence.

(Government Exhibits 201, 202, 203 and 204 received in evidence)

MR. LI: Mr. Sitko could you please publish Government Exhibit 202.

BY MR. LI:
Q. Detective Nash, do you recognize Government Exhibit 202?

A. I do.

Q. What do you recognize that to be?

A. That is the Home Depot truck at the intersection of West Street and Chambers Street.

Q. Is this approximately the condition in which you observed it?

A. Yes.

Q. Did you see the man with a gun nearby?

A. I did.

Q. What did you see?

A. I saw him in what is like the center median of West Street, it's a highway that runs on the west side of Manhattan. So there is actually two separate sections of lanes, one going northbound and one going southbound, and then there's like a pedestrian crosswalk in the middle, and that's where I saw him.

Q. So was he in the vicinity of that intersection?

A. Correct.

Q. And what was he wearing?

A. He was wearing a blue jumpsuit with a red stripe.

Q. What, if anything, was he carrying?

A. He had two guns with him.

Q. At some point in time did you get a close look at that man?

A. I did.

Q. Who is he?

A. Sayfullo Saipov.

Q. Is that the defendant?
A. Correct.
Q. Did the defendant appear to be armed at the time?
A. Yes.
Q. And what did he appear to be armed with?
A. It looked like one pistol in each of his hands.
Q. Did the guns appear to be real?
A. Yes.
Q. Did you later learn whether they were, in fact, real?
A. I did.
Q. Were they?
A. They were not.

MR. LI: Mr. Sitko, could you please pull up Government Exhibit 2005, which is a stipulation in evidence.

Let's turn to paragraph 9, please.

I am reading paragraph 9.

The parties agree Government Exhibit 407 is an excerpt of a video obtained from the vicinity of the West Side Highway and Chambers Street in Manhattan, New York, and depicting the bike path and Chambers Street.

Government Exhibit 407 depicts between approximately 3:05 p.m. and 3:06 p.m.

At this time the government offers Government Exhibit 407.

MR. STERN: No objection.

THE COURT: Government Exhibit 407 is admitted in evidence.

(Government Exhibit 407 received in evidence)

MR. LI: Mr. Sitko, please play Government Exhibit 407.

(Video played)

BY MR. LI:

Q. Detective Nash, do you recognize the contents of the video we just watched?

A. I do.

Q. What do you recognize it to be?

A. That is the intersection of Chambers and West Streets.

Q. And what is depicted at that intersection?

A. That is the Home Depot truck that was at the intersection and the defendant.

MR. LI: Mr. Sitko, could we go to about two seconds into the video. If we could go back just a smidge.

Thank you.

Mr. Sitko, could we zoom in on the person in the video.

BY MR. LI:

Q. So, Detective Nash, we paused the video at about two seconds in. Do you recognize the man in the center of the frame wearing a blue jacket with a red stripe?

A. I do.

Q. Who do you recognize him to be?
A. The defendant.
Q. Do you see an object in the defendant's right hand?
A. I do.
Q. What is it?
A. A pistol.
Q. And what's in his left hand?
A. A pistol.
MR. LI: Mr. Sitko, we can take down Government Exhibit 407.
BY MR. LI:
Q. Detective Nash, what did you do when you saw the defendant with the guns?
A. I ran towards the intersection. I gave commands for him to drop the weapons.
Q. And when you say you gave him a command, you gave him commands to drop the weapons, what did you say to him?
A. I said, "Please drop the weapons."
Q. Did he drop the weapons?
A. He did not.
Q. What did he do?
A. He raised them up and aimed them at me.
Q. What did you do?
A. I discharged my firearm.
Q. How many shots did you fire?

A. Nine.
Q. Did you hit the defendant?
A. I did.

MR. LI: Mr. Sitko, please pull up Government Exhibit 2005, which is a stipulation in evidence.

Let's turn to paragraph 11, please.

I am now going read paragraph 11.

The parties agree Government Exhibit 409 is an excerpt of a video depicting the intersection of Chambers Street and the West Side Highway in Manhattan, New York.

Government Exhibit 409 depicts between approximately 3:07 p.m. and 3:08 p.m.

At this time the government offers Government Exhibit 409.

MR. STERN: No objection.

THE COURT: Okay.

Government Exhibit 409 is admitted in evidence.

(Government Exhibit 409 received in evidence)

MR. LI: Mr. Sitko, please play Government Exhibit 409.

(Video played)

Q. Detective Nash, do you recognize the contents of this video?
A. I do.
Q. What do you recognize it to be?

A. That is the intersection of West Street and Chambers Street. That is, actually, in frame, that is the pedestrian crosswalk in the middle of the highway.
Q. And what happened in the video?
A. That is the defendant raising his firearms towards me and you can hear me discharging my firearm.
Q. Does this video accurately depict your encounter with the defendant?
A. Yes.
MR. LI: Mr. Sitko, let's please pause at 3 seconds in. If you could go back just a smidge, please.
And, Mr. Sitko, can we zoom in on the person in the center of the screen.
BY MR. LI:
Q. Detective Nash, do you see a person in the center of the screen wearing a jacket with a red stripe?
A. I do.
Q. Do you recognize that person?
A. I do.
Q. Who is it?
A. The defendant.
Q. What is the defendant doing in this still frame?
A. He is aiming his weapons at me.
Q. Where are you in the video?
A. I am just off camera to the right, so just north of where

he is.

MR. LI: Mr. Sitko, could we just play the remainder of the video, please.

(Video played)

Q. Detective Nash, what do we hear in the background of the video?

A. That's me discharging my firearm.

Q. Are those gunshots?

A. Yes.

Q. Are they your gunshots?

A. Yes.

Q. We are now paused at the very end of the video, which is about 7 seconds in. Do you see a man in shorts standing on the right part of the screen?

A. I do.

Q. Do you recognize that man?

A. I do.

Q. Who that person?

A. William Harris.

Q. After you discharged your firearm, what did you do next?

A. I took cover behind a white box truck that was in the intersection. I reloaded my firearm, and I looked back out to see if there was still a threat.

Q. Was there still a threat?

A. The defendant was on the ground with both guns still in his

hands.

Q. What did you do at that point?

A. Me and my partner, Officer Hasiotas, started to move towards the perp -- I mean the defendant. Sorry. As we got closer, there was a civilian individual that came into our view.

Q. Do you know the name of that civilian individual?

A. William Harris.

Q. What did that civilian individual do, if anything?

A. He ran up to the defendant and kicked both weapons out of his hands.

Q. What did you do at that point?

A. We gave him commands to get on the ground so we could secure the scene, and then we effected the arrest.

Q. When you say you "effected the arrest," what do you mean by that?

A. My partner handcuffed the defendant.

Q. And what was the defendant's condition at that point when you and your partner arrested the defendant?

A. He had a gunshot wound.

Q. Do you know where the gunshot wound was?

A. In his lower torso.

Q. Other than the civilian and the defendant, was anyone with you?

A. My partner, Officer Hasiotas.

Q. After you and Officer Hasiotas arrested the defendant, what happened next?
A. We gave him aid by requesting an ambulance to the location.
Q. Did the ambulance come?
A. It did.
Q. And what happened after the ambulance came?
A. They took him to, I believe it to be a hospital.
Q. I am going to show you one more video, Detective Nash.

MR. LI: Mr. Sitko, please pull up Government Exhibit 2005, which is a stipulation in evidence, and let's turn to paragraph 10, please.

I am now reading paragraph 10.

The parties agree Government Exhibit 408 is an excerpt of a video recorded using the Snapchat application taken in the vicinity of the West Side Highway and Chambers Street in Manhattan, New York, and depicting that intersection.

Government Exhibit 408 depicts between approximately 3:07 p.m. and 3:09 p.m.

The government offers Government Exhibit 408.

MR. STERN: No objection.

THE COURT: Okay.

Government Exhibit 408 is admitted in evidence.

(Government Exhibit 408 received in evidence)

MR. LI: Mr. Sitko, please play Government Exhibit 408.

(Video played)

BY MR. LI:

Q. Detective Nash, do you recognize the contents of this video?

A. I do.

Q. What do you recognize it to be?

A. It is what looks to be a few different clips put together, but it is the incident at West Street and Chambers Street.

Q. When you say "the incident," are you referring to your encounter with the defendant?

A. Yes.

MR. LI: Mr. Sitko, could we please play just the first nine seconds.

(Video played)

Q. Detective Nash, in this nine-second clip that we just saw, what is the defendant doing?

A. He is running around in traffic. He has two weapons about chest height aimed out. It doesn't look like he's directly aiming at anybody.

Q. Do you recognize the street that he is on?

A. I do.

Q. What street is that?

A. That is the West Side Highway.

Q. Did you see the defendant acting in this manner when you encountered him?

A. I did.
Q. Mr. Sitko, please play the next nine seconds.
(Video played)
BY MR. LI:
Q. Detective Nash, in the nine seconds we just saw, what is going on in this video?
A. That is me and my partner effecting the arrest on the defendant.
Q. Can you identify for the jury where you and your partner are in this still frame.
A. There is a white box truck, there's what looks to be three individuals, and that is me, my partner, and the defendant just above the box truck.
MR. LI: Mr. Sitko, please play the remaining eight seconds of the video.
(Video played)
Q. Detective Nash, what is occurring in the last eight seconds of the video that we just saw?
A. This is the same intersection as the white box truck that I took cover behind. That is me and my partner effecting the arrest. The other officers are securing the screen.
Q. When you say it's the same intersection, what intersection are you referring to?
A. West Street and Chambers Street.
Q. When you say the box truck that you took cover behind,

where is that box truck in this still frame?
A. It is the white truck towards the bottom of the screen.
Q. After arresting the defendant on October 31, 2017, did you have any further involvement in the investigation?
A. No.
MR. LI: Your Honor, may I have just a moment?
THE COURT: Yes.
MR. LI: No further questions, your Honor.
THE COURT: All right.
Cross-examination.
CROSS-EXAMINATION
BY MR. STERN:
Q. Good afternoon, Detective Nash.
A. Good afternoon.
Q. Detective Nash, how long did you say you have been working for the New York City Police Department?
A. At the time five years.
Q. And how about now?
A. Ten years.
Q. And when you began your career with the police department, you received various kinds of training, didn't you?
A. Correct.
Q. People go to the police academy for training?
A. And other training, but yes.
Q. In that training, you received information on various

things, how to fill out forms, right?
A. Correct.
Q. How to take statements from people?
A. Correct.
Q. And how to deal with armed individuals?
A. Correct.
Q. And after that training, sometime later, you received additional training in dealing with shooters, which is called active shooter training; is that right?
A. Correct.
Q. In training you also were learning how to deal with a situation where there's an armed individual?
A. Correct.
Q. Now, one of the things you learned is that before shooting someone you should announce that you are a police officer?
A. Yes.
Q. And that's what you did in this case?
A. Correct.
Q. And you learned that you should warn them to drop their weapon?
A. Correct.
Q. And that's what you did in this case?
A. Correct.
Q. And you also learned that shooting someone is really a last resort for a police officer, right?

A. Correct.
Q. Now, you never wanted to shoot anyone, did you?
A. No.
Q. As a matter of fact, this occasion was the first time you had ever discharged your weapon, wasn't it?
A. That I ever discharged my weapon?
Q. Up to that date, was this the first time you had discharged your weapon?
A. I discharge my weapon when I go to training.
THE COURT: Yes. Rephrase. Yes.
MR. STERN: Sorry.
BY MR. STERN:
Q. In an actual street situation, was this the first time you had discharged your weapon?
A. Yes.
Q. Okay. Now, before the shooting you talked about someone informing you there was a man with a gun, right?
A. Correct.
Q. And that that man was wearing a particular outfit; it was a blue track suit with a red stripe?
A. Correct.
Q. And when you saw the person, that is, when you came to the intersection of Chambers and West, there was a man wearing a blue track suit with a red stripe on it?
A. Correct.

Q. So, as far as you could tell, that person hadn't made an effort to change his clothes, right?
A. I don't believe so.
Q. And it was a pretty distinctive outfit, wasn't it?
A. Yes.
Q. I mean, we saw in the video it wasn't the kind of outfit you would wear to blend in necessarily, was it?
A. Correct.
Q. And the person that you saw was running around in circles, kind of zigzagging around, wasn't he?
A. Yes.
Q. But he wasn't trying to run away, that is, for example, towards the center of Manhattan? He was staying in that area?
MR. LI: Objection, your Honor.
MR. STERN: Pardon me.
THE COURT: I will allow it.
Objection overruled.
A. I'm sorry. Can you repeat the question.
Q. Yes. The person was running around in that same relatively confined area, the intersection of Chambers and West Streets?
A. When I saw him?
Q. Yes.
A. Yes.
Q. That is all you know about, is when you saw him, right?
A. Correct.

Q. You had been told he was there some minutes earlier, correct?
A. By less than a minute, but yes.
Q. When you were in Stuyvesant High School is when you were first told?
A. Yes.
Q. When you got there, that person was still there running around in that same area, wasn't he?
A. Correct.
Q. When you first saw him, you could see the guns in his hands, couldn't you?
A. I did.
Q. And they looked real?
A. Very.
Q. From your training, seeing that man with those guns, you thought you and/or people around you were in danger?
A. Correct.
Q. And you knew that as a police officer you had to do something about it?
A. Yes.
Q. Now, the fact is it turned out that one was a paint gun, right?
A. That's what I was told, yes.
Q. And the other was a pellet gun?
A. Correct.

Q. But you couldn't tell that looking at it?
A. No.
Q. And so in your mind you thought either you or other people were in danger?
A. Correct.
Q. And you did what you had been trained to do, right?
A. Correct.
Q. You told him twice to drop those guns?
A. I did tell him to drop the guns, yes.
Q. And he did not?
A. He did not.
Q. And you said, "We're police officers," right?
A. Well, I said, "Police. Drop the guns."
Q. He didn't drop the guns?
A. He did not.
Q. Instead of dropping the guns, he raised those guns and pointed them at you?
A. Correct.
Q. You know now that a pellet gun was unlikely to really hurt you, right?
A. Now, yes.
Q. And you know now that a paint gun was really unlikely to hurt you, right?
A. Yes.
Q. But then you had no idea that that's what those were.

A. Correct.
Q. You thought they were real, right?
A. Yes.
Q. And you thought that if you didn't do something, you or your partner or someone on the street could get hurt or killed?
A. Yes.
Q. And really what happened is Saipov left you no choice but to shoot him?
A. At that moment --
MR. LI: Objection.
THE COURT: Yes. If you could -- objection sustained.
BY MR. STERN:
Q. Well, you had told him you were a police officer?
A. Correct.
Q. You had told him to drop the weapon?
A. Correct.
Q. You had your gun drawn?
A. Correct.
Q. He refused to drop the weapon?
A. Correct.
Q. And to protect yourself and the people around you, you shot him?
A. Correct.
MR. STERN: Thank you.
THE COURT: Okay.

Any redirect?

MR. LI: No, your Honor.

THE COURT: Okay.

Thank you, Detective.

You may step down.

(Witness excused)

THE COURT: The next witness?

MR. DEMBER: Your Honor, the government calls Margaret Gerard.

MARGARET GIRARD,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DEMBER:

MR. DEMBER: May I proceed, your Honor?

THE COURT: You may.

Q. Ms. Gerard, by whom are you employed?

A. I am employed by the Federal Bureau of Investigation.

Q. And what is your position with the FBI?

A. I am a supervisory special agent.

Q. And how long have you been a special agent with the FBI?

A. Approximately eight and a half years.

Q. Would you tell the jury what your current assignment with the FBI is.

A. I am assigned to our Huntsville Alabama headquarters

division, where I oversee large enterprise system development.
Q. In addition to that assignment, do you have any additional responsibilities as a special agent?
A. I was a member of the evidence response team.
Q. What is the evidence response team?
A. The evidence response team is a collateral duty for special agents in the FBI as well as professional staff. We go through additional training in addition to the training we receive at Quantico, Virginia, which is our basic training that we receive to become a member of the evidence response team. The evidence response team assists squads and field offices with crime scenes, search warrants, etc., and gets additional crime scene training.
Q. By the way, you mentioned Quantico, Virginia.
A. Quantico, Virginia, is a Marine Corps base that our FBI academy is housed at. And the evidence response team has an additional ops site which is located just south of Quantico Virginia, where we receive additional advanced forensic training.
Q. Let me direct your attention back to October of 2017. Could you tell us where you were assigned to the FBI at that time?
A. I was assigned to the New York field office. I was assigned to our New York Metro Safe Streets task force, which is Squad C30.

Q. What does that squad investigate?
A. We primarily investigate all gangs and violent crime in the New York metro city area.
Q. At the time were you also a member of the evidence response or evidence recovery team?
A. Yes, I was.
Q. Now let me direct your attention to October 31, 2017.
Do you recall working that day?
A. I do.
Q. And at some point in time did you receive a notification as a member of the evidence response recovery team?
A. Yes, I received an e-mail notification at approximately 3:30 in the afternoon.
Q. Do you remember where you were at that time?
A. I was crossing over the Brooklyn Bridge en route to lower Manhattan back to our office.
Q. What kind of a notification did you receive?
A. It was the notification from our senior team leader requesting all available agents who could respond to lower Manhattan for an active crime scene.
Q. Okay. Were you given a location in that notification to respond to?
A. Yes. We were advised to report to the area of Chambers and West Side Highway or West Street.
Q. When you got that notification, what did you do?

A. I continued to proceed over the Brooklyn Bridge. We went code to lights and sirens over the bridge. Arrived at the scene, assessed what was going on, and we stated that the evidence response team arrived.
Q. When you said you went code with lights and sirens, what does that mean?
A. It's just to help get us over, through traffic a little faster when there is an active scene going on.
Q. Did you put the lights and sirens on, on your vehicle?
A. I did. The traffic was a standstill, and we were asked to response as quickly as possible.
Q. When you got to the scene, what did you actually respond to?
A. I responded to our evidence response team truck. We had a crime scene perimeter set up. Once we parked outside that perimeter, then we walked under the tape into our staging area.
Q. Is that a specific vehicle, the evidence response or recovery team truck?
A. Yes. It is our truck that houses all of our packaging material and anything that we would need to properly process a crime scene.
Q. And was the truck on-site when you arrived?
A. Yes, it was.
Q. Now, were you given any specific role as a member of the response team that day?

A. Yes. My primary role was the evidence custodian.
Q. What are the responsibilities of an evidence custodian at a crime scene?
A. The evidence custodian is in charge of inventorying the evidence as it comes in and processing, so ensuring that it is photographed once it is taken off the scene, making sure the evidence is documented properly, photographed with a scale if possible, and then placed in the proper packaging based on what the evidence item is and how it's going to be processed, sealed, and then turned over to the case team.
Q. When you say, when a piece of evidence is photographed with a scale, what do you mean by that?
A. Well, the item will come off scene and come over to our processing area that is designated in a controlled area. Then the item will be placed on a controlled area, like a block of brown butcher paper. And a scale would be such as a ruler or an L scale that provides measurements like inches to show the approximate size of the weapon in a photograph.
Q. What will determine how you package a particular piece of evidence?
A. It will depend on what forensic technique we are doing or what the evidence has on it. So, for example, if it had biological evidence, it may only be able to go into a paper bag; or if it is a weapon, it might go into a box. And we might separate certain components based on FBI procedures of

how to package the evidence.
Q. By the way, if a piece of evidence that is recovered is photographed actually on the scene, meaning where it was located and found, would you also take a photograph, a separate photograph after it's been processed?
A. Yes.
Q. What is the reason for that?
A. We like to show the item on scene and where the location is when we first arrive to document the scene as we saw it when we first got there. And then, additionally, when we take it off the scene, if we have to take it apart and show different sizes of it, the scale gives an idea of the size of the item.
Q. Other than serving as the evidence custodian at this particular crime scene, did you have any other role?
A. I did. I was also searching.
Q. Were you looking for evidence or searching for evidence?
A. Correct. I was one of the individuals that recovered evidence from the scene that day.
Q. By the way, how long did you personally remain on the crime scene that day?
A. I arrived on October 31, approximately 4 p.m. in the afternoon, and I stayed throughout the duration. I left the scene when the scene was closed the next day, November 1, approximately 7 p.m. the next day.
Q. So were you there for more than a day?

A. Yes.
Q. Did you go home during that period of time?
A. No.
Q. Okay. Now, at some point in time did you survey the entire crime scene?
A. Yes.
Q. Okay. And can you describe for the jury the extent of the crime scene, the outer boundaries, or what it was?
A. So we were staged at West Side Highway, West Street and Chambers. The crime scene went south a few blocks down toward I think Warren Street, approximately around Warren Street. And then it also proceeded northbound to approximately Pier 40. And then the bike path on the west side near the Hudson River is on that boundary, and then the buildings were a natural barrier, as well as one block out we put some crime scene to avoid people walking into the immediate crime scene.
THE COURT: Just to be clear, Agent, when you are saying crime scene, was this area cordoned off?
THE WITNESS: Yes. We had crime scene tape or vehicles that were delineating the crime scene.
THE COURT: Okay.
BY MR. DEMBER:
Q. By the way, was the FBI the only law enforcement agency participating in this investigation?
A. No. The NYPD, the New York City Police Department was also

on scene processing different parts of it.

MR. DEMBER: Mr. Sitko, can we show the witness and the parties what has been marked for identification as Government Exhibit No. 2.

BY MR. DEMBER:

Q. Now, Special Agent Gerard, do you recognize what is marked for identification as Exhibit 2, Government Exhibit 2?

A. Yes, I do.

Q. What is that?

A. It is a map overview depicting New Jersey on the -- my left side, the Hudson River, Route 9A or West Side Highway or West Street, and the Borough of Manhattan, as well as Queens and part of Brooklyn.

Q. To the best of your knowledge, is that a fair and accurate representation of those locations?

A. Yes, it is.

MR. DEMBER: Your Honor, the government offers Government Exhibit 2 into evidence.

THE COURT: Any objection?

MS. LEVINE: No objection.

THE COURT: Government Exhibit 2 is admitted in evidence.

(Government Exhibit 2 received in evidence)

Q. Special Agent Gerard, do you see up towards the top of the -- can we show --

MR. DEMBER: I'm sorry, your Honor.

May we display it to the jury?

THE COURT: Yes, you may. You may publish it to the jury. Yes.

BY MR. DEMBER:

Q. Special Agent Gerard, do you see at the very top, in the middle at the very top, the words "New Jersey" on top of the words "New York"?

Do you see where that is?

A. Yes.

Q. Do you see some kind of -- first of all, do you know what the blue represents there, by the way?

A. The Hudson River.

Q. Okay. And you know what that appears to be, a crossing that goes through those two the names of the two states is?

A. Yes. That's the George Washington Bridge.

MR. DEMBER: Okay. Can we back that up a little bit so we can see the whole thing.

Q. You see as you -- on what would be the -- according to the west side of Manhattan in yellow a roadway there on the edge?

A. Yes.

Q. Bordering the Hudson River?

A. Yes.

Q. And do you know what road that is?

A. So it's route -- State Route 9A that runs northbound and

southbound. It is also referred to as West Side Highway or West Street it runs into.

MR. DEMBER: We can take that down, Mr. Sitko.

Can we show the witness what is marked for identification as Government Exhibit No. 1, and the parties as well, of course.

BY MR. DEMBER:

Q. Do you recognize what is before you, Special Agent Gerard?

A. Yes.

Q. And what is that?

A. This is an overview of a portion of West Side Highway or 9A, and the crime scene, overall crime scene approximately.

Q. And does that diagram or map fairly and accurately represent the streets and landmarks between say Chambers Street or a little south of Chambers Street and Pier 40?

A. Yes, it does.

MR. DEMBER: Your Honor, the government offers Government Exhibit No. 1 in evidence.

MS. LEVINE: No objection.

THE COURT: Okay.

Government Exhibit 1 is admitted in evidence.

(Government Exhibit 1 received in evidence)

MR. DEMBER: May we show it to the jury, your Honor?

THE COURT: You may.

BY MR. DEMBER:

Q. Special Agent Gerard, do you see on the map here where in fact West Street is or the West Side Highway is on the map?
A. Yes.
Q. And where is it?
A. It's marked by the black vertical line going up and down the piece of paper. That's West Street, and it's marked "West Street."
Q. Okay. Do you see that on the bottom there, West Street?
A. Yes.
Q. Is this also another name on it higher up above West Street?
A. There's Pier 40 at the top left, and then the Holland Tunnel leading off of West Street.
Q. Just so it's crystal clear, Special Agent Gerard, could you take your finger on the screen and draw an arrow as to where West Street is or the West Side Highway?
A. Sure. So West Street is right here. That's where it's delineated. And that street running north and south is West Street.
Q. You circled a portion of West Street; is that correct?
A. Yes, I circled where it says "West Street" on it, but it's that street running vertical.

MR. DEMBER: Your Honor, the record should reflect, may reflect that the agent has circled the name West Street, which is opposite I think Pier -- it looks like 28 or 26, your

Honor, but it's the one place on the map where the words "West Street" appear.

Let me clear that for you.

THE COURT: The record so reflects.

MR. DEMBER: Thank you, your Honor.

BY MR. DEMBER:

Q. Can you just circle where Pier 90 is so the jury can see it.

A. Which pier, sir?

Q. I'm sorry. Pier 40. Circle that as well.

MR. DEMBER: Your Honor, may the record reflect Special Agent Gerard has circled what is labeled Pier 40 on the map.

THE COURT: The record will so reflect.

BY MR. DEMBER:

Q. Just so we have a good sense of where things are, Special Agent Gerard, can you circle the intersection of West Street or the west side highway and Chambers Street on the map.

A. Yes. Is there a way you can zoom into the lower half of the map, please.

MR. DEMBER: And, again, your Honor, may the record reflect the agent has circled the intersection of West Street and Chambers Street on the map.

THE COURT: It so reflects.

MR. DEMBER: Thank you.

Mr. Sitko, you can take that down.

oh, can you put that back up again. I left out something. Exhibit 1.

BY MR. DEMBER:

Q. Agent Gerard, do you see, are you familiar with the bicycle path that runs adjacent to West Street and the West Side Highway?

A. Yes, I am.

Q. Do you see it on the map?

A. Yes.

Q. And can you show us -- well, first, try to describe where it is. As you are looking at the map, where would the bicycle path be and describe what it looks like.

A. So on this map the bicycle path is indicated by, on the white space, if you are looking at the map to the left of the black road, indicating the West Side Highway. There are gray lines running vertical and a little horizontal. That's the bike path.

Q. Okay. Just so we can see it, can you, with your finger, circle a portion the bike path so we can distinguish it from the West Side Highway.

A. Yes. Can it be zoomed in a tiny bit on that portion. Thank you. So that is a segment of the bike path indicated by that gray.

MR. DEMBER: Let the record reflect, your Honor, that

the agent has circled part of a gray, what looks like a gray path in front of Pier 26 and Pier 25 and south of that, which on the map is to the left, running alongside and to the left of the West Street or the West Side Highway.

THE COURT: The record will so reflect.

MR. DEMBER: Thank you.

BY MR. DEMBER:

Q. Now, Agent Gerard, other than being the custodian, the evidence custodian, you indicated you were a searcher; is that correct?

A. Yes.

Q. And were you assigned a specific area to search along the crime scene?

A. Yes. I was assigned to search near the Home Depot truck in the vicinity of that area.

Q. And did you -- withdrawn. Did you work with another member of the evidence recovery team?

A. Yes. I worked with Special Agent Douglas Vetrano, the evidence response team.

Q. Now, before you started your search of the Home Depot truck and the area around the truck, do you know whether photographs had been taken of that location?

A. Yes, photographs were taken of the location before we stepped on to remove evidence and search the crime scene.

Q. Were the photographs taken of just the area outside the

truck or inside the truck?

A. There were photographs taken of the both th exterior of the truck and the interior of the truck.

MR. DEMBER: With your Honor's permission, may I read from the stipulation, your Honor, which is in evidence as Government Exhibit 2017?

THE COURT: You may.

MR. DEMBER: Okay.

Just so that the jury and the parties can understand the full context, your Honor, I am going to reread paragraph 5 starting with subdivision a or subparagraph a and then read two additional paragraphs.

May I do that?

THE COURT: You may.

MR. DEMBER: Okay.

Government Exhibit 201 through 204 fairly and accurately depict the Home Depot rental truck bearing New Jersey license plate XDFF74 (referred to as the "Truck").

Going on to the next page,

Subparagraph b. Government Exhibits 205 through 209 fairly and accurately depict the interior of the truck and certain items lawfully recovered from the truck.

If we could drop down to subparagraph e. Government Exhibits 216 through 218 fairly and accurately depict certain evidence items seized from the vicinity of the truck and the

surrounding area on October 31, 2017.

MR. DEMBER: Thank you, Mr. Sitko.

You can take that down.

Your Honor, the government moves into evidence Government Exhibits 205 through 209 and 216 through 218.

MS. LEVINE: No objection.

THE COURT: Okay. Government Exhibits 205 -- and is that consecutive, Mr. Dember.

MR. DEMBER: Yes, your Honor.

THE COURT: 205 through 209 and 216 through 218 are admitted in evidence.

MR. DEMBER: Your Honor that's -- that's right. Correct, your Honor. Thank you.

THE COURT: Sure.

(Government Exhibits 205 through 209 and 216 through 218 received in evidence)

BY MR. DEMBER:

Q. Special Agent Gerard, let's start with the search of the area that was around or outside the truck. Do you recall what evidence was recovered outside the truck, the Home Depot truck?

A. I do. There were two pellet guns and a knife and a black bag that we recovered from outside the truck.

Q. Do you recall there being some kind of document also as well?

A. Yes.

MR. DEMBER: Okay. Your Honor, may I approach the witness?

THE COURT: You may.

BY MR. DEMBER:

Q. Special Agent Gerard, I am going to hand up to you, actually four exhibits, Government Exhibits which have been marked for identification as Government Exhibits 210 and 210-1 -- excuse me. Withdrawn.

Government Exhibits 310 and 310-1 and Government Exhibits 311 and 311-1.

MR. DEMBER: Mr. Sitko, could you put on the screen what is now in evidence as Government Exhibit 217.

BY MR. DEMBER:

Q. Special Agent Gerard, do you recognize what is shown in Exhibit 217?

A. Yes.

Q. And what is that that you see there?

A. It's one of the pellet guns that was recovered.

Q. And is the location depicted in the photograph the location where you actually first saw it when you arrived on the scene?

A. Yes.

Q. And where is that location?

Do you know?

A. I --

Q. Let me withdraw it and ask you a different question first.

Why don't you -- let me -- I've handed up to you Government Exhibits 311 and 311-1. Could you put that in front of you so you can see that.

My first question for you is do you recognize each of those exhibits?

A. Yes, I do.

Q. How do you recognize them?

A. I recognize them because this is the packaging and I assisted and oversaw as the evidence custodian that day.

Q. Okay. What are Government Exhibits 311 and 311-1?

A. One of the items is a pellet gun, and the other item is also a pellet gun.

Q. No. I am talking about 311 --

MR. DEMBER: Can we leave 217 up on the screen, please.

BY MR. DEMBER:

Q. Okay. Let me ask -- let me rephrase the question. I will start again. I am asking you to look at Government, what's been marked for identification as Government Exhibits 311 and 311-1.

A. Yes.

Q. Okay?

A. All right.

Q. Have you done that?

A. Yes.

Q. Do you recognize each of those exhibits?
A. Yes, I do.
Q. How do you recognize Government Exhibit 311?
A. 311 is the pellet gun recovered on the street on the southbound side on West Street in the road. And then 311-1 are the items that were inside of 311, which is the magazine and the cartridge.
Q. Were they a part of the gun when you recovered them?
A. Yes.
Q. Were they inserted into the gun when you recovered them?
A. Yes, they were.
Q. Is that the same gun that appears in Government Exhibit 217?
A. Yes.

MR. DEMBER: Your Honor, the government offers Government Exhibits 311 and 311-1 into evidence.

MS. LEVINE: No objection.

THE COURT: Okay. Government Exhibits 311 and 311-1 are admitted in evidence.

(Government Exhibits 311 and 311-1 received in evidence)

BY MR. DEMBER:
Q. Special Agent Gerard, can you show to the jury what Government Exhibit 311 looks like. Try to display it to them?
A. Yes.

MR. DEMBER: Now, Mr. Sitko, can you put on the screen the photograph which has been marked for identification as Government Exhibit 311-A.

What is that? Do you recognize that photograph --
A. Yes.
Q. -- Special Agent Gerard?

What is that a photograph of?
A. That is Exhibit 311. That was taken, the photo of this weapon, after it was recovered from the scene. It was placed on the butcher paper as I previously described with a scale. That was taken when the item was moved into our evidence processing area and then photographed before being packaged into the box.

MR. DEMBER: Your Honor, the government offers Government Exhibit 311-A into evidence.

MS. LEVINE: No objection.

THE COURT: Okay. Government Exhibit 311-A is admitted in evidence.

(Government Exhibit 311-A received in evidence)

MR. DEMBER: Can we show that exhibit to the jury, your Honor?

THE COURT: You may.

MR. DEMBER: Thank you.

Mr. Sitko, you can take that down.
BY MR. DEMBER:

Q. Special Agent Gerard, do you have before you Government Exhibits 310 and 310-1?
A. Yes, I do.
Q. And do you recognize each of those exhibits?
A. Yes, I do.
Q. And what do you recognize them to be?
A. They are the items that were recovered from the scene that day, and I recognize them based on the packaging that I assisted with as evidence custodian.
Q. Mr. Sitko, could we put on the screen what is now in evidence as Government Exhibit 203.

Excuse me. That should be 218. I'm sorry. 218, which is in evidence.

BY MR. DEMBER:
Q. Special Agent Gerard, do you recognize that photograph?
A. Yes.
Q. What is that a photograph of?
A. This is a photograph of Exhibit 310 in place on the southbound side of West Street or the West Side Highway.
Q. Is that the location you recovered it from?
A. Yes.
Q. And your Honor, the government offers Government Exhibits 310 and 310-1 into evidence.

THE COURT: Okay. Any objection?

MS. LEVINE: Your Honor --

THE COURT: I am not sure if --

MS. LEVINE: I think they just need to lay some more foundation.

THE COURT: I am not sure. Has the witness already identified them in their packaging or whatever?

MR. DEMBER: Oh, let me do that. Well, I haven't --

BY MR. DEMBER:

Q. Do you recognize it?

A. Yes, I do.

Q. I thought you did, but I will ask again.

THE COURT: You may have and I missed it.

MR. DEMBER: I may have missed it, your Honor.

Let me ask it again.

Q. How do you recognize Government Exhibits 310 and 310-1?

A. In this picture, 310, is the item that is packaged in the box. And 310-1 is the item that was within the weapon that was seized from this picture.

Q. And 310 is what? What is it exactly?

A. It is, 310 is a pellet gun that was located on the street, in the road.

Q. What is 310-1?

A. 310-1 is the cartridge that was found within that weapon.

MR. DEMBER: And the government offers each of those exhibits into evidence at this point, your Honor.

THE COURT: Okay.

MS. LEVINE: No objection.

THE COURT: All right. Government Exhibit 310 and 310-1 are admitted in evidence.

(Government Exhibits 310 and 310-1 received in evidence)

MR. DEMBER: Mr. Sitko, could you show to the witness and parties Government Exhibit 310-A.

BY MR. DEMBER:

Q. Do you recognize what's in that photograph?

A. Yes.

Q. What is in that photograph?

A. That is a photograph of Exhibit 310, the pellet gun that was recovered from the road, the second one. And that is when the gun came into the processing scene where I was overseeing all the evidence processing, and it was photographed with scale on the butcher paper before being packaged into the box.

MR. DEMBER: Your Honor, the government offers Government Exhibit 310-A into evidence.

THE COURT: Government Exhibit 310-A is admitted in evidence.

(Government Exhibit 310-A received in evidence)

MR. DEMBER: May we show it to the jury?

THE COURT: You may.

MR. DEMBER: We can take that down.

Thank you.

Mr. Sitko, can we put up government -- if we can do it at once -- Government Exhibits 202 and 203, which are now in evidence.

BY MR. DEMBER:

Q. Now, Special Agent Gerard, do you recognize what's depicted in those photographs?

A. Yes, I do.

Q. What is in the photographs?

A. These are overall pictures of the Home Depot truck and the surrounding area around the Home Depot truck at West Side Highway or West Street and Chambers.

Q. Is that the way the truck appeared to you at the time you started your investigation?

A. Yes, at the time I arrived on scene, that is what the scene looked like in the picture.

Q. Okay. Now, in each of those photographs, can you look to the left of the photograph, on the left side of these photographs?

A. Yes.

Q. Thank you. Do you recognize what is to the left of the truck in the photograph?

A. Yes, there is a black Adidas bag.

Q. And did you eventually recover that bag?

A. Yes.

MR. DEMBER: Okay. Mr. Sitko, can you put on the

screen Government Exhibit 216, which is now in evidence.

BY MR. DEMBER:

Q. What is shown in that photograph?

A. In this photograph is a closer view of the black Adidas bag that was to the left of the Home Depot truck. And there is also a set of worker gloves a piece of paper, and at the bottom center of the string -- I'm sorry, screen or picture is a knife.

MR. DEMBER: Your Honor, may I approach the witness?

THE COURT: You may.

MR. PATTON: Andy.

(Counsel conferred)

BY MR. DEMBER:

Q. Special Agent Gerard, where is the actual knife? The knife that you referred to, where is that actually in this photograph?

A. It is on the bottom of the photograph in the center with the black sheath over it and the white handle sticking up.

Q. I have just handed up to you Government Exhibits 309 and 309-3. Can you tell -- do you recognize Government Exhibit 309?

A. Yes, I do.

Q. How do you recognize it?

A. 309 is the black bag that is shown in the picture as well as the black bag I recall recovering from the scene that day

that was adjacent to the Home Depot truck.
Q. And what is Exhibit 309-3?
A. 309-3 is the knife that is shown in this picture that was recovered next to the black bag adjacent to the Home Depot truck.
Q. How do you recognize it?
A. I recognize it based on the evidence packaging and just recalling from memory what it looked like.
Q. Your Honor, the government offers Government Exhibit 309 and 309-3 into evidence.

MS. LEVINE: No objection?

THE COURT: Okay. Government Exhibits 309 and 309-3 are admitted in evidence.

(Government Exhibits 309 and 309-3 received in evidence)

BY MR. DEMBER:
Q. For the benefit of the jury, Special Agent Gerard, can you hold up the black bag, Government Exhibit 309, so the jury can see it.
A. Yes.
Q. That's the bag that was depicted in the photograph, 216?
A. Yes, sir.
Q. Okay. And can you take out of that envelope Government Exhibit 309-3. Again, what is Government Exhibit 309-3?

Is that a knife?

A. Yes.

Q. Okay. Can you for the benefit of the jury take the knife out of the sheath. Just display it for the jury.

A. Can you repeat the question?

(Continued on next page)

Q. I just asked you to display it to the jury. Why don't you reholster it into the sheath.

MR. DEMBER: Mr. Sitko, can we put on the screen what has been marked for identification as Government Exhibit 309-3(b). Just show it to the parties and the witness.

Special Agent Girard, do you recognize that photograph?

A. Yes, I do.

Q. What is the photograph?

A. This is a photograph after the knife was recovered from the crime scene. It was brought into the evidence processing area, where it was photographed with a scale before being packaged into the envelope that it was packaged in.

Q. Is that the same knife you just had in your hands?

A. Yes.

Q. Thank you.

MR. DEMBER: You can take that down.

Q. Special Agent Girard, do you recall --

THE COURT: Mr. Dember, were you offering the photo?

MR. DEMBER: I'm sorry?

THE COURT: Are you offering it?

MR. DEMBER: I should have. I offer the photograph into evidence.

THE COURT: I am just not sure --

MR. DEMBER: 309-3B. We offer it into evidence and

may we display it to the jury?

MS. LEVINE: No objection.

THE COURT: 309-3B is admitted in evidence. You may display it to the jury.

(Government Exhibit 309-3B received in evidence)

MR. DEMBER: Thank you, Judge. And thank you for reminding me.

Thank you, Mr. Sitko.

Q. Did you at some point search the black bag, Exhibit 309?

A. Yes.

Q. Do you recall what you found inside the bag?

A. Within the bag we recovered, there was water bottles and there was a black wallet. Within the black wallet there were debit cards and a Florida driver's license.

Q. Did you find any additional weapons in the bag as well?

A. Yes. We found an additional knife.

Q. How many knives did you find, additional knives?

A. Two.

MR. DEMBER: May I approach, your Honor?

THE COURT: You may.

Q. I have just handed you up four items which are marked for identification as Government Exhibits 309-4, 309-5, 309-6, and 309-7.

Do you recognize those exhibits?

A. Yes, I do.

Q. How do you recognize them?
A. I recognize them as the items that I packaged during the evidence processing.
Q. What is Government Exhibit 309-4?
A. Government Exhibit 309-4 is the black wallet that was recovered out of the black bag that was on the roadway adjacent to the Home Depot truck.
Q. What is Exhibit 309-5?
A. 309-5 is a PNC Bank debit card.
Q. Where did you recover that from?
A. That was inside the black wallet that was inside the black Adidas bag.
Q. What is Government Exhibit 309-6?
A. 309-6 is an Uber fuel card.
Q. Where did you recover that from?
A. Inside the black wallet that was inside the black Adidas bag.
Q. Finally, what is Government Exhibit 309-7?
A. It's a Florida driver's license.

MR. DEMBER: Your Honor, at this time the government offers Government Exhibit 309-4, 309-5, 309-6, and 309-7.

MS. LEVINE: No objection.

THE COURT: Government Exhibits 309-4, 309-5, 309-6, and 309-7 are admitted in evidence.

(Government Exhibits 309-4, 309-5, 309-6, and 309-7

received in evidence)
Q. By the way, was there any money in the wallet when you recovered it?
A. Yes, there was.
Q. Now, let's start with Government Exhibit 309-5. Again, what is that exhibit?
A. The PNC Bank business debit card.
Q. Is there a name printed on that exhibit?
A. Yes, there is.
Q. What is the name?
A. Sayfullo Saipov.
Q. Is there anything else printed below the name Sayfullo Saipov on that card?
A. Yes. There is a company name.
Q. What is the name of the company?
A. Bright Auto LLC.
Q. Let's turn to Government Exhibit 309-6. Again, what is that exhibit?
A. That's the Uber fuel card.
Q. Is there a name printed on that card?
A. Yes.
Q. What is the name?
A. Sayfullo Saipov.
Q. Let's turn to Government Exhibit 309-7. Is there a name printed on that driver's license?

A. Yes.
Q. What is the name printed on its driver's license?
A. It's Sayfullo, middle name I am not sure the pronunciation, and then Saipov.
Q. Where was that a driver's license from, what state?
A. Florida.
Q. Does it have a Florida address on the license -- on the driver's license?
A. Yes, it does.
Q. Is there a photograph on that driver's license as well?
A. Yes, there is.

MR. DEMBER: Can we show the witness what's been marked for identification as Government Exhibit 309-7P and show it to the parties as well, please.

Q. Special agent Girard, do you recognize what has been marked as Government Exhibit 309-7P?
A. Yes, I do.
Q. What is that?
A. That is a close-up of the Florida driver's license that I retrieved from the black wallet.
Q. And that you have before you --
A. Yes.
Q. -- on the witness stand.

Your Honor, the government offers Government Exhibit 309-7P into evidence.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 309-7P is admitted in evidence.

(Government Exhibit 309-7P received in evidence)

MR. DEMBER: May we show it to the jury?

THE COURT: You may.

MR. DEMBER: We could take that down. Thank you, Mr. Sitko.

May I approach the witness again, your Honor?

THE COURT: You may.

Q. Special Agent Girard, I am going to hand up to you two exhibits which are marked for identification as Government Exhibits 309-1 and 309-2.

Why don't we start with the item that has been marked for identification as Government Exhibit 309-1. Take a look at it.

Do you recognize the item?

A. Yes, I do.

Q. How do you recognize it?

A. I recognize it from memory, as well as from the packaging, which I packaged this knife in on the night of the search.

Q. What is the item?

A. It's a black-and-silver Gerber knife.

Q. Where did you recover that knife from?

A. I recovered it -- it was recovered from the vicinity of

West Street and Chambers Street in the black bag.
Q. That's the black bag that is Government Exhibit 309?
A. Yes, the black Adidas bag that was found next to the Home Depot truck.

MR. DEMBER: Your Honor, the government offers Exhibit Government Exhibit 309-1 in evidence.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 309-1 admitted in evidence.

(Government Exhibit 309-1 received in evidence)

Q. Why don't you take the exhibit out of the envelope and just hold it up so the jury can see it. Thank you. You could put it back.

MR. DEMBER: Mr. Sitko, can we put on the screen three photographs which are marked for identification as Government Exhibits 309-1A, 309-1B, and 309-1C.

Q. Do you recognize each of those photographs?
A. Yes, I do.
Q. What do they appear to be?
A. These are -- Government Exhibit 309-1, the black knife that was recovered from the black Adidas bag. Once we recovered it from the black bag, we brought it into our evidence processing area where photos were taken with scale before being packaged.
Q. The top two photographs show the knife closed, is that correct?

A. Yes.
Q. 309-1C shows it open, correct?
A. Yes.
MR. DEMBER: Your Honor, the government offers Exhibits 309-1A, 309-1B, and 309-1C into evidence.
MS. LEVINE: No objection.
THE COURT: Government Exhibits 309-1A, 309-1B, and 309-1C are admitted in evidence.
(Government Exhibits 309-1A, 309-1B, and 309-1C received in evidence)
Q. Special Agent Girard, why don't you put that aside. I am going to ask you to look at what has been marked for identification as Government Exhibit 309-2.
Do you recognize that exhibit?
A. I do.
Q. How do you recognize it?
A. I recognize it based on the evidence packaging and my recollection of the item when it was collected that evening.
Q. What is the item?
A. The item is a black-and-red Milwaukee knife in a sheath.
Q. Where did you recover that knife and the sheath from?
A. This was recovered from the black Adidas bag that was found adjacent to the Home Depot truck.
MR. DEMBER: Your Honor, the government offers Government Exhibit 309-1 into evidence.

THE COURT: Government Exhibit 309 --

MR. DEMBER: Dash 2. I'm sorry.

THE COURT: Government Exhibit 309-2 --

MS. LEVINE: No objection.

THE COURT: -- is admitted in evidence.

(Government Exhibit 309-2 received in evidence)

MR. DEMBER: Mr. Sitko, can you put on the screen for the witness and the parties what has been marked for identification as Government Exhibit 309-2B.

Q. By the way, Special Agent Girard, before I get to the photograph, can I ask you one thing. Could you show the jury Government Exhibit 309-2.

A. Yes.

Q. Why don't you reholster it in the sheath. Thank you. Put that aside.

Do you recognize what is shown in the photograph before you, Government Exhibit 309-2B for identification?

A. Yes, I do.

Q. What is that?

A. That is the close-up picture of the knife after it was recovered from the scene and recovered out of the Adidas bag. We took it out, we photographed it with scale before packaging it.

Q. That's the black-and-red Milwaukee knife?

A. Yes.

MR. DEMBER: Your Honor, we offer 309-2B into evidence.

THE COURT: OK.

MS. LEVINE: No objection.

THE COURT: 309-2B is admitted in evidence.

(Government Exhibit 309-2B received in evidence)

MR. DEMBER: May we show this to the jury?

THE COURT: You may.

MR. DEMBER: Thank you, Mr. Sitko. You can take that down.

Your Honor, may I approach the witness again?

THE COURT: You may.

Q. Special Agent Girard, I am going to hand up to you a document which has been marked for identification as Government Exhibit 308.

Do you recognize the exhibit I have just shown you, I've handed up to you?

A. I do.

Q. How do you recognize it?

A. I recognize it based on the evidence packaging that I oversaw as the evidence custodian, as well as the item from memory.

Q. What is that exhibit?

A. It is white paper with Arabic writing on it.

Q. Do you recall -- sorry. Do you understand -- did you read

through that document at some point in time?
A. I reviewed it. I do not know what the translation of it is, though.
Q. Are you familiar with the writing itself, what kind -- what language it is?
A. Yes. I studied Arabic, so I recognized the language there to be Arabic.
Q. Where was this exhibit found on the crime scene?
A. It was found on the northwest corner of West Side Street and Chambers Street on the corner of the sidewalk.

MR. DEMBER: Your Honor, the government offers Government Exhibit 308 into evidence.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 308 is admitted in evidence.

(Government Exhibit 308 received in evidence)

Q. Special Agent Girard, will you just hold up for the jury's benefit what you have in your hand, which is Government Exhibit 308, first of all.

MR. DEMBER: Mr. Sitko, can we put on the screen for the witness and the parties what is marked for identification as Government Exhibit 308-P.

Q. Do you recognize what is on the screen and marked as Government Exhibit 308-P for identification?
A. Yes, I do.

Q. What is that?
A. That is the close-up photo of the paper that was recovered from the sidewalk on the scene. When it was taken in for processing and packaging, the photograph was taken before we packaged it into the paper bag.
Q. Is this the document that you just held up for the jury?
A. Yes.

MR. DEMBER: Your Honor, the government offers Exhibit 308-P into evidence.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 308-P is admitted in evidence.

(Government Exhibit 308-P received in evidence)

MR. DEMBER: Your Honor, may I read a stipulation by the parties?

THE COURT: You may.

MR. DEMBER: With your permission, your Honor, I will summarize the preamble. May I do that?

THE COURT: Any objection?

MS. LEVINE: No, your Honor.

THE COURT: You may proceed.

MR. DEMBER: It is hereby stipulated and agreed between the parties that:

1. Government Exhibit 308-T is a true and accurate translation of Government Exhibit 308. This stipulation, as

well as Government Exhibit 308-T, may be received into evidence as government exhibits at trial, subject to objections by the defendant based on relevance, hearsay, or under Rule 403.

Your Honor, at this point the government offers into evidence Government Exhibit 308-T.

MS. LEVINE: No objection.

THE COURT: 308-T is admitted in evidence.

(Government Exhibit 308-T received in evidence)

MR. DEMBER: Mr. Sitko, can you put on the screens for everyone, including the jury, Government Exhibit 308-T.

Q. Special Agent Girard, would you do the honor of reading, starting in the upper left-hand corner, what is written there.

A. In the upper left-hand corner the Islamic state shall endure, with three exclamation points.

Q. Keep reading across.

A. Moving over to the right top piece, it says, in brackets: TN, semicolon, drawing of ISIS flag, close bracket. Underneath that: There is no God but Allah. Then within a circle it says: Allah, messenger, Mohammed.

Going back to the left center of the screen it says again: The Islamic state shall endure, with three exclamation points.

Moving back to the right-hand side of the screen there is brackets: Capital TN, semicolon, drawing of the ISIS flag, close bracket. Then beneath that is: There is no God but

Allah. This is then a circle drawn and within that circle it says Allah, messenger, and Mohammed.

Moving back to the left side of the screen, there is: The Islamic state shall endure, with three exclamation points. Then moving back to the right side, again a bracket with the letters T and then N with a colon, drawing of the ISIS flag, close bracket. Beneath that: There is no God but Allah. Then beneath that a circle. Within the circle states the words: Allah, messenger, and Mohammed.

Q. Thank you.

MR. DEMBER: You can take that down.

Q. Special Agent Girard, after you searched the vicinity and the area around the Home Depot truck, did you continue to do a search?

A. Yes. After we recovered the evidence from outside the exterior of the truck, we then proceeded to the interior of the truck to begin processing the interior contents.

MR. DEMBER: Mr. Sitko, could you display for us all what's now in evidence as Government Exhibit 209.

Q. Do you recognize what's shown in 209?

A. I do.

Q. What part of the interior of the truck is displayed in this photograph?

A. This is a shot of the air photograph of the interior of the Home Depot truck on the driver's side showing mainly the floor

and seat area.
Q. Is that how it appeared when you started your search of the interior of the truck?
A. Yes.
Q. Do you see any items on the floor there that you recovered?
A. Yes. There are two cell phones that I recovered, as well as a flashlight, stun gun, or taser device.
MR. DEMBER: Your Honor, may I approach the witness again?
THE COURT: You may.
Q. Special Agent Girard, what are Government Exhibits 101 and 104, which are now marked for identification?
A. Government Exhibit 101 is a silver iPhone, and then Government Exhibit 104 is a silver LG phone.
Q. Are those the two cell phones that are depicted in Government Exhibits 209, the photograph before you?
A. Yes.
MR. DEMBER: Your Honor, the government offers Government Exhibits 101 and 104 in evidence.
MS. LEVINE: No objection.
THE COURT: Government Exhibits 101 and 104 are received in evidence.
(Government Exhibits 101 and 104 received in evidence)
Q. What is the document or the exhibit that I handed up to you, Government Exhibit 301, which is marked for identification

at this point, what is that?
A. Exhibit 301 is the black flashlight/stun gun or taser that I recovered from the driver's side floor of the Home Depot truck.
Q. Is that also depicted in the photograph which is before us as Government Exhibit 209?
A. Yes, it is.
MR. DEMBER: Your Honor, the government offers Government Exhibit 301 in evidence.
MS. LEVINE: No objection.
THE COURT: Government Exhibit 301 is admitted in evidence.
(Government Exhibit 301 received in evidence)
Q. Would you take the Exhibit 301 out of the envelope and just show it to the jury.
MR. DEMBER: We can take this photograph down.
May I approach the witness, your Honor?
THE COURT: You may.
MR. DEMBER: Mr. Sitko, could you put on the screen Government Exhibits 206 and 207, which are in evidence.
Q. Special Agent Girard, do you see what is on the seat, what appears to be the passenger's seat in Government Exhibit 206?
A. On the passenger's seat there is a Home Depot rental car agreement and then on the floor is a brown bag.
Q. Was this inside the Home Depot truck itself?

A. Yes.
Q. 207 is a close-up of that same Home Depot rental contract?
A. Yes.
Q. Why don't you look at what has been marked for identification as Government Exhibit 304 that I have just handed up to you.
Do you recognize that?
A. Yes, I do.
Q. What is it?
A. It is the Home Depot rental agreement that was recovered from the Home Depot truck on the passenger's side seat of the front seat.
Q. That's shown in these two photographs?
A. Yes.
MR. DEMBER: Your Honor, the government offers Government Exhibit 304 in evidence.
MS. LEVINE: No objection.
THE COURT: Government Exhibit 304 is admitted in evidence.
(Government Exhibit 304 received in evidence)
Q. What is the name of the customer on that contract, that rental contract?
A. The name of the customer is Sayfullo Saipov.
Q. Does the contract indicate what was rented to Sayfullo Saipov?

A. The item discussion in the middle of the page is listed as flatbed.

Q. Is there a date and time on the contract when the flat bed was rented?

A. The date out in the top center of the contract says 10/31/2017 at 2:06 p.m.

Q. Is there a date and time on the contract when the flatbed was due?

A. Yes. The date due, just under the date out that I had just previously read, states 10/31/2017 at 3:21 p.m.

MR. DEMBER: We can take that down.

Q. Special Agent, why don't you look at Government Exhibit 306, which is marked for identification at this point.

Do you have that in front of you?

A. I do.

Q. Before do you that, let me ask Mr. Sitko to put up on the screen again Government Exhibit 206 and also Government Exhibit 208.

Do you recognize Government Exhibit 306?

A. Yes, I do.

Q. What do you recognize it to be?

A. It is the brown plastic bag containing BBs that was recovered on the passenger's side floor of the front seat of the Home Depot truck.

Q. Does that brown plastic bag appear in each of the exhibits

on the screen, Government Exhibits 206 and 208?
A. Yes.
Q. Is that where you found it in the car?
A. Yes.

MR. DEMBER: The government offers Government Exhibit 306 into evidence, your Honor.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 306 is admitted in evidence.

(Government Exhibit 306 received in evidence)

MR. DEMBER: You can put those aside.

Q. Special Agent Girard, why don't you pick up what's been marked for identification as Government Exhibit 307 that I've handed up to you.

Do you recognize that exhibit?
A. Yes, I do.
Q. How do you recognize it?
A. This was the Progressive Insurance card that was located in the Home Depot truck on the floor of the passenger's side.
Q. Is that where you recovered it from?
A. Yes.

MR. DEMBER: Your Honor, the government offers Government Exhibit 307 into evidence.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 307 is admitted in

evidence.

(Government Exhibit 307 received in evidence)

Q. Is there a name of a Progressive Insurance customer listed on that exhibit?

A. Yes.

Q. What is the name?

A. It says named insured, Sayfullo Saipov.

Q. Is that an insurance identification card, actually?

A. Yes.

Q. Is it for a particular vehicle?

A. Yes, it is.

Q. What is the vehicle listed on the insurance card?

A. The vehicle listed is a 2004 Toyota Sienna and it has the VIN number.

Q. Thank you. You can put that aside.

The last exhibit I've handed up to you is Government Exhibit 302, which is for identification at this point.

Do you recognize that?

A. Yes, I do.

Q. How do you recognize it?

A. These are a set of Toyota car keys that were recovered from the Home Depot truck.

Q. Can you tell by looking at it what type of automobile those car keys are for?

A. Yes. It belongs to a Toyota, based on the Toyota emblem on

the key fob.
Q. Where did you find that set of keys?
A. The floor of the Toyota truck.

MR. DEMBER: Your Honor, the government offers into evidence Government Exhibit 302.

MS. LEVINE: No objection.

THE COURT: Government Exhibit 302 is admitted in evidence.

(Government Exhibit 302 received in evidence)

MR. DEMBER: May I have a moment, your Honor?

THE COURT: You may.

MR. DEMBER: Your Honor, I believe I read from but failed to offer Government Exhibit 2016, which is a stipulation for the translation of 308. I'm offering Government Exhibit 308-T into evidence at this point.

THE COURT: But first 2016. Government Exhibit 2016 will be admitted in evidence and Government Exhibit 308-T, Mr. Dember?

MR. DEMBER: The stipulation, your Honor?

THE COURT: No. The document that you mentioned.

MR. DEMBER: The translation is 308-T.

THE COURT: 308-T is also admitted in evidence.

(Government Exhibits 308-T and 2016 received in evidence)

MR. DEMBER: Thank you, your Honor.

THE COURT: Thank you.

Cross-examination.

CROSS-EXAMINATION

BY MS. LEVINE:

Q. Good afternoon.

A. Good afternoon.

THE COURT: Ms. Levine, you can remove your mask.

MS. LEVINE: Thank you.

THE COURT: Thank you.

Q. Agent Girard, I just want to put up what's already in evidence as 310-A, please.

MS. LEVINE: I am going to ask if the government can display it for me.

THE COURT: Mr. Sitko, would you be able to display Government Exhibit 310-A, please. Thank you.

MS. LEVINE: Thank you.

Q. Agent Girard, I just wanted to clarify. The image in 310-A is one of the pellet guns that you talked about on direct examination?

A. Yes.

Q. I just want to clarify, did you come to learn what kind of pellets can be used in the item in 310-A?

A. No, I did not.

Q. Did you come to learn that the pellets that go into this gun are paint balls?

A. No, I did not.

MS. LEVINE: Thank you.

THE COURT: Any redirect?

MR. DEMBER: No, your Honor.

THE COURT: Thank you, Agent Girard.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: The government's next witness.

MR. DEMBER: Your Honor, may I retrieve --

THE COURT: Yes. Why don't you take your time and get all your evidence before we call the next witness.

The government's next witness.

MS. HOULE: Thank you, your Honor. Before the government calls its next witness, if I may read two stipulations by the parties regarding certain telephone records and video surveillance.

THE COURT: You may.

MS. HOULE: May I publish them as I read them, your Honor?

THE COURT: Yes.

MS. HOULE: Mr. Sitko, could you please --

THE COURT: Any objection?

MS. LEVINE: No, your Honor.

THE COURT: Go ahead.

MS. HOULE: Mr. Sitko, could you please first pull up

Government Exhibit 2004.

Your Honor, may I summarize the introductory paragraph?

THE COURT: You may.

MS. HOULE: The parties hereby agree that:

First, Government Exhibit 107 is a true and accurate copy of cellular subscriber records maintained by T-Mobile US, Inc. for the telephone number 513-828-7007.

And, two, Government Exhibit is a true and accurate copy of cellular subscriber records maintained by T-Mobile for the telephone number 862-285-7642.

Government Exhibits 107 and 108 were made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by, a person with knowledge of the matters, were made in the regular course of the business, and were kept in the regular course of business.

This stipulation and Government Exhibits 107 and 108 referenced herein may be received into evidence as government exhibits at trial.

The government offers the stipulation, which is 2004, as well as Exhibits 107 and 108.

THE COURT: Any objection?

MS. LEVINE: No, your Honor.

THE COURT: Government Exhibit 2004 and Government Exhibits 107 and 108 are admitted in evidence.

(Government Exhibits 107, 108, and 2004 received in evidence)

MS. HOULE: Your Honor, if I may read from Government Exhibit 2012, which is another stipulation by the parties. If I may publish as I read?

THE COURT: You may.

MS. HOULE: This stipulation reads that the parties agree that: Government Exhibit 505 is a segment of a lawfully obtained video depicting the vicinity of 168 Genessee Avenue in Paterson, New Jersey. The date stamp on GX-505 is one day ahead. The time stamp on GX-505 is approximately 12 hours and seven minutes slow. GX-505 depicts October 31, 2017, between approximately 1:57 p.m. and approximately 1:59 p.m.

This stipulation, as well as Government Exhibit 505, may be received into evidence as government exhibits at trial, subject to objections by the defendant.

Your Honor, the government offers 2012, which is the stipulation, and the underlying exhibit, which is 505.

MS. LEVINE: No objection.

THE COURT: Government Exhibits 2012 and 505 are admitted in evidence.

(Government Exhibits 505 and 2012 received in evidence)

MS. HOULE: Mr. Sitko, could you put up 2012 again, the first page. If you could focus in on the first paragraph.

If you could highlight the last line of that paragraph. Thank you, Mr. Sitko. You can take that down.

Your Honor, if I may publish 505.

THE COURT: You may.

MS. HOULE: Mr. Sitko, if you could please pull up 505 and advance it to 11 seconds.

Mr. Sitko, if you could circle the doorway area in the top right corner of the screen.

You can remove that circle, Mr. Sitko.

If you could please pay the exhibit from 11 seconds through one minute and ten seconds.

(Video played)

MS. HOULE: Thank you, Mr. Sitko. You can take that down.

Your Honor, may I ask for a brief sidebar?

THE COURT: You may.

(Continued on next page)

(At sidebar)

MS. HOULE: Thank you, your Honor.

We are at 4:46. This witness I expect to take approximately 15 minutes. I understand from the defense that in fact we don't need to stop exactly at 5 today. So I know that your Honor was planning to stop at 5., but I wanted to let the Court know that it sounds like if we went a few minutes past 5 it would be fine with the defendant.

THE COURT: I am not sure how it will be for the jury, but that's fine.

MR. DALACK: Your Honor, to piggyback on this, I just sent an email to your deputy and to chambers. The so-ordered subpoena regarding disciplinary infraction records from ADX was intended to be kept under seal because it contains disciplinary records against other people, but it's on the public docket. We ask for it to be taken down as soon as possible.

THE COURT: OK.

MR. DALACK: Thanks, Judge.

(Continued on next page)

(In open court)

THE COURT: The government's next witness.

MR. MALBIN: Thank you, your Honor. The government calls Special Agent Stephen Fullington.

THE COURT: Agent, if you could step up. If I could ask you to remain standing in the witness box, my deputy clerk will administer the oath.

STEPHEN FULLINGTON,

called as a witness by the government,

having been duly sworn, testified as follows:

MS. HOULE: May I proceed, your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. HOULE:

Q. Good afternoon.

A. Good afternoon.

Q. Where do you work?

A. The FBI.

Q. How long have you worked for the FBI?

A. Coming up on 21 years.

Q. What is your title at the FBI?

A. I'm acting special agent in charge.

Q. How long have you had that title?

A. About six months.

Q. Before that, what was your title?

A. I was assistant special agent in charge.
Q. What other roles have you had at the FBI?
A. Prior to being an assistant special agent in charge, I was a supervisory special agent and then, prior to that, a special agent.
Q. Have your responsibilities at the FBI also included work on the FBI's evidence response team?
A. Yes.
Q. Can you briefly describe what that is for the jury.
A. Sure. The evidence response team is a team of specialized agents trained to respond to execute search warrants or to process crime scenes forensically or otherwise.
Q. For how long were you involved in the evidence response team at the FBI?
A. For about ten years.
Q. As a member of the evidence response team and also as part of your duties as a special agent, did you participate in searching physical locations pursuant to search warrants?
A. Yes.
Q. During your time with the FBI, approximately how many searches of physical locations have you participated in?
A. I'd say about a hundred.
Q. Directing your attention to October 31, 2017, did there come a time when you responded to the area of the West Side Highway and Chambers Street in Manhattan?

A. Yes.
Q. What did you observe upon reaching that location?
A. When I arrived at that location, I observed an FBI evidence response team, ERT, command post, and I could see a Home Depot truck that was crashed in the middle of the intersection.
Q. Did you search that crime scene at that location?
A. No, I did not.
Q. What did you do instead?
A. So I was assigned with a group of three other ERT members from New York to respond to a residential location in New Jersey to search a residence.
MS. HOULE: Mr. Sitko, could you please publish Government Exhibit 108, which is in evidence.
If you could please zoom in, Mr. Sitko, on the top box. If you could highlight the subscriber name and the subscriber address.
Q. Special Agent, did there come a time on the evening of October 31, 2017 that you traveled to 168 Genessee Avenue, Paterson, New Jersey, apartment 9?
A. Yes.
MS. HOULE: Thank you, Mr. Sitko. You can take that down.
Q. Why did you go to that address?
A. To execute a federal search warrant.
Q. What was your role in that search?

A. So I was designated to lead the New York team to that location. Because it was in New Jersey, the execution of the search warrant was led by the evidence response team from our Newark, New Jersey office, so I participated primarily as a searcher at that location. I also was responsible as the seasoned agent who for custody purposes took custody of the evidence for a period of time that was collected at that location.

Q. What does it mean to be a searcher during the course of executing a search warrant?

A. It means that I was designated to search locations within the residence looking for evidence that was responsive to the search warrant and the items detailed in there.

MS. HOULE: Mr. Sitko, could you now please pull up Government Exhibit 505-A, which is a screenshot from Government Exhibit 505. If you could zoom in on the photo, please.

Q. Special Agent, do you recognize the location shown in this photograph?

A. Yes.

Q. Where is that?

A. That is Genessee Avenue in Paterson, New Jersey.

Q. Is that the location that you searched on or about October 31, 2017?

A. Yes. The apartment complex that's in the top right section of the picture is the complex. And it's a little difficult to

see, but the top right portion of the screen is apartment 9.

MS. HOULE: Your Honor, if the record could reflect that the witness just drew a red circle on a doorway that is in the top right corner of this photo.

THE COURT: The record will so reflect.

MS. HOULE: Thank you, Mr. Sitko. You can take that down.

Q. Special Agent, once you entered apartment 9, can you describe generally for the jury what the layout of that apartment was.

A. Sure. When you walk in the front door, there is immediately a staircase that you walk up. When you get to the top of the staircase, you enter into what would best be described as a living room with a couple of couches, desk. To the left there is a kitchen. Then if you proceed through the living room there was a little foyer area with two bedrooms and a bathroom.

Q. Did you search any particular room in that location?

A. Yes.

Q. What room was that?

A. I searched the living room and helped in the kitchen.

Q. What types of furniture were in the living room?

A. I recall there being two couches, a desk.

MS. HOULE: May I approach, your Honor?

THE COURT: You may.

MS. HOULE: Mr. Sitko, could you please pull up on the screen for the witness and the parties what's been marked for identification as 506-P.

Q. Special Agent, I handed you an envelope. Can you first take a look at that envelope.

A. Yup.

Q. Are there any markings on the envelope that you made at the time of the search?

A. Yes.

Q. What is that?

A. My initials are next to my name.

Q. In advance of your testimony today, did you review the contents of that envelope?

A. Yes, I did.

Q. And following your review did you seal it?

A. Yes, I did.

Q. Could you please open that seal and take out the contents.

A. OK.

Q. What's inside that envelope?

A. There is two Home Depot receipts and a Home Depot contract.

Q. Did you seize that item in connection with your search of apartment 9 at 168 Genessee Avenue?

A. Yes, I did.

Q. Is that item in substantially the same condition as when you seized it?

A. Yes, it is.
Q. If you could now look at the screen, there is a photograph shown which is marked as 506-P. What is that?
A. It is a picture of the documents that I'm holding.
MS. HOULE: Your Honor, the government offers 506 and 506-P.
MS. LEVINE: No objection.
THE COURT: Government Exhibits 506 and 506-P are admitted in evidence.
(Government Exhibits 506 and 506-P received in evidence)
Q. Special Agent, could you hold up the contract. Thank you.
MS. HOULE: Mr. Sitko, could you please zoom in on the contract here.
If you can publish it please, Mr. Sitko, and zoom in on the contract.
Q. Special Agent, now that the jury can see this item, can you please describe what it is.
A. Sure. It is a rental agreement for -- bill to Saipov Sayfullo for the rental of a flatbed truck. The rental date is October 22, 2017. And the truck was rented at 2:17 p.m. and then returned at 3:32 p.m. that same day, October 22, 2017.
Q. Did you participate in seizing this Home Depot agreement from apartment 9 at 168 Genessee Avenue?
A. Yes, I did.

Q. From where in the apartment did you seize this agreement?
A. It was found in the desk in the living room.
MS. HOULE: May I approach again, your Honor?
THE COURT: You may.
Just to be clear, Agent, when you reviewed 506 earlier today, the envelope was sealed and you unsealed it and then resealed it afterwards?
THE WITNESS: Correct.
THE COURT: Go ahead, Ms. Houle.
MS. HOULE: Mr. Sitko, could you please bring up on the screen for the witness and the parties what's marked for identification as 501-P.
Q. Special Agent, I handed you an envelope.
First, are there any markings on the envelope that you made at the time of your search?
A. Yes, there are.
Q. What markings?
A. My initials next to my name.
Q. In advance of your testimony today, did you review the contents of that envelope?
A. Yes, I did.
Q. Was it sealed at that time?
A. Yes, it was.
Q. Did you reseal it following your review?
A. Yes, I did.

Q. Could you please open that seal and take out the contents.
What is inside that envelope?
A. Can you repeat the question.
Q. What is inside that envelope?
A. There is a piece of paper with writing on it and two index cards with writing on them.
Q. Did you seize those items during your search of apartment 9 at 168 Genessee Avenue?
A. Yes, I did.
Q. Are those items in substantially the same condition as when you seized them?
A. Yes, they are.
Q. If you could look at the screen, what's been marked for identification as 501-P. What do you see on the screen?
A. I see a picture of the items that I'm holding that we seized that day at the residence.
MS. HOULE: The government offers 501 and 501-P.
MS. LEVINE: No objection.
THE COURT: Government Exhibits 501 and 501-P are received in evidence.
(Government Exhibits 501 and 501-P received in evidence)
MS. HOULE: May I publish 501-P?
THE COURT: You may.
Q. Now that the jury can see what's on their screens, can you

please explain what these documents are.
A. So there is a piece of paper with unknown writing on it, at least that was what we knew when we collected it, and the two index cards also with unknown writing.
Q. Could you hold up the documents, please.
Thank you.
Did you participate in the seizure of these documents?
A. Yes, I did.
Q. From where did you seize them?
A. They were found in the desk in the living room.
Q. Once you seized them, what did you do with them?
A. We collected them. We put them in the packaging that you saw before. We sealed that packaging, put notations on the outside of the packaging indicating where they were collected from, what they were, completed a chain-of-custody form, and then insured that the evidence was checked into the FBI's evidence control system.
MS. HOULE: Your Honor, if I may now read a stipulation by the parties and publish it as I do so.
THE COURT: You may.
MS. HOULE: Mr. Sitko, could you please pull up Government Exhibit 2015, which reads that: The parties agree that Government Exhibit 501-T is a true and accurate translation of 501.
This stipulation, as well as Government Exhibit 501-T,

may be received into evidence as government exhibits at trial, subject to objections by the defendant.

The government offers the stipulation, 2015, as well as 501-T.

MS. LEVINE: No objection.

THE COURT: Government Exhibits 2015 and 501-T are admitted in evidence.

(Government Exhibits 501-T and 2015 received in evidence)

MS. HOULE: Mr. Sitko, on the left side of the screen could you please publish 501-P. On the right side of the screen could you please publish 501-T.

Q. Special Agent, you indicated that you didn't know how to read the writing that was on the index cards and the papers, is that correct?

A. That is correct.

Q. Looking at the translation to your right, could you please read the first two lines at the top of the page.

A. Sure. Drawing of ISIS flag. There is no God but Allah.

Q. Thank you.

MS. HOULE: Now, Mr. Sitko, if you could zoom in on the bottom right where it lists signature.

Q. Special Agent, if you could please read that.

A. Signature: Sayfullo, Sayfullo.

MS. HOULE: Thank you, Mr. Sitko. You can take that

down.

One moment, your Honor.

THE COURT: Yes.

MS. HOULE: Nothing further.

THE COURT: Cross-examination.

MS. LEVINE: No, your Honor.

THE COURT: Thank you, Agent. You may step down.

(Witness excused)

THE COURT: Ladies and gentlemen, we have reached the time. I know we went a little bit over, but we were able to get through the agent's testimony.

Remember, you are not to talk about the case, no Googling, no doing any research. Go home, relax, and come back, and we will start with some witnesses tomorrow. Thank you very much. Have a good evening.

Remember, if any curious family members ask, the judge told you not to talk about the case.

Thank you very much. Take care.

(Jury not present)

(Continued on next page)

THE COURT: Okay. The issue raised at sidebar has been resolved.

Do the parties have any views, we do have some folks here who are sketch artists and they are drawing various folks, but any objection if they do draw any jurors?

It will be without facial features.

Is that okay with the parties?

MS. HOULE: Yes, your Honor.

MR. PATTON: Yes, your Honor.

THE COURT: Okay.

I guess the question is because today -- we would be able to proceed with the following schedule: That we don't end up taking a morning break. We break for lunch from 12 to 1. We will take an afternoon break around 2:30, and then end around 5 o'clock. In light of the current schedule that we discussed, we will end around 5 o'clock. Because my understanding is that -- well, does that schedule work for the government?

MS. HOULE: Yes, your Honor.

THE COURT: For the defense?

MR. PATTON: Yes, your Honor.

THE COURT: Okay. Obviously as time progresses, we may need to adjust that a little bit to extend our time into the after 5 o'clock time. The only thing I would like to remind the parties is that when you do go into the podium, just

like everywhere else in the courtroom, just adjust the microphone so that you can make sure that you are talking into it. Because not only is it a problem with the acoustics in here, but unless you are speaking into the microphone, since you are in that box, it is very difficult for the jury to hear at times.

Okay. All right.

Let me ask -- yes, Ms. Houle.

MS. HOULE: On the point of hearing, your Honor, I just wanted to note, so the record is complete, that Juror 37 appeared to be assisted by a hearing device throughout the proceedings today.

THE COURT: That's correct. We were able to obtain something from our audiovisual folks, and the juror has indicated that that is working very well and that he will continue to use that rather than the alternative that we had discussed earlier today.

Okay.

Anything that we need to take up right now?

Yes?

MR. DALACK: Yes, your Honor. We wanted to take up with you the discussions that we were having about lunch accommodations.

THE COURT: Sure.

MR. DALACK: So we have had an opportunity to confer

further with the U.S. marshals, including the folks --

THE COURT: Is there a microphone near there?

MR. DALACK: Sorry about that.

We have had an opportunity to confer further with the marshals who are responsible for transporting Mr. Saipov to and from MDC Brooklyn, and we have reached sort of a tentative kind of an agreement with the marshals that would just need to be signed off on by the Court that would permit us to bring Mr. Saipov a meal at lunchtime that could be easily searched by marshals.

THE COURT: Okay.

MR. DALACK: The details of that are still being sort of worked out, but if we were to get you an order with those details ironed out by this evening, we would ask the Court to endorse it.

THE COURT: That makes sense. I think probably indicating what places, and maybe you don't have to literally indicate that, but certainly disclose the places that you might get the food to the marshals in advance so they have an idea of where it is.

MR. DALACK: Absolutely.

THE COURT: And the only thing I ask, Mr. Dalack, is that you take the order for the rest of us so that we can all partake in that -- no. That is fine. Just get me the order. I will look over it. I will confirm it with the marshals

service, and then we can proceed from there.

MR. DALACK: Thank you.

THE COURT: All right.

Anything else that we need to take up?

Yes, Mr. Richman?

MR. RICHMAN: Thank you, Judge.

One what we think is a relatively brief issue. As the Court is aware there was some litigation about the Rule 12.2 notice provided by the defense. There are firewalled AUSAs in our office who are handling that litigation and whatever is going on. They have determined that they think it would be prudent to consult with an attorney from the capital case section.

THE COURT: Okay.

MR. RICHMAN: The capital case section has set it up such that its consulted attorney and the supervisor of the consulted attorney would be themselves firewalled off from our CCS attorney and from us.

We have consulted with defense counsel, and we understand they don't object to this process. We were asked by the capital case section to just get the Court's blessing on that.

THE COURT: Sure. I think what makes the most sense -- and obviously however internally you want to set it up -- that it is clear who is where and which side of the wall

with regard in Washington, and that if the folks who are going to be now on one side of the wall had participation historically that they are no longer, even for consultation, they should no longer participate in that.

MR. RICHMAN: I can confirm that that's the case.

THE COURT: All right.

Yes, Mr. Dalack?

MR. DALACK: This is one corollary to the 12.2 issue, but may I have a moment to speak with Mr. Richman?

THE COURT: Go right ahead.

MR. RICHMAN: Thank you.

THE COURT: While they are consulting, I would ask -- obviously, I know that certain things may come up as the evening progresses as people are prepping witnesses and getting ready for cross-examination.

I do ask, though, if they are issues that we need to discuss in advance of the jury coming out that you try and let us know by 8 o'clock or as soon as you can so that we know we have to be here a little bit earlier so we can try and deal with the evidentiary issues before the jury is brought out.

THE COURT: Yes?

MR. RICHMAN: We discussed, your Honor, there is one ongoing issue that the parties are continuing to work to resolve, and we will continue to do that.

THE COURT: Anything else?

MS. HOULE: Not from the government.

THE COURT: Okay.

From the defense?

MR. PATTON: No, your Honor.

THE COURT: All right.

Well, we've got one day down.

Thank you, counsel.

We'll stand adjourned.

(Adjourned to January 10, 2023, at 10:00 a.m.)

INDEX OF EXAMINATION


Examination of: Page

WILLIAM HARRIS

Direct By Mr. Richman . . . . . . . . . . . . . . 108

RYAN NASH

Direct By Mr. Li . . . . . . . . . . . . . . . . . 119
Cross By Mr. Stern . . . . . . . . . . . . . . . 139

MARGARET GIRARD

Direct By Mr. Dember . . . . . . . . . . . . . . 146
Cross By Ms. Levine . . . . . . . . . . . . . . 194

STEPHEN FULLINGTON

Direct By Ms. Houle . . . . . . . . . . . . . . 200


GOVERNMENT EXHIBITS


Exhibit No. Received

406 and 2005 . . . . . . . . . . . . . . . . . 115
210-214 and 2017 . . . . . . . . . . . . . . . 123
201, 202, 203 and 204 . . . . . . . . . . . . 127

407 . . . . . . . . . . . . . . . . . . . . . 130

409 . . . . . . . . . . . . . . . . . . . . . 132

408 . . . . . . . . . . . . . . . . . . . . . 136

2 . . . . . . . . . . . . . . . . . . . . . . 153

1 . . . . . . . . . . . . . . . . . . . . . . 155

205 through 209 and 216 through 218 . . . . . 161
311 and 311-1 . . . . . . . . . . . . . . . . 164
311-A . . . . . . . . . . . . . . . . . . . . 165

310 and 310-1 . . . . . . . . . . . . . . . . 168

310-A . . . . . . . . . . . . . . . . . . . . 168

309 and 309-3 . . . . . . . . . . . . . . . . 171

309-3B . . . . . . . . . . . . . . . . . . . 174

309-4, 309-5, 309-6, and 309-7 . . . . . . . . 175
309-7P . . . . . . . . . . . . . . . . . . 178
309-1 . . . . . . . . . . . . . . . . . . . 179
309-1A, 309-1B, and 309-1C . . . . . . . . . . 180
309-2 . . . . . . . . . . . . . . . . . . . 181
309-2B . . . . . . . . . . . . . . . . . . 182
308 . . . . . . . . . . . . . . . . . . . . 183
308-P . . . . . . . . . . . . . . . . . . . 184
308-T . . . . . . . . . . . . . . . . . . . 185
101 and 104 . . . . . . . . . . . . . . . . 187
301 . . . . . . . . . . . . . . . . . . . . 188
304 . . . . . . . . . . . . . . . . . . . . 189
306 . . . . . . . . . . . . . . . . . . . . 191
307 . . . . . . . . . . . . . . . . . . . . 192
302 . . . . . . . . . . . . . . . . . . . . 193
308-T and 2016 . . . . . . . . . . . . . . . 193
107, 108, and 2004 . . . . . . . . . . . . . 197
505 and 2012 . . . . . . . . . . . . . . . . 197
506 and 506-P . . . . . . . . . . . . . . . 206
501 and 501-P . . . . . . . . . . . . . . . 208
501-T and 2015 . . . . . . . . . . . . . . . 210